```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND
 2                     NORTHERN DIVISION

 3   UNITED STATES OF AMERICA,  :  CRIMINAL NO.:

 4            Plaintiff,        :  JFM-09-328

 5       vs.                    :

 6   HARVEY M. NUSBAUM and JACK :

 7   W. STOLLOF,                :  Baltimore, Maryland

 8            Defendants.       :  November 13th, 2009

 9       *   *   *   *   *   *   *   *   *   *   *

10       The above-entitled case came on for motions hearing

11   before the Honorable J. Frederick Motz, United States

12   District Judge.

13       *   *   *   *   *   *   *   *   *   *   *

14                   A P P E A R A N C E S

15   For the Government:

16       Nancy H. McMillen, Trial Attorney
         John F. Terzaken, Trial Attorney
17       Mark C. Grundvig, Trial Attorney
         Matthew J. Bester, Trial Attorney
18       Shane N. Cralle, Trial Attorney

19   For Defendant Harvey M. Nusbaum:

20       Paul Mark Sandler, Esquire
         Matthew Esworthy, Esquire
21
     For Defendant Jack W. Stollof:
22
         Joshua R. Treem, Esquire
23       Nicholas J. Vitek, Esquire
         Stephanie Agli Gallagher, Esquire
24

25   Christine T. Asif, RPR, CRR
     Official Court Reporter
```

1          P R O C E E D I N G S

2               THE COURT:  Good morning.

3               THE CLERK:  The matter now pending before this

4     court is criminal docket number JFM-09-0328.  United States

5     of America versus Harvey Nusbaum, et al.  Seated at counsel

6     table for the Government is Shane Cralle, Matthew Bester,

7     Mark Grundvig, John Terzaken and Nancy McMillen.  Seated at

8     counsel table for defendants are Joshua Treem, Nicholas

9     Vitek, Stephanie Gallagher, Paul Sandler and Matthew

10    Esworthy, along with their clients, this matter comes before

11    the Court for a motions hearing.

12              THE COURT:  All right.  This is all legal argument

13    Martina, so you're free to stay, you're free to go.  There

14    are all kinds of motions pending which we'll go through in

15    due course.  I mention -- it would ordinarily be my practice

16    to state at the outset some of my tentative views, but I've

17    actually done that by telephone because government counsel

18    arranged a conference call with all counsel, I think to

19    probably figure out what to work on.  And I think on

20    Wednesday I spoke to people and I stated my tentative view.

21              Like I said, everybody would have to be prepared

22    to argue everything, but one issue which seems to be a major

23    issue cutting across some of the motions is the joint

24    venture defense.  And I let you all know my tentative view

25    was I was really not impressed with the defendant's position

1     because there doesn't seem to be at this point any factual

2     basis for the joint venture defense.  I think I used the

3     adjective silly, but I think that was an overstatement.

4              But the -- but I guess I need to hear from the

5     defendant as to, you know, as of -- you know, it seems to me

6     what the defendants are -- I mean, I will put it bluntly, it

7     looks like they're accused of bid rigging, that they went

8     through the cases to find out what possible defenses, they

9     found a Supreme Court case that there was a joint venture

10    defense and then said, well, we're going to assert that

11    but -- and we're not going to tell you what the facts are

12    because it's a criminal case, and various things follow from

13    that in terms of the pretrial ruling.

14             And it seems to me the Supreme Court case, there

15    clearly was a joint venture, it was formal, it was

16    established.  I don't have anything in front of me now to

17    suggest that there was any kind of joint venture.  And I

18    think I'm entitled to know at this point, and the

19    government's entitled to know to flesh that out a little

20    bit.  So let me hear about either why I shouldn't be told

21    anything more about the joint venture, if I am told it

22    should only be ex parte or what the basis is.

23             Mr. Sandler?

24             MR. SANDLER:  Thank you.  Good morning again, Your

25    Honor.

```
 1              THE COURT:  Good morning.
 2              MR. SANDLER:  As always I appreciate the Court's
 3   candor and assistance to counsel, because during our
 4   telephone conversation, when you expressed your tentative
 5   view and pointed out that there would still be argument,
 6   although an uphill battle, I welcome the challenge because I
 7   think this is an important issue.  And a matter that
 8   hopefully when I conclude you will at least say that the
 9   matter was meritorious to present.  Even --
10              THE COURT:  I have no doubt it was meritorious to
11   present.
12              MR. SANDLER:  Even if you don't agree.  But I'll
13   set the stage this way, although I will comment when you did
14   schedule today's argument I didn't check any calendar and
15   appreciate that it was Friday the 13th.  And then I checked
16   the docket for the trial and I see that the Ides of March is
17   maybe in the middle of our trial.  And since I'm very
18   superstitious it doesn't necessarily auger well for me.
19              THE COURT:  Well, it could be against the
20   Government, I don't know.
21              MR. SANDLER:  I don't think so.  But let me
22   explain to you what I really think this is all about.  It
23   all started when we were in your chambers and you asked how
24   long the trial would take.  Government said one time period,
25   I said another.  And you said why.  And I said because we
```

1    have expert witnesses.  And you said what will they say.

2    And I said with due respect let's wait till trial.  And you

3    said, well, let's tee this up because I want to find out

4    what's going on.  And you asked me to proffer areas of the

5    expert's testimony, which I did.

6          I also took a further step in alerting the Court

7    and counsel to what I thought was a valid and appropriate,

8    which you'll see in a few minutes, defense.  And then which

9    was the single entity defense, that if we do go to trial and

10   if the government meets its burden and if we put on a

11   defense, the defense was, in truth, factually and legally,

12   that the relationship of the parties, being that of a single

13   entity, joint venture, made the defendants not susceptible

14   to antitrust bid rigging.  And then we waited and the

15   Government --

16          THE COURT:  Let's -- I understand, at least would

17   be the rule of reason and not a per se violation--

18          MR. SANDLER:  I could not hear.

19          THE COURT:  I'm sorry maybe -- it would still be

20   subjectively a rule of reason, well, actually maybe not.

21          MR. SANDLER:  Maybe not.  The analysis could go

22   either way.  Now, it's not as if, and I appreciate the

23   suggestion that maybe counsel, as a defense attorney, in the

24   many criminal cases you hear, where obviously when many

25   cases come before you some instances a lawyer might look in

1     a book and say, hey, let's try this.  But I'm going to prove

2     to you unequivocally that that didn't happen.  But I do want

3     to set the stage and talk to you with pure reason.  Pure

4     logic, deductive analysis.  I would like to present to you

5     the reason you should allow the defendants to put on

6     evidence of a joint venture is deductively analyzed and

7     conclusively valid.

8          First a major premise.  If you accept under the

9     law that a single unit entity, if valid, has a valid defense

10    to a bid rigging case under the Sherman Act, if you accept

11    that, then the minor premise in this case is whether the

12    defendants here are a valid single unit entity.  If so, the

13    inescapable conclusion is that they are not susceptible to

14    an antitrust bid rigging case under applicable law.  It's

15    more than just *Dagher*.  And of course *Dagher* can be

16    distinguished, why?  Because *Dagher* under the FTC was a

17    known indisputable joint venture.

18         But there are other cases besides *Dagher*.  First

19    *Copperweld* started the precedent.  And then as you know, the

20    *Needle* case is very much at issue in terms of not the single

21    unit entity defense, but whether the NFL can get all its

22    groups -- franchises together and say we're going to use one

23    vendor, where a jealous vendor claims, wow, this isn't

24    right, this is a violation of antitrust.  And the NFL says,

25    wait, we're a single unit entity.  Now, the government as

1    you know, from our briefing, is involved in that case.  And

2    the government in its -- never disavows the single unit

3    entity theory, not at all.

4            And the cases that I cited, you know, before you

5    in our brief all recognize that the single unit entity is

6    correct.  And even discuss how the defendant has a right to

7    present evidence.  And it's a fact specific issue.  And

8    those cases are --

9            THE COURT:  What are the facts here?  What

10   facts --

11           MR. SANDLER:  Okay.  Now, I'm --

12           THE COURT:  I don't have to -- I mean, it's like

13   entrapment, you don't -- I have an obligation not to present

14   to the jury defenses that have no factual basis.  So I need

15   to know -- I mean, I just have no idea what the --

16           MR. SANDLER:  Of course you don't, because it was

17   not my understanding that it was, A, required at that

18   juncture, before now to present facts.  Also, it's a very

19   delicate situation, because I hope you respectfully

20   appreciate -- in one way this is a case of first impression,

21   because here there are very -- other than in the civil law

22   realm, there are no criminal cases, or maybe there's the

23   *Brinkley* case and *Romer* they only touch upon it, but there's

24   really no book -- speaking of books to turn to, that you can

25   gain a way to proceed.  I can say that the trial is in

1    March.  This is a -- Mr. Nusbaum is a defendant, as is Mr.

2    Stollof.  It's very awkward to be able to convey the factual

3    defense on the merits so early in --

4             THE COURT:  It's not early.  It's not early.  The

5    criminal law is not like the civil law.  I mean, the facts

6    are the facts.  I've got to plan my trial schedule.  And as

7    I said before, the length of trial is going to be much

8    determined by whether or not expert testimony about -- and I

9    need to know.  And because I have an obligation not to

10   present to the jury --

11            MR. SANDLER:  I'm ready to present the facts.

12            THE COURT:  Okay.  Good.

13            MR. SANDLER:  And I would ask this one

14   consideration, some of the facts I might touch upon would be

15   considered privileged, confidential or grand jury

16   information and I either -- I would like the Court to

17   approve my using them at this time if I must.

18            THE COURT:  Sure.

19            MR. SANDLER:  Thank you.  And, finally, I'd like

20   to say to the Court respectfully, that I respectfully object

21   to being required to present the facts in open court without

22   -- without an ex parte opportunity, and I point out that I

23   understand your ruling, but I want to make the record,

24   because counsel have been criticized in some of the cases

25   for not seeking an ex parte opportunity.

1              THE COURT:  No, obviously you have your objection

2    to that.  And it's fine.  It's good to make the record on

3    it.  But I -- all I want is a proffer.

4              MR. SANDLER:  In sharing the facts with Your Honor

5    I would like --

6              THE COURT:  And let me just say, and I am just

7    generally uncomfortable with ex parte proceedings generally

8    because I --

9              MR. SANDLER:  I understand.

10             THE COURT:  Because I believe in the adversary

11   process.  It's not that I want you to have to divulge

12   things, but I just couldn't do my job without having the

13   government being able to respond to your proffer.  But you

14   made your record and you should.

15             MR. SANDLER:  Thank you.  Now, I will also

16   introduce at the proper time a book with probably what I

17   consider a half a pound of facts.  Maybe I need a pound to

18   persuade you, but I ask you to consider the threshold burden

19   that I have in making this proffer.  For example, I do not

20   believe under the case law I need show more than a very

21   minimal predicate to go forward with the defense.  And I ask

22   you also respectfully, very respectfully, to consider

23   viewing the facts I give you in the best light of the

24   defendant.  And not interpret it as a ground of

25   cross-examination or counter argument to show why those

1    facts are not valid, or that it's not credible, or that the

2    government has counter facts.  Because that would obviously

3    result in any case where a defendant presents facts in this

4    controversial case that brings so many good, talented

5    lawyers from the government here, it's naturally going to be

6    controversial.  So let me start with the facts.

7              THE COURT:  It looks pretty equal on both sides.

8              MR. SANDLER:  Let me start with the facts.  I

9    first would like to acquaint Your Honor in a minute with

10   what we're talking about in terms of the bid rigging

11   allegations.  The bid rigging allegations come under the

12   context of tax lien auctions, which you may be familiar with

13   in municipalities in Maryland and even elsewhere in the

14   country.  When a municipality does not receive taxes or

15   payments of water bills, which facts undisputedly reflect

16   are legion in terms of circumstances.  An account receivable

17   is accrued.  And annually an auction is conducted to auction

18   off the liens -- it's not actually a lien, but auction off

19   the accounts receivable which in effect becomes a lien, a

20   tax lien.

21             The auctions are variable, so you can't generalize

22   in terms of the nature of these auctions.  Some auctions are

23   live where you would raise your hand.  The typical auction

24   you would see, you know, in the movies or going to an art

25   auction, that type of thing.  Other types of auctions

1    involve sealed bids.  Still another version of the auction

2    would involve a computer, electronic.  The auction, which is

3    important to appreciate, is for the highest bidder.  Not the

4    lowest bidder, it's the highest bidder.

5           And in addition, what's interesting about this

6    type of auction is you may bid -- you do not pay for your

7    negotiable instrument lien, tax lien, you do not pay the

8    amount you bid.  You could bid -- the tax lien could be

9    $1000, you could bid $15,000.  You don't pay $15,000, you

10   pay the amount of the lien.  And you also pay a deposit,

11   which the term of art is called a high bid premium.  The

12   high bid premium was instituted around 2000, the year 2000,

13   because some auctions got out of hand where somebody would

14   be bidding $2 million and they'd pay $6,000 for a lien.

15          So to curb this runaway situation, legislature has

16   enacted this high bid premium.  So that if you bid a certain

17   amount over the assessed value a formula kicks in.  And you

18   give a deposit called the high bid premium at the time you

19   pay for your liens.  High bid premium is returned.  That

20   just generally gives you the idea of the milieu of this

21   auction.

22          So proffer, Mr. Nusbaum and Mr. Stollof were

23   friends and business partners for years, and they were

24   involved together in tax lien auctions.  They joined

25   together with what I'll call the Berman group, because of

1    their business relationships.  And the way that the

2    relationship developed over the years was that they formed,

3    and Mr. Nusbaum in particular thought, understood, and

4    declared publicly, that he was in partners with Mr. Berman.

5    And he understood this to be a partnership similar to the

6    way he had his relationship with Mr. Stollof, but they

7    formed this larger group.

8            Now, to point out, the first proffer that I wanted

9    to suggest to you, is that the -- when the loans were made

10   to Mr. Nusbaum and Mr. Stollof by the bank, it was Provident

11   Bank, because when they would bid on auctions they would

12   borrow the funds, Provident Bank then was the lender.  And

13   Provident Bank would lend large sums of money, could be

14   upwards of $20 million.  And Provident Bank was fully aware

15   of the partnership relationship between the Berman group and

16   the Stollof group.  In fact, you will see that the banker,

17   Mr. Gregory John Campanaro, I predict, if I can question him

18   at trial, would corroborate that Provident Bank understood

19   that they were teaming up together, that they were partners,

20   and that they were sharing resources.  And I'll get into

21   that.  And that that would be an indicia of this joint

22   relationship.

23           THE COURT:  Or is it indicia that he's a

24   co-conspirator?

25           MR. SANDLER:  Well, you can look at a glass of

 1    water and say it's half full or half empty, it's for the

 2    jury to decide what the --

 3              THE COURT:  Maybe so, maybe not.

 4              MR. SANDLER:  Well, that's my --

 5              THE COURT:  I understand.

 6              MR. SANDLER:  Okay.  Well, here's the -- can we

 7    see this?  I'm not sure.  Can you read this, Your Honor?

 8              THE COURT:  Yes.

 9              MR. SANDLER:  You can scan through to see some of

10    the projected bases of saying that Mr. Nusbaum formed a

11    partnership.

12              THE COURT:  Is this from the grand jury?

13              MR. SANDLER:  This is a 302.

14              THE COURT:  A 302, okay.

15              MR. SANDLER:  I can't speak --

16              THE COURT:  Okay.  That's fine.  I assume he's a

17    government witness?

18              MR. SANDLER:  I beg your pardon?

19              THE COURT:  I assume he's a government witness, is

20    that --

21              MR. SANDLER:  I assume.  Yes.  But that doesn't

22    mean when I cross-examine --

23              THE COURT:  No, no, no, I just want to understand

24    the context.

25              MR. SANDLER:  What I showed you was a sample.  I

1    don't think I need to take you through every document

2    because I'm summarizing.  It's more of the same.  In

3    essence, this particular witness would testify that he

4    understood, was told that there was a partnership, that they

5    were teaming together, they were sharing liens, that they

6    were sharing information.  And of course, the definition of

7    a joint venture, pretty standard in Maryland, and I proffer

8    and have in here excerpts of an expert witness who I would

9    present to the jury to explain what the joint venture is, to

10   explain what the elements of the joint venture, to testify

11   that the observation of the conduct of the parties was

12   consistent with the joint venture, was -- the perfect type

13   of example of a joint venture.  He would also point out that

14   parties can be in a joint venture, teaming arrangement if

15   they don't know it.

16          THE COURT:  Let me ask on the most fundamental

17   level, what is the difference between joint venture, in your

18   view, and bid rigging?

19          MR. SANDLER:  That's a very good question and the

20   answer is supplied by the case law.  If the parties get

21   together with the intention to share their profits, to

22   demonstrate by pooling resources together, they can produce

23   economic efficiencies with a procompetitive impact on the

24   market, it is a valid joint venture and is not bid rigging.

25   And I will produce a witness to demonstrate that by

```
 1    virtue -- as I walk through the elements of this joint

 2    venture, by virtue of these people working together there

 3    was more competition in the market.  And I will be able to

 4    demonstrate that the economic efficiencies identified by

 5    Professor Priest, who's an economist and a professor at

 6    Yale, who will testify, and I have excerpts of his report.

 7    So you can see this is not just someone who pulled a book

 8    out and said, gee, let's do this.

 9            And the point that I'm going to make further, with

10    all due respect, is if this were what you -- and I don't

11    blame the Court -- I shouldn't say that, I do not find

12    argument with the Court to for its early assessment that

13    this seems to be something --

14            THE COURT:  Well, it does, because it seems to be

15    -- and I don't understand why that doesn't turn antitrust

16    law on its head.  There are per se violations.  And even --

17    and the whole purpose of the per se rule is, among other

18    things, to prevent evidence about whether -- the defendant

19    thought something was procompetitive.  So that -- it seems

20    to me that what you've just proffered is it may be true, but

21    this turns the law on its head.  Because the whole idea of a

22    per se violation is you can't do it even if the defendants

23    believe that it's procompetitive to do it.

24            MR. SANDLER:  No, I don't think it does at all.  I

25    don't think the antitrust law is turned on its head.
```

1    Although, I have to suggest to the Court that if one reads

2    the commentary and watches this law over the years, there

3    are some individuals who claim that the single entity

4    defense does just that.  And some predict a total

5    evisceration of the Sherman Act.  But that's not this case,

6    because it's clear if this did not have a procompetitive

7    impact, and if this were not a legitimate teaming agreement,

8    with the economic efficiencies that have to exist, then it

9    doesn't qualify.

10            It's a two-prong test.  That's where my confusion

11   came in.  I started with the law, the major premise.  The

12   minor premise are the facts and the economic efficiencies.

13   I could not, in my view, convince the jury, if I just

14   brought in Professor Booth, my expert on corporate law, who

15   used to teacher here at University of Maryland law school

16   now is at Villanova.  He would opine as to the elements of a

17   joint venture and talk about those elements in pure

18   corporate law.  But that's not enough.  I would have to

19   satisfy antitrust requirements.  I would have to satisfy,

20   for example, the government's own statement in their policy,

21   which as you saw was very important to this.  The government

22   recognizes that there's a single unit entity.

23            Is that -- do I have it right side up, Your Honor?

24            THE COURT:  Yeah, I see the headline, is that what

25   I'm supposed --

```
 1              MR. SANDLER:  Okay.  And then you can see the --
 2    this is from the government's own manual.  In addition to
 3    that, if the Court please, in their own briefing the
 4    government acknowledges the single unit entity defense very
 5    clearly, which I point out -- which I pointed out to you in
 6    my briefing.  If you examine the Supreme Court case, the
 7    Needle case.  Which incidentally is going to be argued in
 8    mid-January.  But it doesn't relate to this case because
 9    it's one of those factual cases.  Can all the franchisees of
10    the NFL and the NFL be one entity?  You know, that's the
11    issue.  And that really springs from Copperweld which
12    predated Dagher.
13              Just look, respectfully, at the quote that I
14    highlight for you from the government about the application
15    of Dagher and the single entity concept.  So it's a factual
16    issue is what I suggest.  And I have case law that says just
17    that, that it would be premature for the Court to say,
18    Counsel, I reject this, you may not defend on this case, you
19    may not try to persuade the fact finder.  Could be you, if
20    we waive a jury trial.
21              THE COURT:  No, no, it's got to be a two-way
22    street.
23              MR. SANDLER:  I'm not -- I am not going to allow
24    you to do this.  But look at the decision in the Gazette
25    case, which I show you.  The proper characterization of a
```

1    joint venture here would appear to require a fact specific

2    undertaking.  The legality of a joint venture will depend on

3    the purpose and nature of the enterprise, the situation of

4    the partners and their place in the market.  So we switch,

5    in answering your question about how this differs from any

6    bid rigging case, we move from the facts to the law.  And

7    I'll return to the facts.

8              But I want to make sure I'm clear in my answer to

9    the question.  That in taking these facts most favorably to

10   the defendant, in the *Ricks* case, our own 4th Circuit

11   clearly says, United States against Ricks, in determining

12   this efficiency of the evidence to support a criminal

13   defendant's request for a jury instruction -- I'm not even

14   asking for the instruction at this point, I'm backing away

15   from that rather optimistic approach, retreating to the bare

16   necessity of letting -- asking you to allow me to adduce

17   evidence to show the trier of fact -- but must be taken most

18   favorable to the defendant."

19             Now, if -- to make it very clear, I respectfully

20   suggest, that the answer to your question lies in the proof

21   of the facts, it must be I cannot survive by simply saying,

22   a-ha this is a joint venture, because the joint venture has

23   to have a profile that satisfy the antitrust requirements.

24   It has to have an integrated core purpose whereby joining

25   together there are efficiencies of economy, and those

1    efficiencies of economy must result in a procompetitive

2    impact on the market.

3           And I point out to Your Honor, it is inherently

4    inevitable to our society that a per se criminal case like

5    this would exist any way.  That's been litigated before.

6    It's been very troublesome to jurists and lawyers throughout

7    the country.  Because here these individuals are being

8    charged allegedly with agreeing to do something in the

9    market and they're not able to show that whatever they did

10   had no harm.  They're just, boom, here it is, there they go.

11   And that is an important principle that we must respect,

12   because that's the law.

13          But just as we respect that law, and the Justice

14   Department respects it and urges that it is applicable, we

15   also should respect the Supreme Court's ruling, and the

16   other jurisdictions that have followed it, to allow a fact

17   specific undertaking if I can show sufficient facts.  I've

18   only given a little bit of the facts.  So I'd like to return

19   to the facts, because they're overwhelming in terms of what

20   I can show.  I regret, and once again, I object to my having

21   to go this route, but I have no choice, none whatsoever.

22          THE COURT:  You're right.

23          MR. SANDLER:  But thank you, Your Honor.  Now, I

24   also would point out to you that in the testimony of Mr.

25   Campanaro, the banker that I've just mentioned to you, that

1   I predict what he said, he would also point out that when

2   the monies were loaned to the Nusbaum Stollof group, because

3   each group had its separate financing, which I'll explain,

4   there were reams of paper that constituted loan documents.

5   And in these loan documents there was statements of what the

6   procedure was between the group.

7       And it would say, for example, "Mr. Stollof,

8   Nusbaum here -- I'm not going to mention another name --

9   will join forces this year, as they have done in the past,

10  for the purchase of liens in Baltimore City.  After the

11  sale, the purchased liens will be divided between the four

12  individuals with bank financing provided."  So the bank loan

13  documents even reflect that Mr. Nusbaum, which the banker

14  said told them that he was a partnering.

15      Another document, which I'm going to submit in

16  this proffer book, "They joined forces this year, as they've

17  done in the past, for purposes of purchasing liens.  The

18  borrowing team with Steve Berman," this is Mr. Nusbaum and

19  Stollof, this is the bank document.  Dozens of people would

20  have studied and reviewed these documents, because a bank

21  doesn't lend $20 million on a hand shake.  Maybe they did in

22  the 1800s, but they don't today.  So bankers and presidents

23  and vice presidents and loan committees all read and studied

24  this.  And all understood that this was a partnership, just

25  the way the Stollof and the Nusbaum were together, although

```
1    there was no writing, there doesn't have to be.   In the
2    Stollof and Nusbaum there were writings.   But it doesn't
3    have to be writing.   Professor Booth will explain that to
4    the jury.
5              Here, another sample:   "The borrower team with
6    Steve Berman in 2004 purchase of 807 Baltimore County tax
7    liens totaling $7 million.   The purchase included 11
8    commercial liens for the sole ownership of Mr. Berman
9    because of the time required to allocate the liens between
10   the parties after purchase Provident funded -- shored up the
11   funds."  Another example, as in the -- this is from the
12   Provident -- and in the proffer book I have the actual
13   documents, because I don't want the Court to just -- I would
14   like the respect of the Court to honor counsel's word, but I
15   think it's imperative that counsel supply the back up data
16   so the Court has a primary source.  But here's a summary,
17   "As in the five Maryland jurisdictions in 2005, the borrower
18   will be partnering with Steve Berman for the purchase of
19   liens."  Partnering.
20             And all this is to demonstrate that one of the
21   ingredients, although not a necessary ingredient of a
22   partner, is to intend to do it.  And I wanted to emphasize
23   this aspect of the proffer, may it please the Court, to let
24   you think more broadly about your initial reaction, which I
25   know is very difficult to change in any of us, particularly
```

1    I know that's very difficult to --

2              THE COURT:  Summon my wife.

3              MR. SANDLER:  -- alter your thinking.  But it

4    could not be if I opened a book and said, hmmm, here's an

5    interesting case, let me try to fit the facts here.  It

6    wouldn't be consistent with the fact in all these earlier

7    years they were calling themselves partners and they were

8    working together with the bank as partners.  That shows you

9    the genuineness of the defense if nothing else, because

10   there's actual data that reflects the partnership prior to

11   this indictment.  And I would also suggest to Your Honor

12   that really, in my view, this would be -- should be enough.

13   But this is only one of many factors.  And I'm go to

14   proceed.  But I want too make sure the Court understands the

15   intent of the parties.

16             Another one, another statement from the

17   Provident Bank records, "Mr.'s Stollof, Nusbaum, Berman will

18   join forces this year as they have done in the past for

19   purchase of liens in Baltimore City and will join forces in

20   Prince George's County."  Another statement.  This is from

21   another document, all the years, because they spread the

22   indictments from 2002 to 2007, each of these years the

23   Provident Bank records -- so you can see, perhaps I'm

24   getting ahead of myself, but why we wanted some subpoenas

25   from other banks to find more helpful information.  But

1     that's for a different argument.

2          As you can see here, or as I'll read to you,

3     "Mr.'s Stollof, Nusbaum, Berman will join forces this year,

4     as they've done in the past, for the purchase of liens in

5     Baltimore City."  A lawyer, who's name I will not mention,

6     but is in this document, who represented the bank from time

7     to time, he knew that Nusbaum, Stollof and Berman all shared

8     information on tax liens before the auctions.

9          As you know, the government has a number of

10    witnesses as is traditional.  One of the defendants, Mr.

11    Steve Berman, who entered a plea, I predict, and I proffer,

12    and I have back up for this, would acknowledge that -- the

13    aspects of the relationship between the parties.  He will

14    even state, I predict and I proffer, and I have back up for

15    and it's in this book, that there was a partnership between

16    the parties.  Now, I know that when you hear his testimony,

17    it's going to be very difficult for me now to bring all this

18    out, but I will.  I will if I have the opportunity.

19          Now his -- in fairness, the statement I had

20    doesn't say we were partners in every aspect of all these

21    liens, but he acknowledges that he had gone into partnership

22    with Stollof and Nusbaum and in one particular auction in

23    2005 in Baltimore City.  And it's in the -- and I've given

24    you the 302 to look at.  And after all, I mean, I'm not able

25    to meet with him, I'm having a very difficult time even

1    going this way to show facts, but I can -- I'm going to show

2    you some more.

3           But I want to make a comment which you may find

4    surprising, but nevertheless I feel that I really do want to

5    credit the integrity of the prosecutors in this case.  I do

6    not feel that I would have been able to garner all of these

7    favorable facts had they not presented me recently with some

8    information that I still, you know, I filed under my motion.

9    And I wanted to make it clear that this is a very hotly

10   contested case, but it's not a hotly contested case in terms

11   of the lawyers trying to work together, which is why we met

12   and crafted that letter for you trying to move this along.

13   But I do have that evidence.  I proffer it.  I say it on the

14   record.

15          I say that I have -- I can show intention to be a

16   partner.  I can show you that bankers and public people knew

17   that they were partners and teaming together.  And by the

18   way a teaming agreement under the law is a joint venture

19   partnership.  And under the antitrust law, I respectfully

20   request you to consider, that you do not have to have a

21   joint venture to qualify as a single unit entity.  It could

22   be collaborating.  It could be teaming, it's called a joint

23   venture.  I'm calling it a joint venture because to me

24   that's how it appears to me.

25          And I'm calling in a expert that tells me it is a

1    joint venture.  I'm going to call, if you let me, an expert

2    economist who's going to take you and the jury through this

3    to see how, no pun intended, silly the government's case is

4    against these defendants.  So I have this proffer about the

5    -- Mr. Berman who would acknowledge.  And I will -- I read

6    it to you, and I have the back up for you.

7         I also want to share with you now some of the

8    ingredients that are important to consider in terms of facts

9    that I can show to the jury.  And I ask you to give this the

10   best light of the defendant at this juncture, months before

11   trial, in an unprecedented setting where I have to give

12   almost my opening statement for the Government.  And you can

13   see they're interested because they're taking copious notes.

14        THE COURT:  I suspect they might even order the

15   transcript.

16        MR. SANDLER:  So I've covered the intentions of

17   the parties.  I've covered how I think the testimony will

18   show this.  And I want to talk about now some of the other

19   ingredients which I think will reflect on the antitrust

20   facts of this, namely the core efficiencies, economic

21   efficiencies of how it was productively wise for these

22   individuals to team up, and how it flowed to the benefit of

23   the market.

24        First, one of the crucial --

25        THE COURT:  Okay.  I just want to make sure that

1    -- and I don't ask this to be argumentative, I'm just -- the

2    facts as proffered, as I understand what they are, is the

3    intention of the parties entering into some kind of

4    agreement, joint venture or teaming.  The belief that they,

5    in their minds, that they were procompetitive.  And the fact

6    that this partnership was known to a third party, the bank.

7    That is what your proffer of the single entity is, before we

8    get into whether it's procompetitive.

9             MR. SANDLER:  No, that's part of it.  I have more.

10            THE COURT:  I'm sorry, I thought you were --

11            MR. SANDLER:  They overlap.  You left out also

12    that one of the witnesses, that's a government witness, will

13    acknowledge partnership.

14            THE COURT:  No, no, as I say, there's an intent to

15    have a partnership or joint venture or single entity.  The

16    belief among the people who are partners, that it is

17    procompetitive, and the fact that this partnership was

18    openly disclosed and known to a third party.

19            MR. SANDLER:  And the belief of the banker that it

20    was too, yes.

21            Now, the other aspects would be as follows, and I

22    have to suggest to you that the parties also -- this is a

23    little summary of what I'm going to talk about next, but

24    before I do that, I'd like to emphasize that the parties

25    also, to satisfy some of the elements of traditional

1    partnership or joint venture, shared the profits.  They

2    divided equally the liens.  And I have some examples in the

3    tab where they do that.  Where, in other words, what

4    happened is sometime -- the concept was, of this joint

5    venture, was to pull your resources together, share a lot of

6    information and due diligence, work hard to, in terms of due

7    diligence, carefully analyze and examine the various

8    properties that were available.  Had 40,000 liens, it was

9    very complicated.  And there was a very arduous task to know

10   what to bid and what not to bid on.  They would share that

11   information.  And then at the end -- and they would divide

12   up the liens, but they would always make sure, at partners

13   do, that they divided up the liens evenly.  There are

14   documents here which I can show you where, for example, Mr.

15   Berman's writing to the attorney, say, for Mr. Stollof,

16   reporting in on his share of liens.  In some instances, for

17   example, in Montgomery County where they bid, Mr. Berman got

18   nothing, and Mr. Stollof and Nusbaum would true up and give

19   him his 50 percent, and vice versa.  I have that documented

20   here.

21            THE COURT:  This is so counter-intuitive, though,

22   since the whole purpose of the bidding, whether it was an

23   auction or sealed bids or whatever, was precisely to prevent

24   this kind of sharing.  It just is absolutely

25   counter-intuitive.  I mean the whole purpose of having an

1    auction or competitive bidding, either sealed or unsealed,

2    is to prevent competitors from getting together to share

3    exactly and divide up the profits.

4                MR. SANDLER:  No, that's not accurate, Your Honor.

5    Many of the partnerships and organizations are in bid

6    rigging traditionally all over the country.  In fact, Mr.

7    Nusbaum and Stollof were partners for years just among

8    themselves doing similar --

9                THE COURT:  Were they telling the counties they

10   were doing it?

11               MR. SANDLER:  Yes.

12               THE COURT:  Of course, that's what we get to

13   later, another motion.

14               MR. SANDLER:  Yes, but that's part of all -- yes,

15   the answer is yes.

16               Now, in order to -- in order to go forward with

17   this, I would ask you to examine whether minimally

18   sufficient facts come forth where I can show that there was

19   a legitimate joint venture.  Then the next question is, can

20   I show minimally that it meets the antitrust guidelines in

21   terms of what is an economic efficiency.  And the reason

22   it's not counter-intuitive is this way, first of all, if in

23   this tab -- book, there's a tab 14, which shows the business

24   plan.  And I didn't give you the book because I'm going to

25   enter it into evidence if you let me.  But I relate as a

1    proffer five or six pages from the report of Mr. Priest,

2    that hopefully will be forthcoming.  And what he goes into

3    are all the issues of why, from an antitrust point of view,

4    this is perfectly appropriate.

5            And I would like to, because we're in open court,

6    I would like you to take a moment and read what I give you.

7    And I'd like to give it to the government so that I don't

8    have to show it on the screen.

9            THE COURT:  Okay.

10           MR. SANDLER:  Is that acceptable?

11           THE COURT:  That's fine.  But nobody in the back

12   can see the screen any way.

13           MR. SANDLER:  Well, I know reporters -- I'm just

14   trying to do what --

15           THE COURT:  No, no, I just think as a practical

16   matter there's no screen.  I mean, at some point --

17           MR. SANDLER:  Okay.  Before I put it up on the

18   screen let me say to you as follows, in the other aspect of

19   this venture is the sharing of information.  And the

20   information that's shared is very crucial.  It's in-depth

21   analysis of what properties are susceptible to these liens.

22   And the individuals would draw upon one another.  Mr. Berman

23   would testify that he needed Mr. Stollof's input.  He was an

24   expert at this.  And they would categorize the properties as

25   to desirable or not desirable, who owned, whether they were

1    owned by banks, whether they were owned by corporations,

2    whether they had a history of paying up quickly, not paying

3    up.  That type of information, the location, the locale, all

4    of that was crucial information.

5           They also shared expenses of corporate -- of

6    software programs, which is resources they pulled together

7    because the software programs with a -- contained the

8    strategy and the way that they could prepare their bid books

9    and how they would analyze the properties.  And I'm going to

10   move on quickly because I don't want to overstay my welcome,

11   but that's another important point.  In addition to sharing

12   the due diligence and sharing computer equipment, they also

13   shared messengers, they shared the profits, as I told you.

14          And they have also the crucial point which going

15   to your counter-intuitive issue, they had the advantage --

16   and here's where part of the procompetitive impact comes --

17   they had the advantage of what I call cross financing.  In

18   these tax liens, auctions, if a bidder overbid and didn't

19   have the funds on the spot, he or she, particularly with a

20   high bid premium, he or she would lose everything.  And when

21   they had the cross financing opportunity they each could bid

22   more.  They each could bid more quickly without being

23   concerned, taking advantage of each other's opportunities to

24   insulate each other from the overbidding, as you will see

25   from some of the examples in the book.

```
1              So as a result of that, when they were not bidding
2     with each other, there was less competition in the market,
3     which I will demonstrate through an expert who will do a
4     market analysis and present it.  So I express to you a
5     proffer of some of the facts that I would produce before a
6     jury in terms of the defense that this is a valid joint
7     venture.  I haven't gone to the antitrust issues.
8              But I would be able to show intention.  I would be
9     able to show recognition.  I would show they acted like
10    partners.  I would show they had proprietary interest in
11    joint ownership of computer programs and hardware.  I would
12    show they had fiduciary duties to each other with regard to
13    what they were doing.  I would show also that they had
14    shared a computer consultant who was crucial.  And I would
15    also show you that they shared the profits.
16             And that they shared what I would call the
17    financing, cross financing.  They couldn't get joint
18    financing because no bank would loan to all of them for
19    reasons of bank needs of priority.  But as you can see in
20    the example I gave you, one bank would help out the other if
21    need be.  So those are the proffered facts for a joint
22    venture.
23             Now, as skeptical as you could be, I respectfully
24    request that still sufficient if you look at it in the best
25    light of the defendant to go forward.  Now, the jury may
```

1    take your approach it's ridiculous.  You may feel at the end

2    of the day I didn't produce all of the testimony and

3    therefore deny me a jury instruction.  That has to -- we

4    have to wait and see.  I would have preferred just to try my

5    case, let go -- and put in my evidence and without having

6    this, but the government properly wants to nip their -- nip

7    it in the bud, I'll put it that way, which I don't think is

8    fair, because the truth should come out.  And the jury

9    should have a chance to evaluate.  This is what they thought

10   they were doing.  This is what they did.  And it wasn't a

11   cook book defense.  You can see this through all the other

12   -- the proffer points that I mentioned.  Because this was

13   happening as it was going on.

14          Now, in terms of other characteristics, just to

15   make it clear, so I haven't missed anything, I put up here

16   the intention of the members of the joint venture as

17   corroborated by testimony of witnesses and bank documents.

18   Intense due diligence and shared personal knowledge and

19   information obtained from due diligence, and collective

20   experience relating to tax sales and real estate markets.

21   The joint venture developed proprietary computer programs

22   and software to organize and analyze publicly available --

23   publicly available tax sale auction data and other relevant

24   bidding information.

25          The joint venture shared a common computer expert.

1      The joint venture purchased equipment and services that

2      enhanced bidding efficiency.  The joint venture shared

3      messenger services when necessary for delivering sealed bids

4      and other communications to auctions.  The joint venture

5      pooled their financial resources and assets together in

6      order to bid on more liens while continuing to submit

7      competitive bids.  Remember it's the high bid that wins.

8      And there are thousands of people that can come in and bid.

9      The joint venture did not submit bids under one entity

10     because of restrictive covenants places on the members of

11     the joint venture by the separate lenders.  The joint

12     venture randomly divided the liens offered that they

13     intended to bid upon and redistributed the acquired liens to

14     reflect a 50/50 ownership.

15              THE COURT:  Let me understand, let's see that --

16              MR. SANDLER:  I beg your pardon?

17              THE COURT:  The one before that, joint venture did

18     not submit bids under one entity because of the restrictive

19     covenants placed on the members of the joint --

20              MR. SANDLER:  That's a mistake, it was under one

21     financing entity.  I left the word financing out.  In other

22     words, what happened was the banks could not -- the banks

23     would not, testimony would be, lend the joint venture $40

24     million, because the banks wanted to make sure that they had

25     an opportunity to place first position on their client's

```
 1    lien, on their client's money.  That is -- so what they did
 2    is they just pool -- they pooled together.
 3           Now, that's the facts the way they are in terms of
 4    how it emerged.  They -- because of the cross financing it
 5    was one of their ways that they could bid more because they
 6    didn't have to be worried, no one would want to go to an
 7    auction and risk overbidding.  Now, you say, why would
 8    someone overbid and the answer is because if you bid --
 9    let's say you bid on a hundred liens, you wouldn't have a
10    hundred liens because many of them are paid up on the spot
11    and many of them are quickly eliminated.  So you don't have
12    enough liens for your day.  So you would calculate bidding
13    maybe up to your limit of financing or a little more.  And
14    sometimes you would miss -- you could miscalculate.  But
15    when you have the other opportunity of what I call the cross
16    financing, where the parties could true up, you didn't have
17    that problem.  And it led -- you'll hear testimony, led to
18    even more competition.
19           THE COURT:  I just don't understand, if it was
20    really a single entity or a joint venture, why didn't they
21    get lending from the financial institutions for the joint
22    venture?  It's a simple question, but it's confusing to me.
23    If in fact there was an entity, everybody knew about it, why
24    wasn't the bank's customer the joint entity?
25           MR. SANDLER:  Because the bank wanted to have
```

1     individual names on their record for primary collection.

2     They did not want to have --

3              THE COURT:  That doesn't make any sense.  I mean,

4     any partnership you can get guarantees, you've got the

5     partners -- under partnership law they're liable.  I don't

6     get it.

7              MR. SANDLER:  Well, the issue is the first lien

8     would be on the individual, not on the collective entity.

9     That's the way Provident Bank wanted it.  We'll have

10    testimony to that effect.  But, you know, when you say that

11    there is a troublesome point, I don't find it particularly

12    troublesome.

13             THE COURT:  No, I'm -- not troublesome, I'm just

14    confused.  I don't understand if there's a single entity,

15    why wouldn't Provident loan money to the single entity.  And

16    then -- and we're talking now not liens against the

17    property, we're talking about liens against the property of

18    the partners, the members of the joint venture.  I don't

19    understand why if there was a single entity why a lending

20    institution wouldn't -- and everybody was acknowledging this

21    to be a joint venture, why they didn't lend to the joint

22    venture and have the lien against the assets of the joint

23    venture.

24             MR. SANDLER:  Because, for several reasons.  First

25    of all the bank, the Provident Bank was the bank that

1    traditionally had loaned money to the Stollof and Nusbaum

2    group, and they wanted a first lien on those liens.  The

3    Berman group had family funds.  And the arrangement with

4    their banking was totally different.  And the bank had a

5    limit on how much they would lend on -- in terms of their

6    total loan.  If they did it separately they could acquire

7    more funding, but that is -- that's the answer I have.  And

8    that's a question that will have --

9              THE COURT:  I don't get it.  It would seem like in

10   the Supreme Court case, and whatever that joint venture

11   would have made its loans from the financial institution.

12   If it really is a single entity, it would seem to me that it

13   gets its financing as a single entity.  I mean, that just

14   seems to me an objective hallmark, if they're not, they're

15   in the a single entity.

16             MR. SANDLER:  So what you're saying to me, if they

17   don't have financing from one bank that means they're not a

18   joint venture?  I mean, that's what you're saying.

19             THE COURT:  No, no, it's just the indicia you're

20   talking about, I don't understand.  They're still -- they're

21   getting separate financing in their separate capacities and

22   yet they're a joint venture.

23             MR. SANDLER:  Yeah.  Yes, Your Honor, because of

24   the nature of the tax liens, the nature of the limits that

25   could be given.  If they -- if the bank would -- if one

1    bank, Provident, would give the loan to the joint venture

2    collectively it would be limited, say, $20 million.  And if

3    the join together they had other banking for significant

4    amounts so they would have more money at their resources to

5    buy --

6            THE COURT:  They could go to another bank if they

7    need more financing.

8            MR. SANDLER:  Well, I don't know.  That's fact

9    that may or may not be of interest, but I don't think that's

10    a dispositive issue.

11            THE COURT:  No, no, the question is whether

12    they're a joint venture.

13            MR. SANDLER:  I'm suggesting to you --

14            THE COURT:  Or single entity.

15            MR. SANDLER:  Excuse me, I want to back up a

16    second, the question for the jury is whether they're a joint

17    venture.

18            THE COURT:  Well, yes and no.  The mere fact that

19    there may be factual disputes, I mean, the issue is of

20    public policy in antitrust law, which that's exactly why I

21    have to make a probing analysis before I decide even if

22    there may be a factual dispute, what's a factual dispute as

23    opposed to a issue of law.

24            MR. SANDLER:  I would say this to you, it's clear

25    to me that that is an issue that's on your mind.  And I

```
 1        would be happy to submit a supplemental memorandum.
 2                THE COURT:  No, no, keep going, I'm just trying to
 3        understand.
 4                MR. SANDLER:  It's my understanding that the
 5        reason there wasn't one massive loan to the entity is
 6        because the borrowing patterns of the individuals
 7        historically were with their own lending institutions for
 8        Nusbaum and Stollof and family for Mr. Berman.  It is my
 9        understanding that Provident Bank would not let a joint --
10        would not go to the entity because they wanted to have a
11        first lien on their client's lien, the one that he bid on.
12        And that's how they kept track.
13                THE COURT:  The one they dealt with historically.
14                MR. SANDLER:  That's correct.  That's the answer
15        that I have.  And I don't --
16                THE COURT:  That's fine.
17                MR. SANDLER:  Okay.  I also wanted to say that
18        they randomly divided the liens, offered on a 50/50 basis.
19        Each group shared control of the venture, including the
20        bidding at the tax lien auctions.  And then I wanted to lead
21        into the economic efficiencies that these groups developed
22        were a direct result of the competitive market.  And the
23        efficiencies developed allowed members of the joint venture
24        to out bid others for liens they may not have been able to
25        bid upon.  And I'm going to talk about these efficiencies,
```

1   because I'd like to share with you in terms of the antitrust

2   issues some of the writing of the expert.  And I really -- I

3   can put it on the screen and let you read through it or I

4   could hand it up and give it to everyone.

5           THE COURT:  Which ever you prefer.

6           MR. SANDLER:  I prefer to hand it up.  I think

7   it's better.  Bear with me one second, Your Honor.

8           MS. GALLAGHER:   Your Honor, would it be okay if

9   we take a brief bathroom break while everyone's --

10          THE COURT:  Sure let's do that.  I'll read and let

11  me know, one of you let me know when they're ready.

12          (A recess was taken.)

13          THE COURT:  Okay.  Timely recess, I could read the

14  materials.  Thank you very much, Mr. Sandler.

15          MR. SANDLER:  Thank you, Your Honor.  I'm coming

16  to a close and I wanted to thank you for your patience.

17          THE COURT:  It's my job.

18          MR. SANDLER:  But if I may go back to one of your

19  questions about the troublesome question -- or your

20  confusion on the banking, I would proffer some further facts

21  that might help.  I understand that based upon thinking

22  about the matter, further learning more information, that

23  essentially the banking situation was very complicated for a

24  number of reasons.  The banks would only loan a certain

25  amount, which was $20 million.  That when they had two banks

1     lending each came with $20 million, so it was $40 million.

2          In addition to that, the collateral was different

3     and the term of loans were quite different.  The Nusbaum

4     group would borrow against the liens and there was a lock

5     box arrangement.  Whereas the Berman's group borrowing was

6     not based that way at all.  They had their own connections,

7     their own interest rates which were lower or different, and

8     that they borrowed against real estate collateral, that I

9     understand was totally separate.  And that explains the

10    financing.  And in addition to that, I've asked you to read

11    part of a proffer of Professor Priest.

12         I also have three more points to bring to your

13    attention by way of proffer.  I wanted to summarize what we

14    believe the economic efficiencies were of this joint

15    venture, which you'll find in the -- when we hand in the

16    proffer notebook.  But the collaboration increased the

17    available information concerning those liens that might

18    possibly be profitable, increasing the dollar magnitude of

19    bids on those tax liens, and increasing the number of tax

20    liens which the joint venture submitted bids.  And there's a

21    two-page summary, which I thought to bring to you while you

22    were in conference, but in take talking to counsel we

23    thought best to do it in open court.

24              THE COURT:  All right.

25              MR. SANDERS:  But I have, for example, a summary

1    of the efficiencies that we've talked about.  I'd like to

2    show you that.  I'd like to read to you a paragraph of a

3    proffer of the testimony of Professor Booth and then show

4    you two examples of partnering.  And then I would conclude.

5    If you could read the market efficiencies.

6              THE COURT:  Okay.

7              MR. SANDLER:  This was the next part of it.

8              THE COURT:  Okay.

9              MR. SANDLER:  Now, you see, I respectfully

10   suggest, you really can't proceed with a single entity

11   defense in an antitrust cases if all you're going to show is

12   you had a joint venture.  The joint venture has to have

13   certain market impacts and certain efficiencies of economy,

14   which we will prove.

15             I'd like to share with you Professor Booth's

16   comment.  It's pages which I put in the proffer book, but in

17   summary.

18             THE COURT:  Okay.

19             MR. SANDLER:  There were occasions, I proffer,

20   when the joint venture members would in some instances only

21   one would bid for all of them, then they would divide, then

22   sometimes they would bid separately and divide.

23             I would also now conclude by stating as follows:

24   If I must, and I would determine that at trial, I would call

25   my client, Harvey Nusbaum, who would testify under oath as

1    to the nature of his relationship with Mr. Berman, business

2    relationship, as to all of the elements that would

3    constitute the venture as I indicated, and underscore,

4    corroborate it, and testifying about the economic

5    efficiencies.  He's not an economist.  He's not going to

6    talk in legal terms.  But he will tell the jury exactly what

7    they did, how they did it, how they met, why they met, what

8    their goals were, what his intention were in terms of

9    expanding his opportunity and joining forces, and the

10   benefit of that.

11          So I conclude as follows:  It's not necessarily a

12   typical case.  It's not necessarily every day that you see

13   so many lawyers in this type of case at this stage of a

14   proceeding, when it's not a drug case or some other large

15   public type of matter.  The issues are not necessarily

16   frivolous.  It's not something that has been contrived just

17   to try to pull something off.  It's a defense based on the

18   facts and the law.  And what's so daunting to me, Your

19   Honor, is that we're at such a preliminary stage, we're not

20   arguing a case now to a jury.  We're suggesting to you as a

21   criminal defendant in this state, in this country, there's a

22   defense that he would like to interpose.

23          If a fact finder thinks it's ridiculous, they will

24   scold him for it.  If the fact finder thinks it's

25   applicable, it's not, as the Justice Department said, a jury

1    nullification.  I had one little article, I'm sorry I wrote

2    it now, I never thought it would appear in legal pleadings,

3    but nevertheless it wasn't geared to nullification, it was

4    an academic article for something totally different.  So

5    what I'm saying to you is, at this stage of the case, please

6    give every benefit of these facts the best light of the

7    defendant so we can prove our defense if we must, interpose

8    what we must.

9            And I suggested to you in my writing that this is

10   not an affirmative defense.  The government has the burden

11   of proving that it's not a joint venture or single entity.

12   The case law makes that clear.  And I cited that Jack

13   Russell Terrier case.  I mean, that's clear.  So I'm not

14   trying to be an alchemist.  And I suggest to you that as my

15   investigation of the case continues I'll uncover even more

16   facts to corroborate these issues.

17           And I would ask you, if there is a doubt, let me

18   come back one more time with my experts.  If I must, I'll

19   give the state free discovery.  I'll bring them here.  And

20   they can give you and explain to you their opinions as

21   academics and individuals with skilled knowledge in these

22   areas, to tell you not the fact that they have the ultimate

23   say, but that are entitled to testify as to the ultimate

24   issues.  Although, I'm not -- I would just ask them legally

25   permissible questions, which they can then ferret these

1    facts and explain to you why, in their opinion, this case is

2    not a bid rigging case.

3          And of course it's easy for the Government to say

4    we recognize that when we put these facts in evidence, if

5    you think about it, and I was kidding counsel during the

6    recess, I saw them smiling at some of my comments, because

7    of course some of the facts that we're going to prove will

8    enhance their own case, it's obvious.  But we're not cowards

9    veering from the truth, we're going to tell -- we want the

10   jury to hear exactly what happened, so a fair trial can

11   exist.

12         And, Your Honor, I don't say this at all without

13   the greatest respect, but in my years of trying cases, very

14   similar age we are, we've known each other a long time, I'm

15   senior status, and I haven't -- I've tried criminal cases

16   with much less than this in terms of facts, much less, and

17   have been able to proceed.  And if my client were wrong, the

18   good jury told them so.  So please let me go to the jury to

19   defend my client --

20         THE COURT:  As I understand your position, the

21   case never goes to the jury because they can't prove beyond

22   a reasonable doubt that it's not a joint venture.

23         MR. SANDLER:  Well, I'm not sure that's correct.

24   I think it would go to the jury, because I think it would go

25   to the jury on the issue of -- I would get to defend --

1    first of all, in the *Ricks* case and the *Romer* case, I mean

2    the 4th Circuit recognizes this --

3            THE COURT:  No, I was just trying to follow the

4    logic of your argument.  They've got the burden of proof,

5    and you're going to establish all this in your case, I don't

6    see how it ever goes to the jury.

7            MR. SANDLER:  Well, maybe that would be a fact,

8    that would be up for you to decide.  I don't think it goes

9    that way, because I think that even under your thinking it's

10   questionable.  I mean, they have the right to stand up and

11   say it's a sham.  They have the right to say it's I silly.

12   And they have a right to give their argument as to facts.

13   But if you believe that the law says a valid -- if you say

14   to me, Mr. Sandler -- if you say to me Mr. Sandler the

15   predicate on which you operate is invalid, I do not accept

16   under any circumstances that if you have the Holy Ghost of

17   joint ventures before me, you still can't put on a defense

18   because it's not acceptable law.  Then I have to bow down

19   and wait for --

20           THE COURT:  And appeal.

21           MR. SANDLER:  Pardon?

22           THE COURT:  May have to bow down and appeal.

23           MR. SANDLER:  Well, then I drive down to Richmond

24   and I see another Judge Motz.  But any way, my point is that

25   if you believe the major premise is valid, then the question

1   of whether the minor premises is valid is debatable

2   fairly --

3           THE COURT:  Okay.  I understand your position.  I

4   want to make clear, the only thing that I -- I mean, you've

5   made a much more -- I think it was important to have a much

6   more detailed factual -- some kind of factual proffer today,

7   because I had absolutely no idea from the papers what it was

8   you were relying on.  So let me hear from Ms. McMillen.

9           MS. McMILLEN:  Your Honor, John Terzaken will be

10  arguing for the United States.

11          MR. SANDLER:  Before you hear from the government

12  I just object -- may I just put a objection on the record?

13          THE COURT:  Sure.

14          MR. SANDLER:  I would like to object to the

15  government's comment on the proffer, because at this stage

16  the government's argument against the proffer should not be

17  considered.  That's the objection.  I know it's overruled.

18          THE COURT:  It's overruled.  I believe in the

19  adversary process.

20          MR. SANDLER:  And finally, Your Honor, at what

21  point may I introduce the proffer book?

22          THE COURT:  Right now.

23          MR. SANDLER:  Thank you.

24          THE COURT:  And I gather it's going to be Mr.

25  Terzaken.

1          MR. TERZAKEN:  Yes, Your Honor.  Good morning,

2    Your Honor, feels like afternoon already.  The United States

3    doesn't disavow the single entity theory, just to make that

4    clear for the record.  What we agree with the Court on is

5    that the application of that particular defense in this case

6    would turn the antitrust laws on its head.  And it would

7    turn the antitrust laws on its head because, as a factual

8    predicate to any single entity defense, there has to be a

9    showing of a formal pre-existing business relationship

10    between the defendants and all of their alleged

11    co-conspirators.  Every single case --

12          THE COURT:  Does it have to be in writing?

13          MR. TERZAKEN:  It doesn't have to be in writing.

14    There has to be a demonstration that there was a formal

15    agreement.  In every single case.  Take the *Romer* case for

16    example, there was a formal partnership.  The *Copperweld*

17    case, a parent and subsidiary.  The *American Needle* case, a

18    franchise case.  Every single case where the single entity

19    defense has ever been considered, or in fact proffered, has

20    been a circumstance in which a pre-existing formal business

21    relationship existed.

22          The reason why is because the single entity

23    defense really isn't asking the question about whether the

24    formal business relationship existed.  It's a question of

25    whether or not all of the parties to that pre-existing

1    relationship were so integrated in their conduct that they

2    therefore should be considered under the law to be one

3    entity.  Those are really two separate questions.  The

4    problem here is we never even get to the single entity

5    defense because there is no showing, and can be no showing,

6    by these defendants that all of the alleged co-conspirators

7    in this case were part of a joint venture or partnership,

8    whatever label they choose to put on it.

9         The formal business relationships that have been

10   demonstrated in the cases I mentioned were either in

11   corporate form, in written agreements, or in unchallenged

12   oral agreements, where firm partnerships were represented to

13   other parties.  None of those facts exist here.  Every fact

14   that's been proffered today is equally consistent with a

15   well-oiled conspiracy as it is with the existence of

16   anything else.  And in fact, to clear up any confusion, a

17   number of the facts suggest exactly the contrary to what

18   they've been representing.

19        For example, to clear up the Court's confusion

20   about why these banks didn't lend money to a single entity,

21   because there is no single entity here.  We've never once

22   heard the name of this joint venture, where its headquarters

23   are, what its joint bank account number is.  The reason why

24   is because there is none.  These are two competitors who sat

25   down with the bank trying to get more money.  There is no

1    single -- to clear up the confusion about why they didn't

2    submit joint bids as a single entity, they never represented

3    themselves as a single entity in submitting those bids.

4    They submitted those bids as separate independent

5    competitors.

6              Where on the face of that evidence is there any

7    suggestion of a formal business relationship?  Instead what

8    the defendants want to do here is call an expert -- who I

9    would put on the record is unqualified yet to testify as an

10   expert in this case -- to suggest that looking at all of

11   these market factors we can assess, after the fact, that

12   this well-oiled conspiracy really could constitute something

13   else, maybe we should call it a joint venture instead.  And

14   that's where the antitrust laws get turned on their head.

15             If this was the defense in every antitrust case we

16   would hear this exact defense every time.  And in fact the

17   per se rule would no longer exist, in fact bid rigging

18   crimes would no longer exist.  The fact that competitors get

19   together and agree, and they do it very well, and it's

20   profitable to them, is exactly why bid rigging is condemned.

21   Because what we're trying to promote here is competition.

22   These folks holding themselves out as independent

23   competitors should be competing not collaborating behind the

24   scenes.  It's exactly what the antitrust laws are meant to

25   prevent.

1          So the issue seized here, I think the court has

2     seized on as the appropriate one is really focused on this

3     factual predicate.  We can argue at a later time about the

4     efficiencies created, or whether or not there was any

5     integration of other things, use of other people, for

6     example, to help facilitate the conspiracy.  All of those

7     things are for a later question.  The critical question here

8     is the defendant --

9          THE COURT:  When do they become material?

10         MR. TERZAKEN:  They don't become material until

11    they establish a factual predicate that a formal business

12    relationship existed.  Again, there is no defense here

13    unless a formal business relationship existed.  And then the

14    question where experts and testimony about bank accounts and

15    use of people to facilitate their activities, that's when

16    that becomes important.  Because then the question is, is

17    this joint venture, if there was such a joint venture, are

18    all of those parties then so integrated that they really

19    were one entity, and therefore, couldn't conspire with each

20    other.

21         Because there's still also the possibility that

22    they can't even meet that second threshold, that is they

23    weren't that integrated and they were simply using the cover

24    of a joint venture as a sham.  And this is the law that's

25    very clearly stated in *Palmer* and *Engine Specialties* and

1    Addamax, none of which, contrary to suggestions of the

2    defendants in their papers, has been contradicted by *Dagher*

3    or any of the recent Supreme Court cases.  It's still the

4    prevailing law.

5           The issue here is that the defendants, regardless

6    of some of the evidence that they've put forward today, or

7    facts that they have proffered, cannot under any

8    circumstances plausibly demonstrate the factual predicate of

9    a formal business relationship between all of the parties

10   alleged as co-conspirators here.  The United States knows

11   this and so do the defendants.  We've produced full

12   discovery to them, including all of the 302s of all of the

13   co-conspirators.  They also have in their hands the plea

14   agreement of one of those co-conspirators, a co-conspirator

15   who appeared before this court and admitted to rigging bids

16   with these defendants.

17           MR. SANDLER:  Objection.

18           THE COURT:  Overruled.  Whatever --

19           MR. SANDLER:  Just for the record.

20           THE COURT:  Fine.

21           MR. TERZAKEN:  He appeared before this Court, in

22   his factual proffer admitted to rigging bids with these

23   exact defendants on these auctions.  Now defense counsel

24   might suggest they can score a few points on

25   cross-examination to try to suggest they can lure out of him

1    that there were parts about the way they contrived this

2    conspiracy that look like a partnership.  But what they

3    can't do is controvert the fact that this individual has

4    admitted before this Court, and I suspect very well would

5    admit on the stand, that he conspired with these individuals

6    to rig bids.  This wasn't any partnership or any joint

7    venture.  It was a bid rigging conspiracy.

8            They're also equally aware of the other

9    co-conspirators alleged in this case, John Rieff, Jay

10   Dackman, they're in possession of their 302s.  And in those

11   302s those very same co-conspirators admit to the bid

12   rigging conspiracy with these defendants.  They cannot over

13   come that.  If all of the defendants to this alleged joint

14   venture didn't participate in it, and instead are admitting

15   to rigging bids, how can a joint venture or formal business

16   relationship ever have existed.  It's nonsensical.

17           Going even further, I found it incredibly

18   interesting that it was proffered that Defendant Nusbaum

19   himself might a take the stand to suggest there was no bid

20   rigging agreement, because the United States had an

21   opportunity to interview Mr. Nusbaum on multiple occasions.

22           MR. SANDLER:  Objection.  May we approach the

23   bench?

24           THE COURT:  No, let's not go there right now.

25           MR. TERZAKEN:  Without getting into the facts

1  behind it, I think the Court is well aware that the United

2  States has firm evidence that any such testimony would be

3  highly questionable from the defendant.

4        On the facts before the Court, that is what has

5  been proffered by the defendant, there is simply no factual

6  basis for them to proceed on the single entity defense.

7        THE COURT:  What do you understand does -- what do

8  you understand Mr. Sandler to have said is the indicia of

9  the single entity.

10       MR. TERZAKEN:  What I think Mr. Sandler has said

11 is the defendants want to say now, after the fact, that they

12 acted very efficiently with their co-conspirators in rigging

13 these bids.  And then he would like to call an expert to get

14 on the stand and say, well, any bid rigging conspiracy is

15 very efficient.

16       THE COURT:  But I ask you because I'm not sure I

17 understand, I'll ask him again myself, but it's that they

18 agreed with one another to divide up the work.  That can't

19 be it, because every bid rigging is a single entity, that's

20 silly.

21       MR. TERZAKEN:  And I said from --

22       THE COURT:  Secondly, that they did it because

23 they thought it was procompetitive.  That seems to me to

24 absolutely underline, as a matter of law, the per se rule.

25 I mean, you can't -- just because somebody thinks something

 1    is procompetitive you don't get to go to the jury

 2    essentially just to determine if something is

 3    procompetitive.  That's what the pro se rule is all about.

 4    You can't defend on that basis.  Thirdly is because they

 5    somehow -- they hired a single computer expert and they

 6    pooled their resources to engage in this.  And fifth that

 7    what they were doing, their teaming arrangement was known to

 8    Provident Bank.  Did you understand him to say anything

 9    else?

10            MR. TERZAKEN:  No, I didn't.  And in fact --

11            THE COURT:  Mr. Sandler, is there any other

12    indicia that this is a joint venture?

13            MR. SANDLER:  Yes, Your Honor, all that I covered

14    and all that's in that book.

15            THE COURT:  But instead of --

16            MR. SANDLER:  I'll summarize --

17            THE COURT:  Let me see the forest for the trees in

18    this.

19            MR. SANDLER:  I said to you as follows, that the

20    parties intended to be -- the proffer, the parties intended

21    a joint venture.  The parties shared that information

22    openly.  The parties shared resources and due diligence,

23    which was a crucial fundamental aspect.  They shared that

24    work, they pooled that together.  They met and they analyzed

25    the research.  They decided what they wanted to do, what

1   they didn't want to do.  In addition to that, they shared

2   expenses of computer consultants.  They shared expenses of

3   hardware and software to support their work.  They shared

4   the advantage of what I call the cross financing.  In

5   addition to that, they divided equally the profits.  I also

6   said to you that there's an expert in Maryland law, and

7   under Maryland --

8           THE COURT:  Okay.  I understand.  Okay.  You've

9   given me the facts.  That's what I understood.  Go ahead.

10          MR. TERZAKEN:  And that's the same as the United

11  States understood.  And, again, all of those facts, if taken

12  as true to defendant, which we would contradict some of

13  those facts, still don't amount to demonstrating a formal

14  business relationship, a pre-existing formal business

15  relationship between these defendants.  For all the reasons

16  that the Court has --

17          THE COURT:  The one thing, I'm not sure that it

18  goes to single entity, tell me about as far as the bank who

19  knew all about the teaming arrangement.  That does seem to

20  be at least they weren't hiding it from them.

21          MR. TERZAKEN:  Well, I'm glad to bring that up,

22  because in terms of clearing up the confusion here, again, I

23  think the Court's questions on this were exactly on point,

24  and that is if there was a single entity here, the bank

25  would have funded the single entity.  It is not an

1    explanation simply that these different competitors got

2    money from different banks and held themselves out in

3    meetings that we might partner up with these other

4    individuals during the process.

5         What due diligence was the bank doing to check

6    into that partnership?  None.  Merely this was a suggestion

7    to the bank as to how this money was going to be used and

8    how they were going to be using it later.  The bank wasn't

9    vetting, as was suggested, the existence of a partnership.

10   They didn't need to because they weren't funding that

11   entity.  And if that entity really did exist, it would have

12   been funded by the bank.

13        And, furthermore, it would have used those funds

14   as a single entity in those auctions.  The most critical

15   question asked by the Court and admitted to by the

16   defendants in their summary of bullet points, they listed

17   out and the Court seized on, was the fact that this these

18   supposed joint venture partners held themselves out as

19   independent competitors and bid separately during the

20   auctions where they were supposed to be competing.

21        THE COURT:  We'll come back to that because that

22   relates to another motion, but again, I'm not sure it goes

23   to whether there's a single entity, but I gather it's your

24   witness because you produced the 302.  The fellow from the

25   bank, and it was reviewed by him and by presumably bank loan

1    officers and maybe the board.  Why wasn't -- I'm not sure it

2    cuts, I don't quite understand why it didn't stand out as a

3    red flag to Provident that this was illegal bid rigging.

4            MR. TERZAKEN:  Well, the statements they're

5    referring to, coming out of certain of the bank papers and

6    the 302, was the description from this individual of the

7    information that was relayed to him, or representations that

8    were made during the course of the discussion.  Ultimately

9    though, the funding was for the specific individual

10   competitors, not for any partnership.  So to the extent that

11   he put a word like "partnership" or "teamed up," or

12   otherwise described it in a way that he didn't believe it

13   was criminal conduct, does not prove the existence of any

14   formal business relationship, when there is no other indicia

15   of the fact this formal business relationship ever existed.

16           THE COURT:  You know, maybe the simple way, I

17   guess even if he did -- even if he did think it was illegal,

18   so what?  If you accept that the fact of the disclosure --

19   the fact of disclosure to a third party of exactly what was

20   going on could be deemed an indicium that the parties to the

21   agreement considered to be a legitimate partnership.  It

22   could be because you don't go around disclosing to third

23   parties things which you think to be illegal.

24           MR. TERZAKEN:  One other -- I guess one other

25   point to consider is, in that particular disclosure we're

1     not talking about the breadth of all the co-conspirators who

2     are alleged to have participated here.  I mean, that covers

3     Steve Berman.  And take what you will from that disclosure.

4     And I think it will be well-proven before the Court that

5     that particular discussion has no bearing on whether or not

6     there was a formal business relationship here.

7            But where is the discussion about John Rieff and

8     his company.  Where is the discussion about Jay Dackman and

9     his company, and others, there is none.  Those individuals

10    stand out there as independent co-conspirators even beyond

11    Steven Berman, who's pled guilty in this case.  All of whom

12    say there was no joint venture, no partnership, have

13    admitted to the bid rigging count.  And are going to testify

14    to that at this trial.

15           I mean the issue that we have here boils really

16    down to the confusion that this issue is going to lend to

17    this jury.  This is, as the Court knows, a run of the mill

18    bid rigging case.  It is a straight forward conspiracy among

19    these defendants, and multiple of their other competitors to

20    sit down in advance of auctions, out cry and otherwise, to

21    predetermine who the winner of that is going to be.  And

22    they did that holding themselves out as independent

23    competitors.

24           THE COURT:  That's leads to -- I realize we're --

25    but we are going to run out of time.  There's a motion, I

1       forget which one it is, but I think it's by you all in

2       limine to keep out statements that were made prior to a

3       certain time the change of the law, or something of that

4       nature.  It goes to the question of whether the public

5       municipalities or counties knew what was going on.  So could

6       you flesh that out for me a little bit.

7              MR. TERZAKEN:  Sure.  Just to clarify for the

8       Court, what we're talking about there is the indictment

9       charges 2002 forward.  And the auctions that we're talking

10      about that we've moved to preclude those statements's are

11      from the auctions prior to 2002.  And the reason why is

12      those auctions were conducted under far different rules than

13      the actual auctions that are the subject of the indictment.

14      The reason why is because the law changed.

15             And the law changed for exactly the reasons that

16      Mr. Sandler discussed with you.  That is, prior to that time

17      period, the tax lien's auctions were set up in a way that

18      allowed bidders to bid infinity.  That is because it goes to

19      the highest bidder, they'll say I'll bid to the sky's limit

20      just to win that tax lien.  And that wasn't helpful to the

21      auctions, to the state, the municipalities who were putting

22      on these auctions because they couldn't determine the winner

23      of the bid.  So in those circumstances where everyone bid

24      infinity, there were circumstances in which, at least

25      allegedly, there were discussions about, well, we've got to

1    figure out who the winner here is, so let's pick a winner.

2    And maybe there were discussions that occurred in that

3    context.

4            The law was specifically changed to encourage

5    competition prior to the charging period in the indictment.

6    Where the law was passed that that infinity rule no longer

7    applied.  This is where you get into the high bid premium

8    and the formulas that Mr. Sandler was talking about.  So

9    with respect to any of this condoning, if you will, of this

10   behavior, that is all preindictment period under far

11   different circumstances than the auctions post-indictment

12   period were conducted.

13           THE COURT:  So you're aware that no evidence of

14   condoning the activity after the change in the law.

15           MR. TERZAKEN:  That's correct.

16           THE COURT:  And your position is even if it were

17   condoned it would be irrelevant?

18           MR. TERZAKEN:  That's correct.

19           THE COURT:  Okay.

20           MR. TERZAKEN:  Your Honor, this is also some --

21           THE COURT:  Except if there was condoning it would

22   cut into at least the atmospheric argument, look, these

23   people were holding themselves out to be competitors, when

24   in fact they weren't, if in fact it was evidence of

25   condonation, to some extent that atmosphere is undermined.

1          MR. TERZAKEN:  That's true.  Although, again, the

2     argument here is notwithstanding what statements they may

3     have ultimately made, those statements are irrelevant as to

4     whether or not these individuals reached an agreement to rig

5     those particular auctions.  I mean, at base, as the Court

6     well understands and has understood early in these

7     discussions, this is a per se case.  The intent, the crime

8     itself, everything gets wrapped into whether or not an

9     agreement was reached between these defendants in advance of

10    these auctions to predetermine the outcome of them.  Because

11    they should have been independently competing.  That's what

12    the issue is here.

13         And now what they want to infuse into this case is

14    this broad label.  And you see it already in the paper that

15    they're submitting to the Court.  Right away the expert

16    calls this a joint venture, right.  That's the label we've

17    put on it.  And it's only a joint venture after the fact as

18    contrived by that expert through a number of logical steps

19    and other things.

20         THE COURT:  Well, I would assume every bid rigging

21    is a joint venture.

22         MR TERZAKEN:  Well, it sure is.  It's a very

23    excellent, well-oiled collaboration among competitors that

24    has an anticompetitive effect.  A partnership in crime my

25    colleague mentions.

```
 1                THE COURT:  Exactly.

 2                MR. TERZAKEN:  Which is exactly correct.  But we

 3     return, I think, to the very point the Court started with,

 4     and I think exactly identifies the issue here, and that is,

 5     were the Court to accept and allow this defense to go

 6     forward, the Court would essentially be turning the

 7     antitrust laws on its head.  It would open the door for

 8     every single partnership in crime, every conspiracy, to come

 9     in and say, well, we were working together very well, jury

10     you should not find us guilty because we were so efficient

11     in what we did.  That would eviscerate the meaning of the

12     antitrust laws and their impact on the economy.

13                Your Honor, there are additional points that

14     were --

15                THE COURT:  It would make John D. Rockefeller a

16     very happy man.

17                MR. TERZAKEN:  What's that?

18                THE COURT:  It would make John D. Rockefeller a

19     very happy man, or maybe Bill Gates.

20                MR. TERZAKEN:  Certainly wouldn't be good for my

21     employment.

22                The other issues that the defendants have raised

23     in their papers, and I don't know how far the Court wants to

24     go into these, because the defendant hasn't raised these per

25     se, but that is they've alternatively argued that even if
```

1    this single entity defense is foreclosed by the Court, that

2    they should be allowed to bring in this evidence for

3    purposes of negating the defendants' intent, which the case

4    law doesn't support.  There isn't a single case cited by the

5    defendant which stands for that proposition.  The case law

6    is clear that under a per se offense the intent -- the

7    knowledge of the individual engaging in the agreement itself

8    is in fact the intent.  It's a general intent crime.  And,

9    therefore, any suggestion they would bring in any of this

10   evidence, even notwithstanding the existence of any single

11   entity defense, for purposes of intent, would be completely

12   inappropriate.  Altern --

13            THE COURT:  Go ahead.

14            MR. TERZAKEN:  Alternatively, the other argument

15   they've made is this argument about converting this case

16   from a per se case to a rule of reason case.  And we just

17   want to make sure that the Court is clear, if it isn't clear

18   under our papers, that under no circumstances would this

19   case be converted from a per se case to a rule of reason

20   case.  Even assuming, which is a huge assuming in this

21   particular case, they could make out the single entity

22   defense and were allowed to proceed on it, this case still

23   remains a per se case.  Every case cited by the United

24   States is the prevailing law, that is *Palmer*, and Addamax,

25   and *Engine Specialties*, and the others cited by the United

1    States.  Which the question in the case, where a couple is

2    able to bring a valid single entity defense, becomes whether

3    or not the purpose for forming that single entity was to

4    restrain competition.  That is whether or not that entity

5    was a sham.  That's the ultimate ruling in that case.

6              THE COURT:  As I understand Mr. Sandler's

7    position, the way you would back door this into is a rule of

8    reason case, because he would -- I understand him to say one

9    of the reasons that it was a single entity was because the

10   participates believed it was procompetitive.  So, therefore,

11   there would be evidence in front of the jury about the

12   alleged procompetitive nature of the activity.

13             MR. TERZAKEN:  But it still wouldn't -- that

14   procompetitive benefits -- this is an additional point,

15   should we get that far, I anticipate the United States will

16   want to have additional discussions with the Court about

17   what the boundaries would be of the kinds of evidence that

18   could be brought in to prove a single entity defense.

19   Because a single entity defense again, is restricted to

20   trying to determine whether or not there's sufficient

21   economic integration between the parties to any supposed

22   formal business relationship.  It's not about demonstrating

23   the procompetitive benefits.

24             THE COURT:  Another way of saying that, and again,

25   I haven't read the cases, I'll assume you're telling me that

1   in the cases which have recognized a single entity defense,

2   it has not been an element the participants thought it was

3   procompetitive.

4              MR. TERZAKEN:  Because it doesn't go to their

5   intent.  It doesn't matter --

6              THE COURT:  It doesn't matter, because what you'd

7   have to establish would be that there was a pre-existing

8   formal business relationship.

9              MR. TERZAKEN:  Pre-existing formal business

10  relationship.  And then even, the next threshold, which is

11  really the question, if a question ever went to the jury, is

12  whether the parties to that formal business relationship

13  were so integrated, that is in their operation, in their

14  conduct, that they should be considered to be a single

15  entity.  That's the question.  We don't get to that question

16  ever in this case because there's no basic factual

17  predicate.

18             Again, there is no case that has been cited by the

19  defendants, and certainly none cited by the United States,

20  or that the United States is aware of, where a theory has

21  been put forward that you could prove a single entity

22  defense in the absence of a pre-existing formal business

23  relationship by merely stating at the end of the conduct,

24  oh, by the way, you can consider our bid rigging conspiracy

25  to be a formal business relationship because we were very

1    efficient at it.  Those are two very different questions.

2            THE COURT:  Okay.  Why don't we -- and I realize

3    that -- I'll let Mr. Sandler respond, but to be efficient, I

4    realize this may not -- since you're on your feet, there may

5    be other people who are going to speak to the various

6    motions.  Let's go through these motions one by one now.

7            MR. TERZAKEN:  Sure.

8            THE COURT:  Okay.  We've got your motion in limine

9    to preclude evidence or arguments that the defendants were

10   acting as a joint venture.  That, I assume, we have

11   discussed.

12           MR. TERZAKEN:  I believe that's correct, yes, Your

13   Honor.

14           THE COURT:  Now we have Mr. Nusbaum's motion in

15   limine to present evidence showing intent to form a single

16   entity, we've discussed that.

17           MR. TERZAKEN:  Yes, Your Honor.

18           THE COURT:  Now we have the United States' motion

19   in limine to preclude expert testimony and compel expert

20   disclosure, that all relates to the single entity.  Is there

21   anything else in that?

22           MR. TERZAKEN:  It does, Your Honor.  There are

23   some individual points that are made by the government in

24   addition to stating --

25           THE COURT:  Are you the one who's going to argue

1    that or somebody else?

2              MR. TERZAKEN:  Yes, Your Honor.

3              THE COURT:  Okay.  Tell me about that.

4              MR. TERZAKEN:  That particular motion we're

5    focused on the notice of disclosures made by the defendants

6    as to what experts they would call.  And they teed up a

7    number of those experts.  We honed in specifically on the

8    single-entity-type experts that were being proffered.  Our

9    first argument in that regard is no different than all the

10   facts we've been talking about and arguments we've been

11   talking about here today, that is if there is no factual

12   predicate for the defense there is no defense and no need to

13   be calling any experts because that testimony is otherwise

14   irrelevant and prejudicial.

15             Further, to that, we've also argued that in the

16   event that expert should be called that there are additional

17   things identified in the proffer as to what that expert

18   would testify to that are inappropriate.  First and

19   foremost, that he would conclude, for example, come to the

20   legal conclusion on the stand, that all of the market

21   factors at issue here constituted a joint venture.  That

22   conclusion is a conclusion as a matter of law.  And he can't

23   make that legal conclusion.

24             And we've cited the case of *McIver* is the

25   governing case there.  And we've distinguished *Garrett* and

1    *Karns*, which were the cases that were cited by the defendant

2    for purposes of calling an expert to conclude as a matter of

3    law on an inquiry where that particular term, that is a

4    joint venture, has a legal meaning other than that

5    understood by the average layperson.

6            Further to that we've also argued against that

7    particular expert testifying as to the intent of these

8    particular defendants.  Defendants have suggested they may

9    back door their defendant's testimony into this case by

10   having this expert testify what Mr. Nusbaum or Mr. Stollof

11   intended for purposes of their actions.  That's

12   inappropriate, not only because intent is irrelevant in this

13   particular case, but it's specifically excluded by the

14   Federal Rules of Evidence under Rule 704.

15           Finally, there is a broader aspect beyond simply

16   the single entity expert, which really bears more on

17   Defendant Stollof's motion to call a medical expert who

18   would purport to testify that at certain times Mr. Stollof

19   had to go to medical appointments or other things, which may

20   have meant that he didn't appear at certain meetings, that

21   may ultimately come up as part of the testimony.  We've

22   argued against introduction of that evidence on a number of

23   grounds, but first and foremost, that it's entirely

24   prejudicial and unnecessary.  The probative value that the

25   man went out to doctor's appointment versus its prejudicial

1     value of his particular health is great here.  And we think

2     it should be excluded on that ground.

3            Second, they haven't properly noticed under Rule

4     12.2B that this particular expert is going to be testifying

5     to any mental capacity of Mr. Stollof to engage in that

6     agreement.  If that's what they're intending to do here,

7     they failed to make that appropriate notice both to the

8     United States and to the Court, and should be precluded from

9     doing so.  Finally, I would just state for the record that

10    our motion to preclude that particular expert stands

11    unopposed by Defendant Stollof.

12            THE COURT:  United States motion in limine to

13    preclude introduction of improper evidence or argument.  Is

14    there anything in that which is not related to the single

15    entity?

16            MR. TERZAKEN:  Yes, there is, Your Honor.

17            THE COURT:  And I gather Ms. McMillen is going to

18    address that.

19            MR. TERZAKEN:  Yes, Your Honor.

20            THE COURT:  Ms. McMillen?

21            MR. SANDLER:  Could I short circuit this by

22    pledging not to argue anything that's improper?

23            THE COURT:  I know you wouldn't, so you don't need

24    to proffer that.

25            MS. McMILLEN:  We have several in limine motions,

1   Your Honor.  With respect to the one I believe you're

2   talking about, it had -- there was several elements to that

3   motion.  One of which was that the defendants be precluded

4   from introducing any evidence as to whether or not anyone,

5   the defendants or others, believed that what they were doing

6   was perfectly permissible or legal.  We believe that that

7   sort of testimony is classic lay witness opinion testimony

8   about a legal conclusion and should be precluded on those

9   grounds alone.

10          THE COURT:  It also is immaterial, I gather.

11          MS. McMILLEN:  It's absolutely immaterial since

12   it's a general intent crime.  And what they believed --

13   whether they believed they were doing something legal was --

14   is irrelevant totally.  This is also the motion that touches

15   on evidence of government officials having been aware of or

16   having condoned the activity, which I think you've talked

17   to -- or Mr. Terzaken has dealt with.  If there's anything

18   else you would like to know about that one, I would be glad

19   to address it.

20          Would you like to touch on the other in limine

21   motions that we've --

22          THE COURT:  Sure.  Tell me which one you want to

23   address next.

24          MS. McMILLEN:  -- jury nullification.

25          THE COURT:  Which one do you want to address next?

1          MS. McMILLEN:  We have a motion dealing with jury

2    nullification, which is our docket number 50.  And the

3    defendant's responses are 91 and 95.

4          THE COURT:  Right.

5          MS. McMILLEN:  Specifically there, the first of

6    those in limine motions is to exclude any evidence and

7    arguments that the rigged bids were reasonable, or that the

8    conspiracy caused little or no harm.  And the reason that

9    we're moving to exclude that sort of evidence is because in

10   a per se case, obviously, those things are irrelevant and

11   would be prejudicial if brought in.  Defendant Stollof

12   concedes that our position is correct, but argues that the

13   motion is too broad, argues that it would preclude any

14   mention of prices or yields or amounts paid for liens, and

15   that's not what our motion would do.

16          He also rightly states that a defendant should be

17   entitled to present evidence of prices to prove that the

18   prices in a particular auction were inconsistent with a big

19   rigging agreement.  We generally agree with that legal

20   proposition.  Although we might disagree with how it is

21   done.  However, to the extent Mr. Stollof wishes to

22   introduce this evidence through any sort of expert witness,

23   we don't believe that they noticed us of that in their

24   September 11th filing of areas of expert testimony.

25          Defendant Nusbaum objects to the notion on the

1    grounds that the reasonableness of prices and lack of

2    economic harm is relevant and admissible with respect to his

3    single entity defense.  And I think we've fully dealt with

4    that.  So I will -- I won't go into it.

5            Second part of that motion deals with moving --

6    the United States has moved to exclude evidence or argument

7    as to age, illness or financial condition, circumstances

8    that is.  Obviously the defendants are both in their 70s,

9    they have various physical  --

10           THE COURT:  That's not obvious to me.

11           DEFENDANT STOLLOF:  Thank you.

12           MS. McMILLEN:  I think we were told that at one

13   point on the record, Your Honor.  We've moved to exclude

14   evidence of age and ill health because of lack of --

15           THE COURT:  I understand.

16           MS. McMILLEN:   Can I move on from that one, Your

17   Honor?

18           THE COURT:  Beg your pardon?  Yes, you may.

19           MS. McMILLEN:  And the last deals with financial

20   condition.

21           THE COURT:  The various things about penalties and

22   charging decisions you need not address those.

23           MS. McMILLEN:  Thank you very much, Your Honor.

24   We also had an in limine motion to exclude advice of counsel

25   defense.  And I believe I've touched on that already in

1    terms of our earlier motion to exclude any discussions about

2    whether or not what the defendants were doing was right or

3    correct or not illegal.  And basically for those same

4    reasons we would -- we would seek to exclude it here too.

5              THE COURT:  Okay.  What's next?

6              MS. McMILLEN:  I believe that's all that I have

7    for you, Your Honor.

8              THE COURT:  Okay.  Mr. Terzaken, what do you want

9    to argue next?  I just want to go through all of these, make

10   sure we cover them all.

11             MR. TERZAKEN:  Your Honor, there are a number of

12   other motions that were made, they're all motions that were

13   made by the defense.

14             THE COURT:  Okay.  Let me hear your position on

15   them.

16             MR. TERZAKEN:  I have to concede to my co-counsel.

17             THE COURT:  Okay.  I think we have the defendants'

18   motion for failure to allege a single conspiracy and lack of

19   jurisdiction.

20             MR. TERZAKEN:  Mr. Grundvig is going to address

21   that argument, Your Honor.

22             MR. GRUNDVIG:  If I could, Your Honor, I'll

23   address both the motion to dismiss the indictment for

24   failure to allege a single conspiracy, along with their

25   similar motion to dismiss the indictment for failure to

1   state sufficient subject matter jurisdiction.  Our response

2   was the same to both, or they dealt with both of those

3   issues the same.

4         I think as a -- I guess as a starting point, the

5   burden to dismiss an indictment is high because essentially

6   all that the government has to allege are the elements of

7   the offense sufficiently to put the defendants on notice,

8   and such that they can also object to a future prosecution

9   for the same offense.  And I think without question the

10  indictment has done that in this case.  I think essentially

11  they are confusing a sufficient allegations in an indictment

12  to bring an offense versus the evidence necessary to prove

13  beyond a reasonable doubt commission of the offense at

14  trial.  But I can certainly get into the specifics of those

15  if you'd like.

16        But taking on first the subject matter

17  jurisdiction, the indictment at paragraphs 9 and 10 is --

18  couldn't be clearer.  The paragraph 10 in particular --

19        THE COURT:  Actually, I'll hear from the

20  defendants.  If there's something I need after hearing from

21  them I'll --

22        MR. GRUNDVIG:  That makes sense, Your Honor.

23        THE COURT:  Again, I'll hear from -- go ahead, Mr.

24  Terzaken.

25        MR. TERZAKEN:  Your Honor, in terms of the

1    remaining motions the Court can certainly hear from the

2    defendants as to which of those motions they'd like to

3    argue.  I think the Court may have indicated you would like

4    to hear from the United States on the grand jury subpoenas

5    issue -- I mean, trial subpoenas.

6              THE COURT:  Trial subpoenas.

7              MR. TERZAKEN:  We're happy --

8              THE COURT:  It would seem to me, I mean my -- it

9    would seem to me that to some extent the propriety of the

10   trial subpoenas is going to depend upon my ruling upon the

11   single entity defense, at least it's going to inform some.

12   But to the extent that my ruling allowed that motion to go

13   forward, I guess my -- to the extent that the complaint was

14   that the subpoenas were overburdensome, that was an argument

15   to be made by the recipients of the subpoenas not by the

16   government.  But I'll hear from you or from whoever's going

17   to address it.

18             MR. TERZAKEN:  Thank you, Your Honor.  Mr. Bester

19   is going to address it.

20             MR. BESTER:  Thank you Your Honor, I understand

21   from the telephone conference the other day that you had

22   some concerns about standing, whether the United States had

23   standing --

24             THE COURT:  It wasn't so much formal standing, it

25   was just about who was best to make the arguments.  But go

1   ahead.

2           MR. BESTER:  I wanted to just point out to the

3   Court that although it wasn't addressed in the papers there

4   certainly are District Courts that have found that the

5   United States has standing when considering the issuance of

6   pretrial subpoenas.  The *United States versus Wittig* and

7   *United States versus Beckford* both found that the United

8   States has standing when a motion has properly been filed

9   with the Court.  As a party to litigation the United States

10  has standing to come forward and raise its objections.

11          In that *Wittig* case, though, the Court while it

12  found that the United States had standing, it said that it's

13  a nonissue.  As Your Honor's well aware, ultimately you have

14  the authority and responsibility to make sure that Rule 17,

15  and the case law that flows from it, is adhered to.  And

16  that the subpoenas that are issued comply -- comport with

17  those requirements.  Here, the subpoenas, as Your Honor has

18  made note, mainly seem to be concerned with the single

19  entity defense.  And depending on Your Honor's ruling on

20  that issue, I think will inform the issuance of these

21  pretrial subpoenas.

22          But to the extent they don't, to us these

23  subpoenas look like a fishing expedition.  The language

24  contained in those requests is very vague.  It asks for any

25  and all documents.  It's asking for personnel records.

1    Those seem to me to be much more like civil discovery

2    requests rather than a pretrial subpoena in a criminal

3    matter.  As you're well aware, the *Nixon* case governs these

4    issues.  And the requirements of *Nixon* must be met before

5    Rule 17 subpoenas can be issued.  And those requirements are

6    that the -- the subjects in those subpoenas must be

7    relevant, admissible and specific.  And I would submit that

8    the subpoenas issued here, or proposed to be issued here, do

9    not meet those factors.

10            The Court was very clear that rule 17 cannot be

11   used as a discovery device.  That the Rule 17 subpoenas need

12   to be much more narrowly tailored than a common discovery

13   tool.  In *Nixon* the prosecutors were seeking specific tapes

14   with specific conversations on them.  The prosecutors were

15   able to identify the time, the place and the participants in

16   those conversations that they were seeking.  By contrast

17   here, the request for documents seem to be much, much

18   broader.  They don't specify the recipients.  They don't

19   specify the dates.  And for those reasons it appears that

20   this is much more of a fishing expedition than a narrowly

21   tailored request for documents pretrial.

22            Further, the defendants have much of this material

23   already.  We have produced a great volume of information

24   back in July.  And there is no mention in any of the papers

25   by the defendants of whether the recipients of these

1    proposed subpoenas have -- they have produced this, they've

2    seen it already, we don't know.  At a minimum the defendant

3    should be required to tell the Court which of the material

4    they already have before going and asking these subpoena

5    recipients for the same information again.

6           There's other information that appears wholly

7    irrelevant to the matters of this case.  There are requests

8    for materials for internal investigations.  There's

9    material, as Your Honor is aware, seeking materials for

10   joint ventures and whether there was a joint venture.  As

11   you've heard today there is no joint venture in this matter.

12   And, therefore, documents requesting materials related to a

13   joint venture are simply a red herring here.

14          The internal investigation documents sought,

15   again, are irrelevant to the consideration of the issues in

16   this case.  As for the proposed subpoenas directed at the

17   municipalities, this is material, as I mentioned, that at

18   least it appears from the way that those requests are

19   phrased here, and the materials already produced to them

20   over the summer that they is have much if not all the

21   information that was requested there.  So for those reasons

22   I would urge the Court to block the issuance of these

23   subpoenas.

24          THE COURT:  Okay.  And, again, I realize they're

25   defense motions, but since the government's on its feet.

1    The motion by Mr. Nusbaum to exclude the admission of

2    alleged co-conspirator statements absent a pretrial showing.

3    Isn't that just governed by 4th Circuit law?

4              MR. GRUNDVIG:  It is, Your Honor.

5              THE COURT:  Okay.  I'll ask Mr. Sandler about

6    that.

7              MR. GRUNDVIG:  I think this issue is largely moot,

8    we've produced the 302s and the interview memoranda to the

9    defendants.

10             MR. SANDLER:  We agree.

11             THE COURT:  Okay.  So that's moot.  I'll deny that

12   one as moot.  How about the use of guilty pleas and plea

13   agreements?

14             MR. GRUNDVIG:  Your Honor, we're certainly happy

15   to stand on the papers that have been filed.  It's fairly

16   clear law on that.  We can address any questions you might

17   have.

18             THE COURT:  Frankly, I thought I had read all

19   these.  I haven't read this.

20             MR. SANDLER:  We'll defer on the papers.

21             THE COURT:  Yeah, let's defer.  I'll deny it

22   without -- I'll deny it subject to being renewed at trial.

23             MR. SANDLER:  Well --

24             THE COURT:  I mean, the fact of the matter is plea

25   agreements are going to come in -- evidence about plea

1    agreements is going to come in.  I tend not to allow plea

2    agreements themselves into evidence, different judges have

3    different practices.  I tend not to do it because, if for no

4    other reason, plea agreements contain statement of facts

5    which I don't think ought to be back in the jury room

6    because they're, you know, by virtue of the fact that the

7    defendant pled guilty they're pro-government.  Another way

8    to do that is to redact that.  But that's something you can

9    -- that to me is a trial issue.

10        MR. GRUNDVIG:  And maybe slightly separate

11   question is the defendant that raises this motion is seeking

12   to allow himself to introduce the existence of a plea.  To

13   preclude the government from doing it in direct

14   examination --

15        THE COURT:  I'm not going to let them do that.  I

16   understand the position, but it's established practice that

17   the government can produce evidence in its own examination

18   of its cooperators that that person is a cooperator.  You

19   can certainly cross-examine.  I'm going to go with

20   established practice on that.

21        MR. GRUNDVIG:  Thank you, Your Honor.

22        THE COURT:  So it's denied.  But is there any --

23   it's denied without prejudice being renewed.  I just see it

24   as a trial -- you know what I'm going to rule.

25        I'm going to deny as moot the motion to exclude

1    evidence of income, assets and financial means, but also

2    because the government's not going to try to put that in.

3              MR. TREEM:  Your Honor, do I infer correctly that

4    you're going to deny the defense the opportunity to elicit

5    that kind of information in cross, perhaps.

6              THE COURT:  Of Mr. Nusbaum?

7              MR. TREEM:  Of either on behalf of Mr. -- on

8    behalf of Mr. Stollof, I can't speak for Mr. Nusbaum.

9              THE COURT:  But this is Mr. Nusbaum's motion to

10   exclude evidence of income asset -- I assumed that was Mr.

11   Nusbaum's.

12             MR. TREEM:  Fine, as long as that's limited to Mr.

13   Nusbaum that's fine.  Because we don't -- because we have an

14   interest in that evidence on behalf of Mr. Stollof coming

15   in, at least to some extent.  And I'd like to at some point

16   address that.

17             THE COURT:  As to Mr. Nusbaum?

18             MR. TREEM:  No, it's Mr. Stollof, Your Honor.

19   Thank you.

20             THE COURT:  This motion I understood to be related

21   to Mr. Nusbaum.

22             MR. CRALLE:  Your Honor, part of this is moot.

23   But as to the income that is not.  And if you would like to

24   hear that, we'd be happy to address it.

25             THE COURT:  I'm going to deny it without prejudice

1    to being renewed.  This really is a trial issue.  When I say

2    -- it's generally without prejudice.  I mean, it doesn't

3    make any sense for me to decide it now.  Compel disclosure

4    of confidential witnesses.

5              MR. SANDLER:  It's moot, Your Honor.

6              THE COURT:  It's moot.  Denied as moot.

7    Inspection complete FBI 302 reports.

8              MR. SANDLER:  Moot.

9              THE COURT:  Moot.  For leave to file additional

10   motions.  If after today anybody wants to file an additional

11   motion, they can file an additional motion, it's a free

12   country.  404(b) evidence and any alleged acts falling

13   outside the statute of limitations.  Who wants to address

14   that?  I don't remember what the issues are.  I read this

15   once.  I don't remember what the issues are.

16             MR. CRALLE:  I'd be happy to address it, but as

17   we've said we're not aware of any 404(b) evidence.  To the

18   extent we become aware of it we'll give reasonable notice.

19             THE COURT:  If you don't let them know about it,

20   you can't introduce it.  So that's an easy one.  Rule of

21   inclusion as it is.

22             All right.  Let me hear from any defendant on any

23   of the motions, either rebuttal on the single entity, or any

24   of the other motions they want to address.

25             MR. SANDLER:  May it please the Court, I thought I

1    would do the rebuttal and certainly Mr. Treem can then

2    articulate what he wishes.

3            THE COURT:  Absolutely.

4            MR. SANDLER:  I am not going to reargue, that's

5    not the purpose of rebuttal.  But I am going to point out to

6    you some issues that we do think are incorrect.  And remind

7    the Court that the document that I handed, I would like to

8    have it marked as motion Exhibit 1.  And when Mr. Esworthy

9    brought it forth, we didn't state that.  Will you accept it

10   as Exhibit 1?

11           THE COURT:  Yes.

12           MR. SANDLER:  Thank you.  And should I, after the

13   Court should I mark it with the label because we didn't do

14   that.

15           THE COURT:  Well, Martina's not here, Ben can you

16   get a -- I'm going to take one with me too, so if you've got

17   an extra copy give one to Ben to be marked.

18           MR. SANDLER:  Yes.  And I also, if you noted,

19   Exhibit 1 is preliminary proffer, because when we spoke on

20   Wednesday and I saw the direction, which I welcome, in which

21   we were going, it was not possible for me to bring my expert

22   witnesses here.  One is in South America.  One is not -- the

23   other's not available.  But I would suggest to you that

24   before you conclusively send the piercing arrow to the heart

25   of the defense, that you consider the balance of the

1      proffer.

2             And I point out to you, I once read this comment

3      by Schopenhauer, I don't know if it's applicable, but he

4      described the difference between brilliance and genius.  He

5      said that a brilliant person could take an arrow, aim it at

6      a target and hit the bull's eye that no one else could.  He

7      said, the genius can aim the arrow at the target that no one

8      else can see and hit it.  I'm neither brilliant or a genius,

9      just a trial lawyer taking the facts and applying the law.

10     And the first point that I dispute with the government is

11     that when they talk about other co-conspirators and no

12     agreements, that is incorrect.  There are 302s that have

13     other agreements acknowledged by co-conspirators.  And one

14     of them is even in writing.  So I attribute that just to

15     oversight.

16             I also point out to Your Honor that much -- I'm

17     talking about DeLaurentis, and Rieff, Counsel.  I also point

18     out, with all respect, that much of what the government

19     presented by way of its reply supports the position of the

20     defendant.  And was speculative and argumentative in terms

21     of how the case could come out, to try to go -- it goes to

22     the weight and not the admissibility of what I seek to

23     present.  Remember, my threshold, I respectfully suggest, is

24     very little.  And the case law is clear that these issues

25     are for a jury.  That's my interpretation of the cases, the

1   *Continental Baking Company* case is one that's specific in

2   that regard.  And there are others that I suggested.

3          But now let's go to the heart of my rebuttal,

4   which will be brief.  The government which you -- which I

5   understood and could never doubt, acknowledges the validity

6   of the single entity defense.  There's nothing more to say.

7   So when I began with you at the very beginning, couple of

8   hours, and once again, we all appreciate your patience and

9   courtesy.  When I began --

10          THE COURT:  You alluded as though that was

11   unexpected.

12          MR. SANDLER:  Well, it's always expected in my

13   experience.

14          THE COURT:  Go ahead.

15          MR. SANDLER:  It's always expected in my

16   experience, Your Honor.  But on the other hand, when I know

17   Your Honor has made up his mind --

18          THE COURT:  I haven't made up my mind.  I just

19   wanted exactly what you've given me today.

20          MR. SANDLER:  Now, when I talked to you at the

21   very beginning, I suggested to you that we would show the

22   elements of the single entity unit, which in this case was a

23   joint venture.  And I suggested to you at the beginning that

24   I was going to appeal to your logic, not emotion, not

25   passion, but what Aristotle called logos, pure logic,

1    deductive analysis, major premise, minor premise and

2    conclusion.  The major premise has been conceded by the

3    government.  Single entity is a defense to the bid rigging

4    case, which really dispels some of your concern about

5    sending antitrust law on its head, because it's already

6    acknowledge, and of course it's acknowledged because that's

7    the law.

8           So the only question that -- in terms of this

9    proffer that we need to wrestle with is whether the minor

10   premise flows.  And the minor premise is that the single

11   entity is exhibited by the conduct of these individuals.

12   Now, what the government does is really interesting, they

13   talk about where's the formal agreement, where's the formal

14   writing, but under RUPA that's certainly not even required.

15   What's RUPA?  RUPA is the Revised Uniform Partnership Act

16   that's followed by Maryland.  And my expert, Mr. Booth, in

17   the tab gives some explanation of that, but it's not the

18   full report.  I'd like to --

19          THE COURT:  I don't want to be overly simplistic,

20   but isn't it as simple as, where is there any evidence of a

21   joint venture other than the engaging in the bid rigging?  I

22   mean, it really is as simple as that.  I mean, in the other

23   cases there is evidence of a relationship, I mean, that's

24   what this is all about.  I'll go back and read your proffer,

25   but it seems to me that -- that seems to me is the issue,

```
 1      there has to be a joint venture other than the illegal
 2      agreement.
 3                MR. SANDLER:  Well, I share with you what that is,
 4      I'll repeat it.
 5                THE COURT:  No, we've been over that.  I'm going
 6      to read it, but I --
 7                MR. SANDLER:  I'm not going to read it.  You can
 8      look in the proffer book.  They have those elements.  They
 9      shared the profits, they shared the risk, they meet the --
10                THE COURT:  They shared the risk of the --
11                MR. SANDLER:  Sure, they put up -- they each put
12      up their money.  They each brought $20 million to the table.
13      They each relied on each other.  They shared the risk of
14      getting the bids, not getting the liens --
15                THE COURT:  That's all inherent to the bid
16      rigging.
17                MR. SANDLER:  It's all inherent to the joint
18      venture.
19                THE COURT:  Which is the bid rigging.
20                MR. SANDLER:  Not if it's econ -- a bid rigging --
21      I would say the anecdote to bid rigging is whether or not
22      the relationship generated the efficiencies of economy.  And
23      those efficiencies of economy are crucial.  Under your
24      thinking --
25                THE COURT:  But that's where you're turning
```

1     antitrust law on its head, because then you're turning every

2     per se case into a rule of reason case, because you're

3     allowing a defense to be proffered that this was

4     procompetitive, and so therefore, it's not actionable.  And

5     that's why this is not just a jury determination, it's a

6     question of law.  The law is clear, right or wrong, that

7     there are certain kinds of activities which are per se

8     illegal even if they're procompetitive.

9          MR. SANDLER:  I'm not asking that, though.  I

10    agree with the government that the procompetitiveness is not

11    the aspect of the joint venture, it's the result.  But you

12    first have to have the valid joint venture.  You first must

13    have the economic efficiencies.  Here's what the government

14    in their brief claims, by the way, I think this should be of

15    interest to you, respectfully.  Says in order to have this

16    joint venture, to show a joint venture -- I'm quoting on

17    page 3 of their response in limine to preclude evidence of

18    the joint venture.  They say that to show a joint venture in

19    the absence of a written agreement, so they acknowledge you

20    can have a joint venture without a written agreement, you

21    have to -- you should have a proprietary interest, a pooling

22    of assets and/or capital over the subject of the

23    undertaking, and you should have joint control of the

24    undertaking.  That's all you have to do.

25          And what you're trying to do is read more into

1    what's required.  What's required for the joint venture is

2    minimal.  And under the -- under -- I put it to you

3    respectfully, that if you share capital, if you share

4    computer consultants, if you share resources of a computer

5    software and hardware, if you share your profits, if you get

6    together and share your trade secrets with each other so

7    that you jointly can proceed and divide the profits, that's

8    a joint venture.  And that's a question that's easily

9    answered.  And that's for the jury to decide.

10              THE COURT:  But isn't -- again, I'll read the

11   cases, and maybe I'm -- but I think Mr. Terzaken referred to

12   as a pre-existing business relationship.  Another way to say

13   that is it is a joint venture extrinsic to the bid rigging

14   itself.  I mean, is there any case in which, you know,

15   there's relationship between parents and subsidiaries, there

16   was a former joint venture in the Supreme Court case, there

17   is the NFL case, there's a franchise, franchisee case, I

18   assume that's what it is.  There is extrinsic to the alleged

19   illegal conduct, there is an existing business relationship.

20              MR. SANDLER:  No, I mean absolutely not.  I mean

21   the *Texaco Dagher* case they were prior competitors and they

22   formed this other entity and they went forward.  That's

23   incorrect interpretation of law I respectfully suggest.  And

24   you can't criticize the government, I can't, for wanting to

25   hold firm because they recognize what they're policy -- it's

1    been -- they have a very stern policy.  And they want to

2    come, you know, they run with a hammer and every nail gets

3    hit.  And this is one of them, in my interpretation, based

4    on these facts, which I'd like to present to the jury.

5          It's important to know that I do not think the

6    procompetitive impact is part of the economic efficiency.

7    What I'm saying to you is you need the joint venture, you

8    need the economic efficiencies, and you need the

9    procompetitive impact.  And that's why every bid rigging is

10   not a joint venture.  You can't do that in 99.9 percent.

11   First of all, most of the bid riggings are lower, not

12   higher.  Most of the bid riggings aren't open to the world.

13   This is a very unique case.

14         And I respectfully point out to the Court,

15   synopsis to the Court, I must have looked at hundreds of

16   cases and hours of studying trying to find precedent.  There

17   is none.  So I'm out here in almost a case of first

18   impression in this regard.  But please do not fail to

19   consider the logic that I'm trying to present to you.  If

20   all the -- ask yourself one question, if this were a common

21   law case that we were in civil court in the state of

22   Maryland, and say it went up on appeal, the Court of Special

23   Appeals, and Judge Hollander, for example, was looking at

24   this, would she analyze -- if this were just a joint

25   venture, could she find if expert testimony was helpful to

1      explain this to you or to the jury that this relationship

2      constituted a joint venture.

3              Because if you say to yourself that under no

4      circumstances, giving it the best light to me, all I said to

5      you in terms of the sharing, the drawing the capital

6      together the resources, the computer experts, sharing the

7      messenger, dividing the profits.  In one instance which I

8      showed you, one got zero the other then equalized.  If

9      you're saying that under no circumstances could that be a

10     joint venture, in other words, in civil law you would say,

11     Mr. Sandler, this could never go to the jury, summary

12     judgment granted.  If that's your conclusion, based on these

13     facts, I still should win, because my burden is even less in

14     this criminal case.

15             THE COURT:  Let me ask you one other thing.  It

16     just occurred to me, and I could be wrong about this, you

17     keep emphasizing it's already here.  It's odd because the

18     rigging results in the high bidder always wins.  And maybe

19     the government, I assume, maybe it's a per se violation, per

20     se violation, but the theory is that there would have been a

21     higher -- there might have been a potential higher bid,

22     because these two people were -- these people were bid

23     rigging, so there could have been still a higher bid.

24             MR. SANDLER:  That's a factual issue.

25             THE COURT:  I assume that's the theory of the

1    government's case.  It's no answer to say, here the high

2    bidder won, the whole problem was, at least theoretically,

3    there would have been a higher bidder.

4              MR. SANDLER:  Well, that's what they would say,

5    and we would of course dispute that.

6              THE COURT:  I just want to make sure that I

7    understood the government's theory.

8              MR. SANDLER:  I'm saying to you, we've got major

9    premise resolved, minor premise I'm saying to you that based

10   on the fact --

11             THE COURT:  The major premise is conceded.  I

12   understand.  But let me ask the government one thing because

13   it is something which I've got to reread the case, how -- is

14   the extrinsic intrinsic distinction I'm drawing correct?

15   And if so, how does the Supreme Court -- what I'm saying is,

16   is the pre-existing relationship, is a joint venture

17   extrinsic to the alleged illegal conduct?

18             MR. TERZAKEN:  The answer is I don't think a court

19   has ever said it that clearly, but it certainly can be

20   inferred in the way the case law --

21             THE COURT:  How about the Supreme Court case, was

22   there any --

23             MR. TERZAKEN:  The Supreme Court case wasn't

24   addressing that, because there was already a business

25   relationship.

```
 1                    THE COURT:  Was there a business relationship for

 2      any purpose other than the purchasing on the market?

 3                    MR. TERZAKEN:  That was a different question, yes.

 4      It was formed -- this was a formal joint venture between the

 5      parent -- or sorry, between the joint venture partners, they

 6      created a third entity called Equilon, which they wanted to

 7      put their assets.

 8                    THE COURT:  But did Equilon have any other purpose

 9      other than --

10                    MR. TERZAKEN:  It was to put in the assets in to

11      jointly market these two brands of gasoline that these

12      companies were independently marketing on their own.

13                    THE COURT:  So they had a purpose other than

14      purchasing the fuel on the market, which was the alleged bid

15      rigging.

16                    MR. TERZAKEN:  The sale of the fuel, that's

17      exactly right.

18                    THE COURT:  If no court has said it so clearly,

19      I'm neither brilliant nor a genius, is there a valid

20      distinction between the extrinsic and the intrinsic.

21                    MR. TERZAKEN:  Yes.  Well, let me put this way,

22      first there's no case law cited by the defendant, and none

23      the United States is aware of where this theory has ever

24      been put forward to a court.  I think because it's

25      nonsensical on its face, for all the reasons we discussed,
```

```
1    that it would turn antitrust law on its head.  Every case

2    that the Supreme Court or other courts have considered, were

3    exactly the kinds of pre-existing business relationships

4    that had extrinsic value beyond simply rigging bids or

5    fixing prices --

6              THE COURT:  For purposes.  Okay.

7              MR. TERZAKEN:  For a particular purpose.  Now

8    follow that on with the cases we've also cited, what happens

9    in this case, if there is in fact a formal business

10   relationship, and the defendants were then allowed to argue

11   the other factors that go into the single entity defense.

12   What the Courts have then said is, the question isn't about

13   the extrinsic parts necessarily of that organization, but

14   what the purpose was for forming it in the first instance.

15             And that's why even in the event they were allowed

16   to bring this defense, the question is whether or not they

17   label they want to put on it is a sham.  That's the holding

18   of Palmer and Addamax.  So I think the Court is completely

19   correct in reading exactly that fact.  Because that's the

20   question you get to once you show the formal business

21   relationship is next.  What was the purpose for forming it?

22   Is it a sham or was it for all these other reasons?  We

23   never get out of box No. 1 to get to those latter questions.

24             MR. SANDLER:  I respectfully -- I must

25   respectfully disagree with learned counsel.  I have read
```

1    *Dagher*, I do not read it the way he reads it.  I read out of

2    it, not into it.  And I know that historically Texaco and

3    Shell Oil competed with one another in the national,

4    international gasoline markets.  And their business was head

5    to head competitors.  And they formed this business solely

6    for this joint venture, solely for this one undertaking.

7    And I say to Your Honor, it matters not in the law whether

8    there's a written formal agreement or not.  And there's

9    never any discussion -- I think counsel finally conceded or

10   not -- finally recognized it, that there's no extrinsic

11   intrinsic issues in this.

12          The major premise is conceded by the government

13   because it's the law.  And in terms of where I'm going now

14   in trying to wrap this up is to ask Your Honor to focus on

15   what it is to have a joint venture.  It's very little.  To

16   understand what the Maryland law is about joint ventures.

17   That this is a joint venture.  And then the final point is

18   whether the joint venture exhibited economic efficiencies.

19   And for me to convince you of that.  Even though it's not

20   the trial.  Even though it's not my closing argument.  I

21   need to bring the experts here.  So that they can testify

22   and -- or at least produce their reports so that if the

23   government wants to examine, to demonstrate that the

24   economic efficiencies exist.  Because my saying so isn't

25   enough.  Because I am not an antitrust specialist.

```
 1              THE COURT:  I understand.  Does any defendant want

 2    to be heard on any of the other pending motions?

 3              MR. SANDLER:  Thank you, Your Honor.

 4              MS. GALLAGHER:  Your Honor, very briefly on our

 5    jurisdictional motion, the failure to allege a single

 6    conspiracy and the motion to dismiss for lack of

 7    jurisdiction, we're going to submit on the papers.  We

 8    recognize that further exposition of the facts might be

 9    necessary for the Court to make a final decision on those

10    issues.

11              THE COURT:  Thank you.

12              MR. TREEM:  And, Your Honor, just to comment or

13    respond to the government's argument that we haven't filed

14    notice of experts with respect to Mr. Stollof's illness or

15    potentially his competence.  The government can infer that

16    we don't intend to call any experts with respect to that

17    particular issue.  And the same with respect to the pricing

18    expert.  But I do want to respond to the in limine motion

19    with respect to age, illness, financial condition.

20              The government has to prove that Mr. Stollof knew

21    the nature and scope of the agreement that they have alleged

22    that he participated in.  And issues concerning his

23    knowledge, his participation, his association with other

24    co-conspirators, are very much at the heart of that.  You

25    know, mere association isn't enough.  And mere participation
```

1    without knowledge isn't enough.  I mean, the threshold --

2    the threshold case of the government is that Mr. Stollof had

3    to know that he was entering into an agreement, the object

4    of which is described in the indictment.

5            And so I think it is premature, at least at this

6    stage, to cut us off at the knees without having had the

7    trial at least commence where these issues of relevance,

8    which is what really they are all about, come into play.  If

9    we ask a question that the government thinks is improper,

10   then they will object and the Court will rule.  And I think

11   that's --

12           THE COURT:  As long as you're not suggesting that

13   if you're 70, you can't understand --

14           MR. TREEM:  Oh, no, not at all, Your Honor.  I'm

15   rapidly getting there.  And I'd like to think that that

16   won't be the case.

17           THE COURT:  Okay.  I'll reserve -- to the extent

18   that it's relevancy, Mr. Treem, you know the mere fact that

19   somebody doesn't feel well or is ill or is old, you're going

20   to have a tough time with me on that, but I'll reserve

21   ruling on that.

22           MR. TREEM:  Thank you, Your Honor.  That's all I

23   have.

24           THE COURT:  Or relatively old.  All right.  I'm

25   not even sure I'm going to formalize all the rulings on the

1   smaller motions.  I will defer ruling on the big issue,

2   which is the joint venture issue.  I'll take a look at the

3   proffer, that is what I needed to see, to make some -- to

4   put it in proper context.  I'll issue an opinion.  I will,

5   depending upon that ruling, I may grant the motion for the

6   third party subpoenas because obviously -- excuse me, if I

7   find -- basically if I find the single entity defense is not

8   viable, those subpoenas ought to be rethought and reissued,

9   if there's anything left to find there.  So that's related.

10  But I will -- I don't expect -- I may write a long opinion,

11  I probably won't.  I'll take a look at the proffer.  The big

12  issue today, obviously, is whether I'm going to allow the

13  single entity defense.  Thank you.

14          MR. SANDLER:  May it please the Court, would it be

15  helpful, and I'm not trying to overburden the Court, would

16  it be helpful for the two expert reports --

17          THE COURT:  No.

18          MR. SANDLER:  It would not.

19          THE COURT:  Absolutely not.  Let me say it this

20  way, if I decide after reviewing the papers it would, then

21  I'll let you know.

22          MR. TERZAKEN:  Your Honor, certainly no discredit

23  to defense counsel, but the United States has not had an

24  opportunity to review this supposed factual information

25  they've presented or in the form it's been presented.

```
 1              THE COURT:  If you want to submit any response to

 2    it, when can you do it?

 3              MR. TERZAKEN:  We could certainly do it, but it

 4    includes expert testimony for an expert who hasn't been

 5    qualified before this court.

 6              THE COURT:  Don't do anything with it unless --

 7    I'll take a look at it.  Mr. Sandler's made a good argument.

 8    I'll take a look at this.  If I was going to rule from the

 9    bench right now I wouldn't allow the single entity defense.

10              MR. TERZAKEN:  Thank you, Your Honor.

11              MR. SANDLER:  Thank you, Your Honor.  I want to

12    mark officially this exhibit.

13              THE COURT:  Thank you.  I'm saying that only in

14    terms of guidance.  If I change my mind on that, I'll give

15    you a chance to respond.

16              (The proceedings were concluded.)

17
              I, Christine Asif, RPR, CRR, do hereby certify
18    that the foregoing is a correct transcript from the
      stenographic record of proceedings in the above-entitled
19    matter.

20              _____/s/_____
                  Christine T. Asif
21                Official Court Reporter

22

23

24

25
```

< Dates >.
point may 46:21.
$1000 11:9.
$15,000 11:9.
$15,000. 11:9.
$2 11:14.
$20 12:14, 20:21,
   37:2, 39:25,
   40:1, 87:12.
$40 33:23, 40:1.
$6,000 11:14.
$7 21:7.
.
.
< 1 >.
1 83:10, 83:19,
   94:23.
1. 83:8.
10 74:17, 74:18.
11 21:7.
11th 71:24.
12.2B 69:4.
13th 4:15.
14 28:23.
17 76:14, 77:5,
   77:10, 77:11.
1800s 20:22.
.
.
< 2 >.
2000 11:12.
2002 22:22,
   59:9.
2002. 59:11.
2004 21:6.
2005 21:17,
   23:23.
2007 22:22.
2009 1:15.
.
.
< 3 >.
3 88:17.
302 13:14, 23:24,
   57:6, 82:7.
302. 13:13,
   56:24.
302s 51:12, 52:10,
   52:11, 79:8,
   84:12.

.
.
< 4 >.
40,000 27:8.
404(b 82:12,
   82:17.
4th 18:10, 45:2,
   79:3.
.
.
< 5 >.
50 27:19.
50. 71:2.
50/50 33:14,
   38:18.
.
.
< 7 >.
70 97:13.
704. 68:14.
70s 72:8.
.
.
< 8 >.
807 21:6.
.
.
< 9 >.
9 74:17.
91 71:3.
95. 71:3.
99.9 90:10.
_____/s/_____
   _____
   99:23.
.
.
< A >.
a-ha 18:22.
able 8:2, 9:13,
   15:3, 19:9,
   23:24, 24:6,
   31:8, 31:9,
   38:24, 44:17,
   64:2, 77:15.
above-entitled
   1:19, 99:20.
absence 65:22,
   88:19.
absent 79:2.

Absolutely 27:24,
   46:7, 53:24,
   70:11, 83:3,
   89:20, 98:19.
academic 43:4.
academics 43:21.
accept 6:8, 6:10,
   45:15, 57:18,
   62:5, 83:9.
acceptable 29:10,
   45:18.
account 10:16,
   48:23.
accounts 10:19,
   50:14.
accrued 10:17.
accurate 28:4.
accused 3:7.
acknowledge 23:12,
   25:5, 26:13,
   86:6, 88:19.
acknowledged
   84:13, 86:6.
acknowledges 17:4,
   23:21, 85:5.
acknowledging
   35:20.
acquaint 10:9.
acquire 36:6.
acquired 33:13.
across 2:23.
Act 6:10, 16:5,
   86:15.
acted 31:9,
   53:12.
acting 66:10.
actionable 88:4.
actions 68:11.
activities 50:15,
   88:7.
activity 60:14,
   64:12, 70:16.
acts 82:12.
actual 21:12,
   22:10, 59:13.
Actually 2:17,
   5:20, 10:18,
   74:19.
Addamax 51:1,
   63:24, 94:18.

addition 11:5,
    17:2, 30:11,
    40:2, 40:10,
    55:1, 55:5,
    66:24.
additional 62:13,
    64:14, 64:16,
    67:16, 82:9,
    82:10, 82:11.
address 69:18,
    70:19, 70:23,
    70:25, 72:22,
    73:20, 73:23,
    75:17, 75:19,
    79:16, 81:16,
    81:24, 82:13,
    82:16, 82:24.
addressed 76:3.
addressing
    92:24.
adduce 18:16.
adhered 76:15.
adjective 3:3.
admissibility
    84:22.
admissible 72:2,
    77:7.
admission 79:1.
admit 52:5,
    52:11.
admitted 51:15,
    51:22, 52:4,
    56:15, 58:13.
admitting 52:14.
advance 58:20,
    61:9.
advantage 30:15,
    30:17, 30:23,
    55:4.
adversary 9:10,
    46:19.
advice 72:24.
affirmative
    43:10.
afternoon 47:2.
age 44:14, 72:7,
    72:14, 96:19.
Agli 1:46.
agree 4:12, 47:4,
    49:19, 71:19,

79:10, 88:10.
agreed 53:18.
agreeing 19:8.
agreement 16:7,
    24:18, 26:4,
    47:15, 51:14,
    52:20, 57:21,
    61:4, 61:9,
    63:7, 69:6,
    71:19, 86:13,
    87:2, 88:19,
    88:20, 95:8,
    96:21, 97:3.
agreements 48:11,
    48:12, 79:13,
    79:25, 80:1,
    80:2, 80:4,
    84:12, 84:13.
ahead 22:24, 55:9,
    63:13, 74:23,
    76:1, 85:14.
aim 84:5, 84:7.
al 2:5.
alchemist 43:14.
alerting 5:6.
allegations 10:11,
    74:11.
allege 73:18,
    73:24, 74:6,
    96:5.
alleged 47:10,
    48:6, 51:10,
    52:9, 52:13,
    58:2, 64:12,
    79:2, 82:12,
    89:18, 92:17,
    93:14, 96:21.
allegedly 19:8,
    59:25.
allocate 21:9.
allow 6:5, 17:23,
    18:16, 19:16,
    62:5, 80:1,
    80:12, 98:12,
    99:9.
allowed 38:23,
    59:18, 63:2,
    63:22, 75:12,
    94:10, 94:15.
allowing 88:3.

alluded 85:10.
almost 25:12,
    90:17.
alone 70:9.
already 47:2,
    61:14, 72:25,
    77:23, 78:2,
    78:4, 78:19,
    86:5, 91:17,
    92:24.
alter 22:3.
Altern 63:12.
Alternatively
    62:25, 63:14.
Although 4:6,
    4:13, 16:1,
    20:25, 21:21,
    43:24, 61:1,
    71:20, 76:3.
America 2:5,
    83:22.
American 47:17.
among 15:17,
    26:16, 28:7,
    58:18, 61:23.
amount 11:8,
    11:10, 11:17,
    39:25, 55:13.
amounts 37:4,
    71:14.
analysis 5:21,
    6:4, 29:21,
    31:4, 37:21,
    86:1.
analyze 27:7,
    30:9, 32:22,
    90:24.
analyzed 6:6,
    54:24.
and/or 88:22.
anecdote 87:21.
annually 10:17.
answer 14:20,
    18:8, 18:20,
    28:15, 34:8,
    36:7, 38:14,
    92:1, 92:18.
answered 89:9.
answering 18:5.
anticipate

64:15.
anticompetitive
    61:24.
antitrust 5:14,
    6:14, 6:24,
    15:15, 15:25,
    16:19, 18:23,
    24:19, 25:19,
    28:20, 29:3,
    31:7, 37:20,
    39:1, 41:11,
    47:6, 47:7,
    49:14, 49:15,
    49:24, 62:7,
    62:12, 86:5,
    88:1, 94:1,
    95:25.
anybody 82:10.
appeal 45:20,
    45:22, 85:24,
    90:22.
Appeals 90:23.
appear 18:1, 43:2,
    68:20.
appeared 51:15,
    51:21.
appears 24:24,
    77:19, 78:6,
    78:18.
applicable 6:14,
    19:14, 42:25,
    84:3.
application 17:14,
    47:5.
applied 60:7.
applying 84:9.
appointment
    68:25.
appointments
    68:19.
appreciate 4:2,
    4:15, 5:22,
    7:20, 11:3,
    85:8.
approach 18:15,
    32:1, 52:22.
appropriate 5:7,
    29:4, 50:2,
    69:7.
approve 8:17.

arduous 27:9.
areas 5:4, 43:22,
    71:24.
argue 2:22, 50:3,
    66:25, 69:22,
    73:9, 75:3,
    94:10.
argued 17:7,
    62:25, 67:15,
    68:6, 68:22.
argues 71:12,
    71:13.
arguing 42:20,
    46:10.
argument 2:12,
    4:5, 4:14, 9:25,
    15:12, 23:1,
    45:4, 45:12,
    46:16, 60:22,
    61:2, 63:14,
    63:15, 67:9,
    69:13, 72:6,
    73:21, 75:14,
    95:20, 96:13,
    99:7.
argumentative
    26:1, 84:20.
arguments 66:9,
    67:10, 71:7,
    75:25.
Aristotle 85:25.
around 11:12,
    57:22.
arranged 2:18.
arrangement 14:14,
    36:3, 40:5,
    54:7, 55:19.
arrow 83:24, 84:5,
    84:7.
art 10:24,
    11:11.
article 43:1,
    43:4.
articulate 83:2.
Asif 1:49, 99:18,
    99:24.
asks 76:24.
aspect 21:23,
    23:20, 29:18,
    54:23, 68:15,

88:11.
aspects 23:13,
    26:21.
assert 3:10.
assess 49:11.
assessed 11:17.
assessment
    15:12.
asset 81:10.
assets 33:5,
    35:22, 81:1,
    88:22, 93:7,
    93:10.
assistance 4:3.
association 96:23,
    96:25.
assume 13:16,
    13:19, 13:21,
    61:20, 64:25,
    66:10, 89:18,
    91:19, 91:25.
assumed 81:10.
assuming 63:20.
atmosphere
    60:25.
atmospheric
    60:22.
attention 40:13.
Attorney 1:32,
    1:33, 1:34,
    1:35, 5:23,
    27:15.
attribute 84:14.
auction 10:17,
    10:18, 10:23,
    10:25, 11:1,
    11:2, 11:6,
    11:21, 23:22,
    27:23, 28:1,
    32:23, 34:7,
    71:18.
auctions 10:12,
    10:21, 10:22,
    10:25, 11:13,
    11:24, 12:11,
    23:8, 30:18,
    33:4, 38:20,
    51:23, 56:14,
    56:20, 58:20,
    59:9, 59:11,

59:12, 59:13,
59:17, 59:21,
59:22, 60:11,
61:5, 61:10.
auger 4:18.
authority 76:14.
available 27:8,
32:22, 32:23,
40:17, 83:23.
average 68:5.
aware 12:14, 52:8,
53:1, 60:13,
65:20, 70:15,
76:13, 77:3,
78:9, 82:17,
82:18, 93:23.
away 18:14,
61:15.
awkward 8:2.
.
.
< B >.
back 21:15, 23:12,
23:14, 25:6,
29:11, 37:15,
39:18, 43:18,
56:21, 64:7,
68:9, 77:24,
80:5, 86:24.
backing 18:14.
Baking 85:1.
balance 83:25.
Baltimore 1:13,
20:10, 21:6,
22:19, 23:5,
23:23.
banker 12:16,
19:25, 20:13,
26:19.
bankers 20:22,
24:16.
banking 36:4,
37:3, 39:20,
39:23.
banks 22:25, 30:1,
33:22, 33:24,
39:24, 39:25,
48:20, 56:2.
bare 18:15.
base 61:5.

based 39:21, 40:6,
42:17, 90:3,
91:12, 92:9.
bases 13:10.
basic 65:16.
basically 73:3,
98:7.
basis 3:2, 3:22,
7:14, 38:18,
53:6, 54:4.
bathroom 39:9.
battle 4:6.
Bear 39:7.
bearing 58:5.
bears 68:16.
Beckford 76:7.
become 50:9,
50:10, 82:18.
becomes 10:19,
50:16, 64:2.
Beg 13:18, 33:16,
72:18.
began 85:7,
85:9.
beginning 85:7,
85:21, 85:23.
behalf 81:7, 81:8,
81:14.
behavior 60:10.
behind 49:23,
53:1.
belief 26:4,
26:16, 26:19.
believe 9:10,
9:20, 15:23,
40:14, 45:13,
45:25, 46:18,
57:12, 66:12,
70:1, 70:6,
71:23, 72:25,
73:6.
believed 64:10,
70:5, 70:12,
70:13.
Ben 83:15,
83:17.
bench 52:23,
99:9.
benefit 25:22,
42:10, 43:6.

benefits 64:14,
64:23.
Berman 11:25,
12:4, 12:15,
20:18, 21:6,
21:8, 21:18,
22:17, 23:3,
23:7, 23:11,
25:5, 27:15,
27:17, 29:22,
36:3, 38:8,
40:5, 42:1,
58:3, 58:11.
besides 6:18.
best 9:23, 25:10,
31:24, 40:23,
43:6, 75:25,
91:4.
Bester 1:34, 2:6,
75:18.
better 39:7.
beyond 44:21,
58:10, 68:15,
74:13, 94:4.
bidder 11:3, 11:4,
30:18, 59:19,
91:18, 92:2,
92:3.
bidders 59:18.
bidding 11:14,
27:22, 28:1,
31:1, 32:24,
33:2, 34:12,
38:20.
bids 11:1, 27:23,
33:3, 33:7,
33:9, 33:18,
40:19, 40:20,
49:2, 49:3,
49:4, 51:15,
51:22, 52:6,
52:15, 53:13,
71:7, 87:14,
94:4.
big 71:18, 98:1,
98:11.
Bill 62:19.
bills 10:15.
bit 3:20, 19:18,
59:6.

blame 15:11.
block 78:22.
bluntly 3:6.
board 57:1.
boils 58:15.
book 6:1, 7:24,
    9:16, 15:7,
    20:16, 21:12,
    22:4, 23:15,
    28:23, 28:24,
    30:25, 32:11,
    41:16, 46:21,
    54:14, 87:8.
books 7:24,
    30:8.
boom 19:10.
Booth 16:14, 21:3,
    41:3, 41:15,
    86:16.
borrow 12:12,
    40:4.
borrowed 40:8.
borrower 21:5,
    21:17.
borrowing 20:18,
    38:6, 40:5.
boundaries
    64:17.
bow 45:18,
    45:22.
box 40:5, 94:23.
brands 93:11.
breadth 58:1.
break 39:9.
brief 7:5, 39:9,
    85:4, 88:14.
briefing 7:1,
    17:3, 17:6.
briefly 96:4.
brilliance 84:4.
brilliant 84:5,
    84:8, 93:19.
bring 23:17,
    40:12, 40:21,
    43:19, 55:21,
    63:2, 63:9,
    64:2, 74:12,
    83:21, 94:16,
    95:21.
brings 10:4.

Brinkley 7:23.
broad 61:14,
    71:13.
broader 68:15,
    77:18.
broadly 21:24.
brought 16:14,
    64:18, 71:11,
    83:9, 87:12.
bud 32:7.
bull 84:6.
bullet 56:16.
burden 5:10, 9:18,
    43:10, 45:4,
    74:5, 91:13.
buy 37:5.
.
.
< C >.
C. 1:33.
calculate 34:12.
calendar 4:14.
call 2:18, 11:25,
    25:1, 30:17,
    31:16, 34:15,
    41:24, 49:8,
    49:13, 53:13,
    55:4, 67:6,
    68:17, 96:16.
called 11:11,
    11:18, 24:22,
    67:16, 85:25,
    93:6.
calling 22:7,
    24:23, 24:25,
    67:13, 68:2.
calls 61:16.
Campanaro 12:17,
    19:25.
candor 4:3.
capacities
    36:21.
capacity 69:5.
capital 88:22,
    89:3, 91:5.
carefully 27:7.
cases 3:8, 5:24,
    5:25, 6:18, 7:4,
    7:8, 7:22, 8:24,
    17:9, 41:11,

44:13, 44:15,
    48:10, 51:3,
    64:25, 65:1,
    68:1, 84:25,
    86:23, 89:11,
    90:16, 94:8.
categorize
    29:24.
caused 71:8.
certain 11:16,
    39:24, 41:13,
    57:5, 59:3,
    68:18, 68:20,
    88:7.
Certainly 62:20,
    65:19, 74:14,
    75:1, 76:4,
    79:14, 80:19,
    83:1, 86:14,
    92:19, 98:22,
    99:3.
certify 99:18.
challenge 4:6.
chambers 4:23.
chance 32:9,
    99:15.
change 21:25,
    59:3, 60:14,
    99:14.
changed 59:14,
    59:15, 60:4.
characteristics
    32:14.
characterization
    17:25.
charged 19:8.
charges 59:9.
charging 60:5,
    72:22.
check 4:14,
    56:5.
checked 4:15.
choice 19:21.
choose 48:8.
Christine 1:49,
    99:18, 99:24.
Circuit 18:10,
    45:2, 69:21,
    79:3.
circumstance

47:20.
circumstances
    10:16, 45:16,
    51:8, 59:23,
    59:24, 60:11,
    63:18, 72:7,
    91:4, 91:9.
cited 7:4, 43:12,
    63:4, 63:23,
    63:25, 65:18,
    65:19, 67:24,
    68:1, 93:22,
    94:8.
City 20:10, 22:19,
    23:23.
City. 23:5.
civil 7:21, 8:5,
    77:1, 90:21,
    91:10.
claim 16:3.
claims 6:23,
    88:14.
clarify 59:7.
classic 70:7.
clear 16:6, 18:8,
    18:19, 24:9,
    32:15, 37:24,
    43:12, 43:13,
    46:4, 47:4,
    48:16, 48:19,
    49:1, 63:6,
    63:17, 77:10,
    79:16, 84:24,
    88:6.
clearer 74:18.
clearing 55:22.
clearly 3:15,
    17:5, 18:11,
    50:25, 92:19,
    93:18.
CLERK 2:3.
client 33:25,
    34:1, 38:11,
    41:25, 44:17,
    44:19.
clients 2:10.
close 39:16.
closing 95:20.
co-conspirator
    12:24, 51:14,

79:2.
co-conspirators
    47:11, 48:6,
    51:10, 51:13,
    51:14, 52:9,
    52:11, 53:12,
    58:1, 58:10,
    84:11, 84:13,
    96:24.
co-counsel
    73:16.
collaborating
    24:22, 49:23.
collaboration
    40:16, 61:23.
collateral 40:2,
    40:8.
colleague 61:25.
collection 35:1.
collective 32:19,
    35:8.
collectively
    37:2.
comes 2:10,
    30:16.
coming 39:15,
    57:5, 81:14.
commence 97:7.
comment 4:13,
    24:3, 41:16,
    46:15, 84:2,
    96:12.
commentary 16:2.
comments 44:6.
commercial 21:8.
commission
    74:13.
committees
    20:23.
common 32:25,
    77:12, 90:20.
communications
    33:4.
companies 93:12.
Company 58:8,
    58:9, 85:1.
Compel 66:19,
    82:3.
competed 95:3.
competence

96:15.
competing 49:23,
    56:20, 61:11.
competition 15:3,
    31:2, 34:18,
    49:21, 60:5,
    64:4.
competitive 28:1,
    33:7, 38:22.
competitors 28:2,
    48:24, 49:5,
    49:18, 49:23,
    56:1, 56:19,
    57:10, 58:19,
    58:23, 60:23,
    61:23, 89:21,
    95:5.
complaint 75:13.
complete 82:7.
completely 63:11,
    94:18.
complicated 27:9,
    39:23.
comply 76:16.
comport 76:16.
computer 11:2,
    30:12, 31:11,
    31:14, 32:21,
    32:25, 54:5,
    55:2, 89:4,
    91:6.
concede 73:16.
conceded 86:2,
    92:11, 95:9,
    95:12.
concedes 71:12.
concept 17:15,
    27:4.
concern 86:4.
concerned 30:23,
    76:18.
concerning 40:17,
    96:22.
concerns 75:22.
conclude 4:8,
    41:4, 41:23,
    42:11, 67:19,
    68:2.
concluded.
    99:16.

conclusion 6:13,
    67:20, 67:22,
    67:23, 70:8,
    86:2, 91:12.
conclusively 6:7,
    83:24.
condemned 49:20.
condition 72:7,
    72:20, 96:19.
condonation
    60:25.
condoned 60:17,
    70:16.
condoning 60:9,
    60:14, 60:21.
conduct 14:11,
    48:1, 57:13,
    65:14, 65:23,
    86:11, 89:19,
    92:17.
conducted 10:17,
    59:12, 60:12.
conference 2:18,
    40:22, 75:21.
confidential 8:15,
    82:4.
confused 35:14.
confusing 34:22,
    74:11.
confusion 16:10,
    39:20, 48:16,
    48:19, 49:1,
    55:22, 58:16.
connections
    40:6.
consider 9:17,
    9:18, 9:22,
    24:20, 25:8,
    57:25, 65:24,
    83:25, 90:19.
consideration
    8:14, 78:15.
considered 8:15,
    46:17, 47:19,
    48:2, 57:21,
    65:14, 94:2.
considering
    76:15.
consistent 14:12,
    22:6, 48:14.

conspiracy 48:15,
    49:12, 50:6,
    52:2, 52:7,
    52:12, 53:14,
    58:18, 62:8,
    65:24, 71:8,
    73:18, 73:24,
    96:6.
conspire 50:19.
conspired 52:5.
constitute 42:3,
    49:12.
constituted 20:4,
    67:21, 91:2.
consultant
    31:14.
consultants 55:2,
    89:4.
contain 80:4.
contained 30:7,
    76:24.
contested 24:10.
context 10:12,
    13:24, 60:3,
    98:4.
Continental
    85:1.
continues 43:15.
continuing 33:6.
contradict
    55:12.
contradicted
    51:2.
contrary 48:17,
    51:1.
contrast 77:16.
contrived 42:16,
    52:1, 61:18.
control 38:19,
    88:23.
controversial
    10:4, 10:6.
controvert 52:3.
conversation
    4:4.
conversations
    77:14, 77:16.
converted 63:19.
converting
    63:15.

convey 8:2.
convince 16:13,
    95:19.
cook 32:11.
cooperator
    80:18.
cooperators
    80:18.
copious 25:13.
Copperweld 6:19,
    17:11, 47:16.
copy 83:17.
core 18:24,
    25:20.
corporate 16:14,
    16:18, 30:5,
    48:11.
corporations
    30:1.
correct 7:6,
    38:14, 44:23,
    60:15, 60:18,
    62:2, 66:12,
    71:12, 73:3,
    92:14, 94:19,
    99:19.
correctly 81:3.
corroborate 12:18,
    42:4, 43:16.
corroborated
    32:17.
Counsel 2:5, 2:8,
    2:17, 2:18, 4:3,
    5:7, 5:23, 8:24,
    17:18, 21:14,
    21:15, 40:22,
    44:5, 51:23,
    72:24, 84:17,
    94:25, 95:9,
    98:23.
count 58:13.
counter 9:25,
    10:2.
counter-intuitive
    27:21, 27:25,
    28:22, 30:15.
counties 28:9,
    59:5.
country 10:14,
    19:7, 28:6,

42:21, 82:12.
County 21:6,
  27:17.
County. 22:20.
couple 64:1,
  85:7.
course 2:15, 6:15,
  7:16, 14:6,
  28:12, 44:3,
  44:7, 57:8,
  86:6, 92:5.
courtesy 85:9.
Courts 76:4, 94:2,
  94:12.
covenants 33:10,
  33:19.
cover 50:23,
  73:10.
covered 25:16,
  25:17, 54:13.
covers 58:2.
cowards 44:8.
crafted 24:12.
CRALLE 1:35, 2:6,
  81:22.
created 50:4,
  93:6.
credible 10:1.
credit 24:5.
crime 61:7, 61:24,
  62:8, 63:8,
  70:12.
crimes 49:18.
criminal 2:4,
  3:12, 5:24,
  7:22, 8:5,
  18:12, 19:4,
  42:21, 44:15,
  57:13, 77:2,
  91:14.
CRIMINAL 1:5.
critical 50:7,
  56:14.
criticize 89:24.
criticized 8:24.
cross 30:17,
  30:21, 31:17,
  34:4, 34:15,
  55:4, 81:5.
cross-examination

9:25, 51:25.
cross-examine
  13:22, 80:19.
CRR 1:49, 99:18.
crucial 25:24,
  29:20, 30:4,
  30:14, 31:14,
  54:23, 87:23.
cry 58:20.
curb 11:15.
customer 34:24.
cut 60:22, 97:6.
cuts 57:2.
cutting 2:23.
.
.
< D >.
D. 62:15, 62:18.
Dackman 52:10,
  58:8.
Dagher 6:15, 6:16,
  6:18, 17:12,
  17:15, 51:2,
  89:21, 95:1.
data 21:15, 22:10,
  32:23.
dates 77:19.
daunting 42:18.
day 32:2, 34:12,
  42:12, 75:21.
dealing 71:1.
deals 72:5,
  72:19.
dealt 38:13,
  70:17, 72:3,
  74:2.
debatable 46:1.
decide 13:2,
  37:21, 45:8,
  82:3, 89:9,
  98:20.
decided 54:25.
decision 17:24,
  96:9.
decisions 72:22.
declared 12:4.
deductive 6:4,
  86:1.
deductively 6:6.
deemed 57:20.

defend 17:18,
  44:19, 44:25,
  54:4.
defendant.
  18:18.
defenses 3:8,
  7:14.
defer 79:20,
  79:21, 98:1.
definition 14:6.
Delaurentis
  84:17.
delicate 7:19.
delivering 33:3.
demonstrate 14:22,
  14:25, 15:4,
  21:20, 31:3,
  51:8, 95:23.
demonstrated
  48:10.
demonstrating
  55:13, 64:22.
demonstration
  47:14.
Denied 80:22,
  80:23, 82:6.
deny 32:3, 79:11,
  79:21, 79:22,
  80:25, 81:4,
  81:25.
Department 19:14,
  42:25.
depend 18:2,
  75:10.
depending 76:19,
  98:5.
deposit 11:10,
  11:18.
described 57:12,
  84:4, 97:4.
description
  57:6.
desirable 29:25.
detailed 46:6.
determination
  88:5.
determine 41:24,
  54:2, 59:22,
  64:20.
determined 8:8.

determining
   18:11.
developed 12:2,
   32:21, 38:21,
   38:23.
device 77:11.
difference 14:17,
   84:4.
different 23:1,
   36:4, 40:2,
   40:3, 40:7,
   43:4, 56:1,
   56:2, 59:12,
   60:11, 66:1,
   67:9, 80:2,
   80:3, 93:3.
differs 18:5.
difficult 21:25,
   22:1, 23:17,
   23:25.
diligence 27:6,
   27:7, 30:12,
   32:18, 32:19,
   54:22, 56:5.
direct 38:22,
   80:13.
directed 78:16.
direction 83:20.
disagree 71:20,
   94:25.
disavow 47:3.
disavows 7:2.
disclosed 26:18.
disclosing
   57:22.
disclosure 57:18,
   57:19, 57:25,
   58:3, 66:20,
   82:3.
disclosures
   67:5.
discovery 43:19,
   51:12, 77:1,
   77:11, 77:12.
discredit 98:22.
discuss 7:6.
discussed 59:16,
   66:11, 66:16,
   93:25.
discussion 57:8,

58:5, 58:7,
   58:8, 95:9.
discussions 59:25,
   60:2, 61:7,
   64:16, 73:1.
dismiss 73:23,
   73:25, 74:5,
   96:6.
dispels 86:4.
dispositive
   37:10.
dispute 37:22,
   84:10, 92:5.
disputes 37:19.
distinction 92:14,
   93:20.
distinguished
   6:16, 67:25.
District 1:1, 1:2,
   1:23, 76:4.
divide 27:11,
   28:3, 41:21,
   41:22, 53:18,
   89:7.
divided 20:11,
   27:2, 27:13,
   33:12, 38:18,
   55:5.
dividing 91:7.
DIVISION 1:3.
divulge 9:11.
docket 2:4, 4:16,
   71:2.
doctor 68:25.
document 14:1,
   20:15, 20:19,
   22:21, 23:6,
   83:7.
documented
   27:19.
documents 20:4,
   20:5, 20:13,
   20:20, 21:13,
   27:14, 32:17,
   76:25, 77:17,
   77:21, 78:12,
   78:14.
doing 28:8, 28:10,
   31:13, 32:10,
   54:7, 56:5,

69:9, 70:5,
   70:13, 73:2,
   80:13.
dollar 40:18.
done 2:17, 20:9,
   20:17, 22:18,
   23:4, 71:21,
   74:10.
door 62:7, 64:7,
   68:9.
doubt 4:10, 43:17,
   44:22, 74:13,
   85:5.
down 45:18, 45:22,
   45:23, 48:25,
   58:16, 58:20.
Dozens 20:19.
draw 29:22.
drawing 91:5,
   92:14.
drive 45:23.
drug 42:14.
due 2:15, 5:2,
   15:10, 27:6,
   30:12, 32:18,
   32:19, 54:22,
   56:5.
during 4:3, 44:5,
   56:4, 56:19,
   57:8.
duties 31:12.
.
.
< E >.
earlier 22:6,
   73:1.
early 8:3, 8:4,
   15:12, 61:6.
easily 89:8.
easy 44:3,
   82:20.
econ 87:20.
economic 14:23,
   15:4, 16:8,
   16:12, 25:20,
   28:21, 38:21,
   40:14, 42:4,
   64:21, 72:2,
   88:13, 90:6,
   90:8, 95:18,

95:24.
economist 15:5,
    25:2, 42:5.
economy 18:25,
    19:1, 41:13,
    62:12, 87:22,
    87:23.
effect 10:19,
    35:10, 61:24.
efficiencies
    14:23, 15:4,
    16:8, 16:12,
    18:25, 19:1,
    25:20, 25:21,
    38:21, 38:23,
    38:25, 40:14,
    41:1, 41:5,
    41:13, 42:5,
    50:4, 87:22,
    87:23, 88:13,
    90:8, 95:18,
    95:24.
efficiency 18:12,
    28:21, 33:2,
    90:6.
efficient 53:15,
    62:10, 66:1,
    66:3.
efficiently
    53:12.
either 3:20, 5:22,
    8:16, 28:1,
    48:10, 81:7,
    82:23.
electronic 11:2.
element 65:2.
elements 14:10,
    15:1, 16:16,
    16:17, 26:25,
    42:2, 70:2,
    74:6, 85:22,
    87:8.
elicit 81:4.
eliminated
    34:11.
elsewhere 10:13.
emerged 34:4.
emotion 85:24.
emphasize 21:22,
    26:24.

emphasizing
    91:17.
employment
    62:21.
empty 13:1.
enacted 11:16.
encourage 60:4.
end 27:11, 32:1,
    65:23.
engage 54:6,
    69:5.
engaging 63:7,
    86:21.
Engine 50:25,
    63:25.
enhance 44:8.
enhanced 33:2.
enough 16:18,
    22:12, 34:12,
    95:25, 96:25,
    97:1.
enter 28:25.
entered 23:11.
entering 26:3,
    97:3.
enterprise 18:3.
entirely 68:23.
entitled 3:18,
    3:19, 43:23,
    71:17.
entrapment 7:13.
equal 10:7.
equalized 91:8.
equally 27:2,
    48:14, 52:8,
    55:5.
Equilon 93:6,
    93:8.
equipment 30:12,
    33:1.
Esquire 1:39,
    1:40, 1:44,
    1:45, 1:46.
essence 14:3.
essentially 39:23,
    54:2, 62:6,
    74:5, 74:10.
establish 45:5,
    50:11, 65:7.
established 3:16,

80:16, 80:20.
estate 32:20,
    40:8.
Esworthy 1:40,
    2:10, 83:8.
et 2:5.
evaluate 32:9.
evenly 27:13.
event 67:16,
    94:15.
everybody 2:21,
    34:23, 35:20.
everyone 39:4,
    39:9, 59:23.
everything 2:22,
    30:20, 61:8.
eviscerate
    62:11.
evisceration
    16:5.
ex 3:22, 8:22,
    8:25, 9:7.
exact 49:16,
    51:23.
Exactly 28:3,
    37:20, 42:6,
    44:10, 48:17,
    49:20, 49:24,
    55:23, 57:19,
    59:15, 62:1,
    62:2, 62:4,
    85:19, 93:17,
    94:3, 94:19.
examination 80:14,
    80:17.
examine 17:6,
    27:7, 28:17,
    95:23.
example 9:19,
    14:13, 16:20,
    20:7, 21:11,
    27:14, 27:17,
    31:20, 40:25,
    47:16, 48:19,
    50:6, 67:19,
    90:23.
examples 27:2,
    30:25, 41:4.
excellent 61:23.
Except 60:21.

excerpts 14:8,
    15:6.
exclude 71:6,
    71:9, 72:6,
    72:13, 72:24,
    73:1, 73:4,
    79:1, 80:25,
    81:10.
excluded 68:13,
    69:2.
Excuse 37:15,
    98:6.
Exhibit 83:8,
    83:10, 83:19,
    99:12.
exhibited 86:11,
    95:18.
exist 16:8, 19:5,
    44:11, 48:13,
    49:17, 49:18,
    56:11, 95:24.
existed 47:21,
    47:24, 50:12,
    50:13, 52:16,
    57:15.
existence 48:15,
    56:9, 57:13,
    63:10, 80:12.
existing 89:19.
expanding 42:9.
expect 98:10.
expected 85:12,
    85:15.
expedition 76:23,
    77:20.
expenses 30:5,
    55:2.
experience 32:20,
    85:13, 85:16.
experts 43:18,
    50:14, 67:6,
    67:7, 67:8,
    67:13, 91:6,
    95:21, 96:14,
    96:16.
explain 4:22,
    14:9, 14:10,
    20:3, 21:3,
    43:20, 44:1,
    91:1.

explains 40:9.
explanation 56:1,
    86:17.
exposition 96:8.
express 31:4.
expressed 4:4.
extent 57:10,
    60:25, 71:21,
    75:9, 75:12,
    75:13, 76:22,
    81:15, 82:18,
    97:17.
extra 83:17.
extrinsic 89:13,
    89:18, 92:14,
    92:17, 93:20,
    94:4, 94:13,
    95:10.
eye 84:6.
.
.
< F >.
F. 1:32.
face 49:6,
    93:25.
facilitate 50:6,
    50:15.
factors 22:13,
    49:11, 67:21,
    77:9, 94:11.
factual 3:1, 7:14,
    8:2, 17:9,
    17:15, 37:19,
    37:22, 46:6,
    47:7, 50:3,
    50:11, 51:8,
    51:22, 53:5,
    65:16, 67:11,
    91:24, 98:24.
factually 5:11.
fail 90:18.
failed 69:7.
failure 73:18,
    73:24, 73:25,
    96:5.
fair 32:8,
    44:10.
fairly 46:2,
    79:15.
fairness 23:19.

falling 82:12.
familiar 10:12.
family 36:3,
    38:8.
far 55:18, 59:12,
    60:10, 62:23,
    64:15.
favorable 18:18,
    24:7.
favorably 18:9.
FBI 82:7.
Federal 68:14.
feel 24:4, 24:6,
    32:1, 97:19.
feels 47:2.
feet 66:4,
    78:25.
fellow 56:24.
ferret 43:25.
few 5:8, 51:24.
fiduciary 31:12.
fifth 54:6.
figure 2:19,
    60:1.
file 82:9, 82:10,
    82:11.
filed 24:8, 76:8,
    79:15, 96:13.
filing 71:24.
final 95:17,
    96:9.
Finally 8:19,
    46:20, 68:15,
    69:9, 95:9,
    95:10.
financial 33:5,
    34:21, 36:11,
    72:7, 72:19,
    81:1, 96:19.
financing 20:3,
    20:12, 30:17,
    30:21, 31:17,
    31:18, 33:21,
    34:4, 34:13,
    34:16, 36:13,
    36:17, 36:21,
    37:7, 40:10,
    55:4.
find 3:8, 5:3,
    15:11, 22:25,

24:3, 35:11,
40:15, 62:10,
90:16, 90:25,
98:7, 98:9.
finder 17:19,
42:23, 42:24.
Fine 9:2, 13:16,
29:11, 38:16,
51:20, 81:12,
81:13.
firm 48:12, 53:2,
89:25.
First 6:8, 6:18,
7:20, 10:9,
12:8, 25:24,
28:22, 33:25,
35:7, 35:24,
36:2, 38:11,
45:1, 67:9,
67:18, 68:23,
71:5, 74:16,
84:10, 88:12,
90:11, 90:17,
93:22, 94:14.
fishing 76:23,
77:20.
fit 22:5.
five 21:17,
29:1.
fixing 94:5.
flag 57:3.
flesh 3:19,
59:6.
flowed 25:22.
flows 76:15,
86:10.
focus 95:14.
focused 50:2,
67:5.
folks 49:22.
follow 3:12, 45:3,
94:8.
followed 19:16,
86:16.
follows 26:21,
29:18, 41:23,
42:11, 54:19.
forces 20:9,
20:16, 22:18,
22:19, 23:3,

42:9.
foreclosed 63:1.
foregoing 99:19.
foremost 67:19,
68:23.
forest 54:17.
forget 59:1.
form 48:11, 66:15,
98:25.
formal 3:15, 47:9,
47:14, 47:16,
47:20, 47:24,
48:9, 49:7,
50:11, 50:13,
51:9, 52:15,
55:13, 55:14,
57:14, 57:15,
58:6, 64:22,
65:8, 65:9,
65:12, 65:22,
65:25, 75:24,
86:13, 93:4,
94:9, 94:20,
95:8.
formalize 97:25.
formed 12:2, 12:7,
13:10, 89:22,
93:4, 95:5.
former 89:16.
forming 64:3,
94:14, 94:21.
formula 11:17.
formulas 60:8.
forth 28:18,
83:9.
forthcoming
29:2.
forward 9:21,
28:16, 31:25,
51:6, 58:18,
59:9, 62:6,
65:21, 75:13,
76:10, 89:22,
93:24.
found 3:9, 52:17,
76:4, 76:7,
76:12.
four 20:11.
franchise 47:18,
89:17.

franchisee
89:17.
franchisees
17:9.
franchises 6:22.
Frankly 79:18.
Frederick 1:21.
free 2:13, 43:19,
82:11.
Friday 4:15.
friends 11:23.
frivolous 42:16.
front 3:16,
64:11.
FTC 6:16.
fuel 93:14,
93:16.
full 13:1, 51:11,
86:18.
fully 12:14,
72:3.
fundamental 14:16,
54:23.
funded 21:10,
55:25, 56:12.
funding 36:7,
56:10, 57:9.
funds 12:12,
30:19, 36:3,
56:13.
funds. 21:11.
future 74:8.
.
.
< G >.
gain 7:25.
Gallagher 1:46,
2:9.
garner 24:6.
Garrett 67:25.
gasoline 93:11,
95:4.
Gates 62:19.
gather 46:24,
56:23, 69:17,
70:10.
gave 31:20.
Gazette 17:24.
geared 43:3.
gee 15:8.

general 63:8,
     70:12.
generalize
     10:21.
generally 9:7,
     11:20, 71:19,
     82:2.
generated 87:22.
genius 84:4, 84:7,
     84:8, 93:19.
genuineness
     22:9.
George 22:20.
gets 36:13, 61:8,
     90:2.
getting 22:24,
     28:2, 36:21,
     52:25, 87:14,
     97:15.
Ghost 45:16.
give 9:23, 11:18,
     25:9, 25:11,
     27:18, 28:24,
     29:6, 29:7,
     37:1, 39:4,
     43:6, 43:19,
     43:20, 45:12,
     82:18, 83:17,
     99:14.
given 19:18,
     23:23, 36:25,
     55:9, 85:19.
gives 11:20,
     86:17.
giving 91:4.
glad 55:21,
     70:18.
glass 12:25.
goals 42:8.
governed 79:3.
governing 67:25.
Government 1:29.
governs 77:3.
grand 8:15, 13:12,
     75:4.
grant 98:5.
granted 91:12.
great 69:1,
     77:23.
greatest 44:13.

Gregory 12:17.
ground 9:24,
     69:2.
grounds 68:23,
     70:9, 72:1.
group 11:25, 12:7,
     12:15, 12:16,
     20:2, 20:3,
     20:6, 36:2,
     36:3, 38:19,
     40:4, 40:5.
groups 6:22,
     38:21.
GRUNDVIG 1:33,
     2:7, 73:20,
     79:4, 79:7,
     79:14.
guarantees 35:4.
guess 3:4, 57:17,
     57:24, 74:4,
     75:13.
guidance 99:14.
guidelines
     28:20.
guilty 58:11,
     62:10, 79:12,
     80:7.
.
.
< H >.
half 9:17, 13:1.
hallmark 36:14.
hammer 90:2.
hand 10:23, 11:13,
     20:21, 39:4,
     39:6, 40:15,
     85:16.
handed 83:7.
hands 51:13.
happen 6:2.
happened 27:4,
     33:22, 44:10.
happening 32:13.
happens 94:8.
happy 38:1, 62:16,
     62:19, 75:7,
     79:14, 81:24,
     82:16.
hard 27:6.
hardware 31:11,

55:3, 89:5.
harm 19:10, 71:8,
     72:2.
Harvey 1:37, 2:5,
     41:25.
HARVEY M. NUSBAUM
     1:11.
head 15:16, 15:21,
     15:25, 47:6,
     47:7, 49:14,
     62:7, 86:5,
     88:1, 94:1,
     95:4, 95:5.
headline 16:24.
headquarters
     48:22.
health 69:1,
     72:14.
hear 3:4, 3:20,
     5:18, 5:24,
     23:16, 34:17,
     44:10, 46:8,
     46:11, 49:16,
     73:14, 74:19,
     74:23, 75:1,
     75:4, 75:16,
     81:24, 82:22.
heard 48:22,
     78:11, 96:2.
hearing 1:19,
     2:11, 74:20.
heart 83:24, 85:3,
     96:24.
held 56:2,
     56:18.
help 31:20, 39:21,
     50:6.
helpful 22:25,
     59:20, 90:25,
     98:15, 98:16.
hereby 99:18.
herring 78:13.
hiding 55:20.
High 11:11, 11:12,
     11:16, 11:18,
     11:19, 30:20,
     33:7, 60:7,
     74:5, 91:18,
     92:1.
higher 90:12,

91:21, 91:23,
  92:3.
highest 11:3,
  11:4, 59:19.
highlight 17:14.
highly 53:3.
hired 54:5.
historically 38:7,
  38:13, 95:2.
history 30:2.
hit 84:6, 84:8,
  90:3.
hmmm 22:4.
hold 89:25.
holding 49:22,
  58:22, 60:23,
  94:17.
Hollander 90:23.
Holy 45:16.
honed 67:7.
Honorable 1:21.
hope 7:19.
hopefully 4:8,
  29:2.
hotly 24:9,
  24:10.
hours 85:8,
  90:16.
huge 63:20.
hundred 34:9,
  34:10.
hundreds 90:15.
  .
  .
< I >.
idea 7:15, 11:20,
  15:21, 46:7.
identified 15:4,
  67:17.
identifies 62:4.
identify 77:15.
Ides 4:16.
ill 72:14,
  97:19.
illegal 57:3,
  57:17, 57:23,
  73:3, 87:1,
  88:8, 89:19,
  92:17.
illness 72:7,

96:14, 96:19.
immaterial 70:10,
  70:11.
impact 14:23,
  16:7, 19:2,
  30:16, 62:12,
  90:6, 90:9.
impacts 41:13.
imperative
  21:15.
important 4:7,
  11:3, 16:21,
  19:11, 25:8,
  30:11, 46:5,
  50:16, 90:5.
impressed 2:25.
impression 7:20,
  90:18.
improper 69:13,
  69:22, 97:9.
in-depth 29:20.
in. 11:17, 16:11,
  71:11, 80:1,
  81:2, 96:22.
inappropriate
  63:12, 67:18,
  68:12.
incidentally
  17:7.
included 21:7.
includes 99:4.
including 38:19,
  51:12.
inclusion 82:21.
income 81:1,
  81:10, 81:23.
inconsistent
  71:18.
incorrect 83:6,
  84:12, 89:23.
increased 40:16.
increasing 40:18,
  40:19.
incredibly
  52:17.
independent 49:4,
  49:22, 56:19,
  58:10, 58:22.
independently
  61:11, 93:12.

indicated 42:3,
  75:3.
indicia 12:21,
  12:23, 36:19,
  53:8, 54:12,
  57:14.
indicium 57:20.
indictment 22:11,
  59:8, 59:13,
  60:5, 73:23,
  73:25, 74:5,
  74:10, 74:11,
  74:17, 97:4.
indictments
  22:22.
indisputable
  6:17.
individual 35:1,
  35:8, 52:3,
  57:6, 57:9,
  63:7, 66:23.
individuals 16:3,
  19:7, 20:12,
  25:22, 29:22,
  38:6, 43:21,
  52:5, 56:4,
  58:9, 61:4,
  86:11.
inescapable
  6:13.
inevitable 19:4.
infer 81:3,
  96:15.
inferred 92:20.
infinity 59:18,
  59:24, 60:6.
inform 75:11,
  76:20.
information 8:16,
  14:6, 22:25,
  23:8, 24:8,
  27:6, 27:11,
  29:19, 29:20,
  30:3, 30:4,
  32:19, 32:24,
  39:22, 40:17,
  54:21, 57:7,
  77:23, 78:5,
  78:6, 78:21,
  81:5, 98:24.

infuse 61:13.
ingredient
  21:21.
ingredients 21:21,
  25:8, 25:19.
inherent 87:15,
  87:17.
inherently 19:3.
initial 21:24.
input 29:23.
inquiry 68:3.
Inspection 82:7.
instance 91:7,
  94:14.
instances 5:25,
  27:16, 41:20.
Instead 49:7,
  49:13, 52:14,
  54:15.
instituted
  11:12.
institution 35:20,
  36:11.
institutions
  34:21, 38:7.
instruction 18:13,
  18:14, 32:3.
instrument 11:7.
insulate 30:24.
integrated 18:24,
  48:1, 50:18,
  50:23, 65:13.
integration 50:5,
  64:21.
integrity 24:5.
intend 21:22,
  96:16.
intended 25:3,
  33:13, 54:20,
  68:11.
intending 69:6.
Intense 32:18.
intent 22:15,
  26:14, 61:7,
  63:3, 63:6,
  63:8, 63:11,
  65:5, 66:15,
  68:7, 68:12,
  70:12.
intention 14:21,

24:15, 26:3,
  31:8, 32:16,
  42:8.
intentions
  25:16.
interest 31:10,
  37:9, 40:7,
  81:14, 88:15,
  88:21.
interested
  25:13.
interesting 11:5,
  22:5, 52:18,
  86:12.
internal 78:8,
  78:14.
international
  95:4.
interpose 42:22,
  43:7.
interpret 9:24.
interpretation
  84:25, 89:23,
  90:3.
interview 52:21,
  79:8.
intrinsic 92:14,
  93:20, 95:11.
introduce 9:16,
  46:21, 71:22,
  80:12, 82:20.
introducing
  70:4.
introduction
  68:22, 69:13.
invalid 45:15.
investigation
  43:15, 78:14.
investigations
  78:8.
involve 11:1,
  11:2.
involved 7:1,
  11:24.
irrelevant 60:17,
  61:3, 67:14,
  68:12, 70:14,
  71:10, 78:7,
  78:15.
issuance 76:5,

76:20, 78:22.
issued 76:16,
  77:5, 77:8.
issues 29:3, 31:7,
  39:2, 42:15,
  43:16, 43:24,
  62:22, 74:3,
  77:4, 78:15,
  82:14, 82:15,
  83:6, 84:24,
  95:11, 96:10,
  96:22, 97:7.
itself 61:8, 63:7,
  89:14.
.
.
< J >.
J. 1:21, 1:34,
  1:45.
Jack 1:11, 1:42,
  43:12.
Jay 52:9, 58:8.
jealous 6:23.
JFM-09-0328 2:4.
JFM-09-328 1:7.
job 9:12, 39:17.
John 1:32, 2:7,
  12:17, 46:9,
  52:9, 58:7,
  62:15, 62:18.
join 20:9, 22:18,
  22:19, 23:3,
  37:3.
joined 11:24,
  20:16.
joining 18:24,
  42:9.
jointly 89:7,
  93:11.
Joshua 2:8.
Joshua R. Treem
  1:44.
Judge 1:23, 45:24,
  90:23.
judges 80:2.
judgment 91:12.
July 77:24.
juncture 7:18,
  25:10.
jurisdiction

73:19, 74:1,
74:17, 96:7.
jurisdictional
96:5.
jurisdictions
19:16, 21:17.
jurists 19:6.
Justice 19:13,
42:25.
.

.

< K >.
Karns 67:25.
keep 38:2, 59:2,
91:17.
kept 38:12.
kicks 11:17.
kidding 44:5.
kind 3:17, 26:3,
27:24, 46:6,
81:5.
kinds 2:14, 64:17,
88:7, 94:3.
knees 97:6.
knowledge 32:18,
43:21, 63:7,
96:23, 97:1.
known 6:17, 26:6,
26:18, 44:14,
54:7.
knows 51:10,
58:17.
.

.

< L >.
label 48:8, 61:14,
61:16, 83:13,
94:17.
lack 72:1, 72:14,
73:18, 96:6.
language 76:23.
large 12:13,
42:14.
largely 79:7.
larger 12:7.
last 72:19.
later 28:13, 50:3,
50:7, 56:8.
latter 94:23.
laws 47:6, 47:7,

49:14, 49:24,
62:7, 62:12.
lawyer 5:25, 23:5,
84:9.
lawyers 10:5,
19:6, 24:11,
42:13.
lay 70:7.
layperson 68:5.
lead 38:20.
leads 58:24.
learned 94:25.
learning 39:22.
least 4:8, 5:16,
55:20, 59:24,
60:22, 75:11,
78:18, 81:15,
92:2, 95:22,
97:5, 97:7.
leave 82:9.
led 34:17.
left 26:11, 33:21,
98:9.
legal 2:12, 42:6,
43:2, 67:20,
67:23, 68:4,
70:6, 70:8,
70:13, 71:19.
legality 18:2.
legally 5:11,
43:24.
legion 10:16.
legislature
11:15.
legitimate 16:7,
28:19, 57:21.
lend 12:13, 20:21,
33:23, 35:21,
36:5, 48:20,
58:16.
lender 12:12.
lenders 33:11.
lending 34:21,
35:19, 38:7,
40:1.
length 8:7.
less 31:2, 44:16,
91:13.
letter 24:12.
letting 18:16.

level 14:17.
liable 35:5.
lien 10:12, 10:18,
10:19, 10:20,
11:7, 11:8,
11:10, 11:14,
11:24, 34:1,
35:7, 35:22,
36:2, 38:11,
38:20, 59:17,
59:20.
liens. 21:19.
lies 18:20.
light 9:23, 25:10,
31:25, 43:6,
91:4.
limine 59:2, 66:8,
66:15, 66:19,
69:12, 69:25,
70:20, 71:6,
72:24, 88:17,
96:18.
limit 34:13, 36:5,
59:19.
limitations
82:13.
limited 37:2,
81:12.
limits 36:24.
listed 56:16.
litigated 19:5.
litigation 76:9.
little 3:19,
19:18, 26:23,
34:13, 43:1,
59:6, 71:8,
84:24, 95:15.
live 10:23.
loan 20:4, 20:5,
20:12, 20:23,
31:18, 35:15,
36:6, 37:1,
38:5, 39:24,
56:25.
loaned 20:2,
36:1.
loans 12:9, 36:11,
40:3.
locale 30:3.
location 30:3.

lock 40:4.
logic 6:4, 45:4,
  85:24, 85:25,
  90:19.
logical 61:18.
logos 85:25.
long 4:24, 44:14,
  81:12, 97:12,
  98:10.
longer 49:17,
  49:18, 60:6.
look 5:25, 12:25,
  17:13, 17:24,
  23:24, 31:24,
  52:2, 60:22,
  76:23, 87:8,
  98:2, 98:11,
  99:7, 99:8.
looked 90:15.
looking 49:10,
  90:23.
looks 3:7, 10:7.
lose 30:20.
lot 27:5.
lower 40:7,
  90:11.
lowest 11:4.
lure 51:25.
.
.
< M >.
M. 1:37.
magnitude 40:18.
mainly 76:18.
major 2:22, 6:8,
  16:11, 45:25,
  86:1, 86:2,
  92:8, 92:11,
  95:12.
man 62:16, 62:19,
  68:25.
manual 17:2.
March 4:16, 8:1.
Mark 1:33, 1:39,
  2:7, 83:13,
  99:12.
marked 83:8,
  83:17.
market 14:24,
  15:3, 18:4,

19:2, 19:9,
  25:23, 31:2,
  31:4, 38:22,
  41:5, 41:13,
  49:11, 67:20,
  93:2, 93:11,
  93:14.
marketing 93:12.
markets 32:20,
  95:4.
Martina 2:13,
  83:15.
Maryland 1:2,
  1:13, 10:13,
  14:7, 16:15,
  21:17, 55:6,
  55:7, 86:16,
  90:22, 95:16.
massive 38:5.
material 50:9,
  50:10, 77:22,
  78:3, 78:9,
  78:17.
materials 39:14,
  78:8, 78:9,
  78:12, 78:19.
matter 2:3, 2:10,
  4:7, 4:9, 29:16,
  39:22, 42:15,
  53:24, 65:5,
  65:6, 67:22,
  68:2, 74:1,
  74:16, 77:3,
  78:11, 79:24,
  99:21.
matters 78:7,
  95:7.
Matthew 1:34,
  1:40, 2:6,
  2:9.
Mciver 67:24.
Mcmillen 2:7,
  46:8, 69:17,
  69:20.
mean 3:6, 7:12,
  7:15, 8:5,
  13:22, 23:24,
  27:25, 29:16,
  35:3, 36:13,
  36:18, 37:19,

43:13, 45:1,
  45:10, 46:4,
  53:25, 58:2,
  58:15, 61:5,
  75:5, 75:8,
  79:24, 82:2,
  86:22, 86:23,
  89:14, 89:20,
  97:1.
meaning 62:11,
  68:4.
means 36:17,
  81:1.
meant 49:24,
  68:20.
medical 68:17,
  68:19.
meet 23:25, 50:22,
  77:9, 87:9.
meetings 56:3,
  68:20.
meets 5:10,
  28:20.
members 32:16,
  33:10, 33:19,
  35:18, 38:23,
  41:20.
memoranda 79:8.
memorandum 38:1.
mental 69:5.
mention 2:15,
  20:8, 23:5,
  71:14, 77:24.
mentioned 19:25,
  32:12, 48:10,
  78:17.
mentions 61:25.
mere 37:18, 96:25,
  97:18.
Merely 56:6,
  65:23.
meritorious 4:9,
  4:10.
merits 8:3.
messenger 33:3,
  91:7.
messengers
  30:13.
met 24:11, 42:7,
  54:24, 77:4.

mid-january
17:8.
middle 4:17.
milieu 11:20.
mill 58:17.
million 11:14,
12:14, 20:21,
21:7, 33:24,
37:2, 39:25,
40:1, 87:12.
mind 37:25, 85:17,
85:18, 99:14.
minds 26:5.
minimal 9:21,
89:2.
minimally 28:17,
28:20.
minimum 78:2.
minor 6:11, 16:12,
46:1, 86:1,
86:9, 86:10,
92:9.
minute 10:9.
minutes 5:8.
miscalculate
34:14.
missed 32:15.
mistake 33:20.
moment 29:6.
money 12:13, 34:1,
35:15, 36:1,
37:4, 48:20,
48:25, 56:2,
56:7, 87:12.
monies 20:2.
Montgomery
27:17.
months 25:10.
Moot 79:7, 79:11,
79:12, 80:25,
81:22, 82:5,
82:6, 82:8,
82:9.
morning 2:2, 3:24,
4:1, 47:1.
motions 1:19,
2:11, 2:14,
2:23, 66:6,
69:25, 70:21,
71:6, 73:12,

75:1, 75:2,
78:25, 82:10,
82:23, 82:24,
96:2, 98:1.
Motz 1:21,
45:24.
move 18:6, 24:12,
30:10, 72:16.
moved 59:10, 72:6,
72:13.
movies 10:24.
moving 71:9,
72:5.
MR. BESTER 75:20,
76:2.
MR. CRALLE
82:16.
MR. GRUNDVIG
73:22, 74:22,
80:10, 80:21.
MR. TREEM 81:3,
81:7, 81:12,
81:18, 96:12,
97:14, 97:22.
Ms. 46:8, 69:17,
69:20.
MS. GALLAGHER
39:8, 96:4.
MS. McMILLEN 46:9,
69:25, 70:11,
70:24, 71:1,
71:5, 72:12,
72:16, 72:19,
72:23, 73:6.
multiple 52:21,
58:19.
municipalities
10:13, 59:5,
59:21, 78:17.
municipality
10:14.
myself 22:24,
53:17.
.
.
< N >.
N. 1:35.
nail 90:2.
name 20:8, 23:5,
48:22.

namely 25:20.
names 35:1.
Nancy 2:7.
Nancy H. McMillen
1:31.
narrowly 77:12,
77:20.
national 95:3.
naturally 10:5.
nature 10:22,
18:3, 36:24,
42:1, 59:4,
64:12, 96:21.
necessarily 4:18,
42:11, 42:12,
42:15, 94:13.
necessary 21:21,
33:3, 74:12,
96:9.
necessity 18:16.
need 3:4, 7:14,
8:9, 9:17, 9:20,
14:1, 31:21,
37:7, 56:10,
67:12, 69:23,
72:22, 74:20,
77:11, 86:9,
90:7, 90:8,
95:21.
needed 29:23,
98:3.
Needle 6:20, 17:7,
47:17.
needs 31:19.
negating 63:3.
negotiable 11:7.
neither 84:8,
93:19.
nevertheless 24:4,
43:3.
next 26:23, 28:19,
41:7, 65:10,
70:23, 70:25,
73:5, 73:9,
94:21.
NFL 6:21, 6:24,
17:10, 89:17.
Nicholas 1:45,
2:8.
nip 32:6.

Nixon 77:3, 77:4,
  77:13.
nobody 29:11.
None 19:21, 48:13,
  48:24, 51:1,
  56:6, 58:9,
  65:19, 90:17,
  93:22.
nonissue 76:13.
nonsensical 52:16,
  93:25.
nor 93:19.
NORTHERN 1:3.
note 76:18.
notebook 40:16.
noted 83:18.
notes 25:13.
nothing 22:9,
  27:18, 85:6.
notice 67:5, 69:7,
  74:7, 82:18,
  96:14.
noticed 69:3,
  71:23.
notion 71:25.
notwithstanding
  61:2, 63:10.
November 13th
  1:15.
nullification
  43:1, 43:3,
  70:24, 71:2.
number 2:4, 23:9,
  39:24, 40:19,
  48:17, 48:23,
  61:18, 67:7,
  68:22, 71:2,
  73:11.
.
.
< O >.
oath 41:25.
object 8:20,
  19:20, 46:12,
  46:14, 74:8,
  97:3, 97:10.
Objection 9:1,
  46:12, 46:17,
  51:17, 52:22.
objections

76:10.
objective 36:14.
objects 71:25.
obligation 7:13,
  8:9.
observation
  14:11.
obtained 32:19.
obvious 44:8,
  72:10.
Obviously 5:24,
  9:1, 10:2,
  71:10, 72:8,
  98:6, 98:12.
occasions 41:19,
  52:21.
occurred 60:2,
  91:16.
odd 91:17.
offense 63:6,
  74:7, 74:9,
  74:12, 74:13.
offered 33:12,
  38:18.
officers 57:1.
Official 1:50,
  99:25.
officially
  99:12.
officials 70:15.
Oil 95:3.
Okay 7:11, 8:12,
  13:6, 13:14,
  13:16, 17:1,
  25:25, 29:9,
  29:17, 38:17,
  39:8, 39:13,
  41:6, 41:8,
  41:18, 46:3,
  55:8, 60:19,
  66:2, 66:8,
  67:3, 73:5,
  73:8, 73:14,
  73:17, 78:24,
  79:5, 79:11,
  94:6, 97:17.
old 97:19,
  97:24.
once 19:20, 48:21,
  82:15, 84:2,

85:8, 94:20.
one. 82:20.
open 8:21, 29:5,
  40:23, 62:7,
  90:12.
opened 22:4.
opening 25:12.
openly 26:18,
  54:22.
operate 45:15.
operation 65:13.
opine 16:16.
opinion 44:1,
  70:7, 98:4,
  98:10.
opinions 43:20.
opportunities
  30:23.
opportunity 8:22,
  8:25, 23:18,
  30:21, 33:25,
  34:15, 42:9,
  52:21, 81:4,
  98:24.
opposed 37:23.
optimistic
  18:15.
oral 48:12.
order 25:14,
  28:16, 33:6,
  88:15.
ordinarily 2:15.
organization
  94:13.
organizations
  28:5.
organize 32:22.
others 38:24,
  58:9, 63:25,
  70:5, 85:2.
otherwise 57:12,
  58:20, 67:13.
ought 80:5,
  98:8.
outcome 61:10.
outset 2:16.
outside 82:13.
overbid 30:18,
  34:8.
overbidding 30:24,

34:7.
overburden
  98:15.
overburdensome
  75:14.
overlap 26:11.
overly 86:19.
Overruled 46:17,
  46:18, 51:18.
oversight 84:15.
overstatement
  3:3.
overstay 30:10.
overwhelming
  19:19.
own 16:20, 17:2,
  17:3, 18:10,
  38:7, 40:6,
  40:7, 44:8,
  80:17, 93:12.
owned 29:25,
  30:1.
ownership 21:8,
  31:11, 33:14.
.
.
.
< P >.
page 88:17.
pages 29:1,
  41:16.
paid 34:10,
  71:14.
Palmer 50:25,
  63:24, 94:18.
paper 20:4,
  61:14.
papers 46:7, 51:2,
  57:5, 62:23,
  63:18, 76:3,
  77:24, 79:15,
  79:20, 96:7,
  98:20.
paragraph 41:2,
  74:18.
paragraphs
  74:17.
Pardon 13:18,
  33:16, 45:21,
  72:18.
parent 47:17,

93:5.
parents 89:15.
part 26:9, 28:14,
  30:16, 40:11,
  41:7, 48:7,
  68:21, 72:5,
  81:22, 90:6.
parte 3:22, 8:22,
  8:25, 9:7.
participants 65:2,
  77:15.
participate
  52:14.
participated 58:2,
  96:22.
participates
  64:10.
participation
  96:23, 96:25.
particular 12:3,
  14:3, 23:22,
  47:5, 57:25,
  58:5, 61:5,
  63:21, 67:4,
  68:3, 68:7,
  68:8, 68:13,
  69:1, 69:4,
  69:10, 71:18,
  74:18, 94:7,
  96:17.
particularly
  21:25, 30:19,
  35:11.
parties 5:12,
  14:11, 14:14,
  14:20, 21:10,
  22:15, 23:13,
  23:16, 25:17,
  26:3, 26:22,
  26:24, 34:16,
  47:25, 48:13,
  50:18, 51:9,
  54:20, 54:21,
  54:22, 57:20,
  57:23, 64:21,
  65:12.
partner 21:22,
  24:16, 56:3.
Partnering 20:14,
  21:18, 21:19,

41:4.
partners 11:23,
  12:4, 12:19,
  18:4, 22:7,
  22:8, 23:20,
  24:17, 26:16,
  27:12, 28:7,
  31:10, 35:5,
  35:18, 56:18,
  93:5.
Partnership 12:5,
  12:15, 13:11,
  14:4, 20:24,
  22:10, 23:15,
  23:21, 24:19,
  26:6, 26:13,
  26:15, 26:17,
  27:1, 35:4,
  35:5, 47:16,
  48:7, 52:2,
  52:6, 56:6,
  56:9, 57:10,
  57:11, 57:21,
  58:12, 61:24,
  62:8, 86:15.
partnerships 28:5,
  48:12.
parts 52:1,
  94:13.
party 26:6, 26:18,
  57:19, 76:9,
  98:6.
passed 60:6.
passion 85:25.
past 20:9, 20:17,
  22:18, 23:4.
patience 39:16,
  85:8.
patterns 38:6.
Paul 1:39, 2:9.
pay 11:6, 11:7,
  11:9, 11:10,
  11:14, 11:19.
paying 30:2.
payments 10:15.
penalties 72:21.
pending 2:3, 2:14,
  96:2.
people 2:20, 15:2,
  20:19, 24:16,

26:16, 33:8,
50:5, 50:15,
60:23, 66:5,
91:22.
per 5:17, 15:16,
15:17, 15:22,
19:4, 49:17,
53:24, 61:7,
62:24, 63:6,
63:16, 63:19,
63:23, 71:10,
88:2, 88:7,
91:19.
percent 27:19,
90:10.
perfect 14:12.
perfectly 29:4,
70:6.
perhaps 22:23,
81:5.
period 4:24,
59:17, 60:5,
60:10, 60:12.
permissible 43:25,
70:6.
person 80:18,
84:5.
personal 32:18.
personnel 76:25.
persuade 9:18,
17:19.
phrased 78:19.
physical 72:9.
pick 60:1.
piercing 83:24.
place 18:4, 33:25,
77:15.
placed 33:19.
places 33:10.
Plaintiff 1:7.
plan 8:6, 28:24.
plausibly 51:8.
play 97:8.
plea 23:11, 51:13,
79:12, 79:24,
79:25, 80:1,
80:4, 80:12.
pleadings 43:2.
pleas 79:12.
please 17:3,

21:23, 43:5,
44:18, 82:25,
90:18, 98:14.
pled 58:11,
80:7.
pledging 69:22.
point. 30:11.
pointed 4:5,
17:5.
points 32:12,
40:12, 51:24,
56:16, 62:13,
66:23.
policy 16:20,
37:20, 89:25,
90:1.
pool 34:2.
pooled 33:5, 34:2,
54:6, 54:24.
pooling 14:22,
88:21.
position 2:25,
33:25, 44:20,
46:3, 60:16,
64:7, 71:12,
73:14, 80:16,
84:19.
possession
52:10.
possibility
50:21.
possible 3:8,
83:21.
possibly 40:18.
post-indictment
60:11.
potential 91:21.
potentially
96:15.
pound 9:17.
practical 29:15.
practice 2:15,
80:16, 80:20.
practices 80:3.
Pre-existing 47:9,
47:20, 47:25,
55:14, 65:7,
65:9, 65:22,
89:12, 92:16,
94:3.

precedent 6:19,
90:16.
precisely 27:23.
preclude 59:10,
66:9, 66:19,
69:10, 69:13,
71:13, 80:13,
88:17.
precluded 69:8,
70:3, 70:8.
predated 17:12.
predetermine
58:21, 61:10.
predicate 9:21,
45:15, 47:8,
50:3, 50:11,
51:8, 65:17,
67:12.
predict 12:17,
16:4, 20:1,
23:11, 23:14.
prefer 39:5,
39:6.
preferred 32:4.
preindictment
60:10.
prejudice 80:23,
81:25, 82:2.
prejudicial 67:14,
68:24, 68:25,
71:11.
preliminary 42:19,
83:19.
premature 17:17,
97:5.
premise 6:8, 6:11,
16:11, 16:12,
45:25, 86:1,
86:2, 86:10,
92:9, 92:11,
95:12.
premises 46:1.
premium 11:11,
11:12, 11:16,
11:18, 11:19,
30:20, 60:7.
prepare 30:8.
prepared 2:21.
present 4:9, 4:11,
6:4, 7:7, 7:13,

7:18, 8:10,
   8:11, 8:21,
   14:9, 31:4,
   66:15, 71:17,
   84:23, 90:4,
   90:19.
presented 24:7,
   84:19, 98:25.
presents 10:3.
presidents 20:22,
   20:23.
presumably
   56:25.
pretrial 3:13,
   76:6, 76:21,
   77:2, 77:21,
   79:2.
pretty 10:7,
   14:7.
prevailing 51:4,
   63:24.
prevent 15:18,
   27:23, 28:2,
   49:25.
prices 71:14,
   71:17, 71:18,
   72:1, 94:5.
pricing 96:17.
Priest 15:5, 29:1,
   40:11.
primary 21:16,
   35:1.
Prince 22:20.
principle 19:11.
prior 22:10, 59:2,
   59:11, 59:16,
   60:5, 89:21.
priority 31:19.
privileged 8:15.
pro 54:3.
pro-government
   80:7.
probably 2:19,
   9:16, 98:11.
probative 68:24.
probing 37:21.
problem 34:17,
   48:4, 92:2.
procedure 20:6.
proceed 7:25,

22:14, 41:10,
   44:17, 53:6,
   63:22, 89:7.
proceeding
   42:14.
proceedings 9:7,
   99:16, 99:20.
process 9:11,
   46:19, 56:4.
procompetitive
   14:23, 15:19,
   15:23, 16:6,
   19:1, 26:5,
   26:8, 26:17,
   30:16, 53:23,
   54:1, 54:3,
   64:10, 64:12,
   64:14, 64:23,
   65:3, 88:4,
   88:8, 90:6,
   90:9.
procompetitiveness
   88:10.
produce 14:22,
   14:25, 31:5,
   32:2, 80:17,
   95:22.
produced 51:11,
   56:24, 77:23,
   78:1, 78:19,
   79:8.
productively
   25:21.
Professor 15:5,
   16:14, 21:3,
   40:11, 41:3,
   41:15.
proffered 15:20,
   26:2, 31:21,
   47:19, 48:14,
   51:7, 52:18,
   53:5, 67:8,
   88:3.
profile 18:23.
profitable 40:18,
   49:20.
profits 14:21,
   27:1, 28:3,
   30:13, 31:15,
   55:5, 87:9,

89:5, 89:7,
   91:7.
programs 30:6,
   30:7, 31:11,
   32:21.
projected 13:10.
promote 49:21.
proof 18:20,
   45:4.
proper 9:16,
   17:25, 98:4.
properly 32:6,
   69:3, 76:8.
properties 27:8,
   29:21, 29:24,
   30:9.
property 35:17.
proposed 77:8,
   78:1, 78:16.
proposition 63:5,
   71:20.
proprietary 31:10,
   32:21, 88:21.
propriety 75:9.
prosecution
   74:8.
prosecutors 24:5,
   77:13, 77:14.
prove 6:1, 41:14,
   43:7, 44:7,
   44:21, 57:13,
   64:18, 65:21,
   71:17, 74:12,
   96:20.
provided. 20:12.
Provident 12:10,
   12:12, 12:13,
   12:14, 12:18,
   21:10, 21:12,
   22:17, 22:23,
   35:9, 35:15,
   35:25, 37:1,
   38:9, 54:8,
   57:3.
proving 43:11.
public 24:16,
   37:20, 42:15,
   59:4.
publicly 12:4,
   32:22, 32:23.

pull 27:5,
    42:17.
pulled 15:7,
    30:6.
pun 25:3.
purchase 20:10,
    21:6, 21:7,
    21:10, 21:18,
    22:19, 23:4.
purchased 20:11,
    33:1.
purchasing 20:17,
    93:2, 93:14.
Pure 6:3, 16:17,
    85:25.
purport 68:18.
purpose 15:17,
    18:3, 18:24,
    27:22, 27:25,
    64:3, 83:5,
    93:2, 93:8,
    93:13, 94:7,
    94:14, 94:21.
purposes 20:17,
    63:3, 63:11,
    68:2, 68:11,
    94:6.
put 3:6, 5:10,
    6:5, 29:17,
    32:5, 32:7,
    32:15, 39:3,
    41:16, 44:4,
    45:17, 46:12,
    48:8, 49:9,
    51:6, 57:11,
    61:17, 65:21,
    74:7, 81:2,
    87:11, 89:2,
    93:7, 93:10,
    93:21, 93:24,
    94:17, 98:4.
putting 59:21.
.
.
< Q >.
qualified 99:5.
qualify 16:9,
    24:21.
questionable
    45:10, 53:3.

questions 39:19,
    43:25, 48:3,
    55:23, 66:1,
    79:16, 94:23.
quickly 30:2,
    30:10, 30:22,
    34:11.
quite 40:3,
    57:2.
quote 17:13.
quoting 88:16.
.
.
< R >.
raise 10:23,
    76:10.
raised 62:22,
    62:24.
raises 80:11.
randomly 33:12,
    38:18.
rapidly 97:15.
rates 40:7.
rather 18:15,
    77:2.
reached 61:4,
    61:9.
reaction 21:24.
read 13:7, 20:23,
    23:2, 25:5,
    29:6, 39:3,
    39:10, 39:13,
    40:10, 41:2,
    41:5, 64:25,
    79:18, 79:19,
    82:14, 84:2,
    86:24, 87:6,
    87:7, 88:25,
    89:10, 94:25,
    95:1.
reading 94:19.
reads 16:1,
    95:1.
ready 8:11,
    39:11.
real 32:20,
    40:8.
realize 58:24,
    66:2, 66:4,
    78:24.

really 2:25, 4:22,
    7:24, 17:11,
    22:12, 24:4,
    34:20, 36:12,
    39:2, 41:10,
    47:23, 48:3,
    49:12, 50:2,
    50:18, 56:11,
    58:15, 65:11,
    68:16, 82:1,
    86:4, 86:12,
    86:22, 97:8.
realm 7:22.
reams 20:4.
reargue 83:4.
reason 5:17, 5:20,
    6:3, 6:5, 28:21,
    38:5, 47:22,
    48:23, 59:11,
    59:14, 63:16,
    63:19, 64:8,
    71:8, 80:4,
    88:2.
reasonable 44:22,
    71:7, 74:13,
    82:18.
reasonableness
    72:1.
reasons 31:19,
    35:24, 39:24,
    55:15, 59:15,
    64:9, 73:4,
    77:19, 78:21,
    93:25, 94:22.
rebuttal 82:23,
    83:1, 83:5,
    85:3.
receivable 10:16,
    10:19.
receive 10:14.
recent 51:3.
recently 24:7.
recess 39:12,
    39:13, 44:6.
recipients 75:15,
    77:18, 77:25,
    78:5.
recognition
    31:9.
recognize 7:5,

44:4, 89:25,
96:8.
recognized 65:1,
95:10.
recognizes 16:22,
45:2.
record 8:23, 9:2,
9:14, 24:14,
35:1, 46:12,
47:4, 49:9,
51:19, 69:9,
72:13, 99:20.
records 22:17,
22:23, 76:25.
red 57:3, 78:13.
redact 80:8.
redistributed
33:13.
referred 89:11.
referring 57:5.
reflect 10:15,
20:13, 25:19,
33:14.
reflects 22:10.
regard 31:12,
67:9, 85:2,
90:18.
regardless 51:5.
regret 19:20.
reissued 98:8.
reject 17:18.
relate 17:8,
28:25.
related 69:14,
78:12, 81:20,
98:9.
relates 56:22,
66:20.
relating 32:20.
relationships
12:1, 48:9,
94:3.
relatively
97:24.
relayed 57:7.
relevance 97:7.
relevancy 97:18.
relevant 32:23,
72:2, 77:7.
relied 87:13.

relying 46:8.
remaining 75:1.
remains 63:23.
Remember 33:7,
82:14, 82:15,
84:23.
remind 83:6.
renewed 79:22,
80:23, 82:1.
repeat 87:4.
reply 84:19.
report 15:6, 29:1,
86:18.
Reporter 1:50,
99:25.
reporters 29:13.
reporting 27:16.
reports 82:7,
95:22, 98:16.
representations
57:7.
represented 23:6,
48:12, 49:2.
representing
48:18.
request 18:13,
24:20, 31:24,
77:17, 77:21.
requested 78:21.
requesting
78:12.
requests 76:24,
77:2, 78:7,
78:18.
require 18:1.
required 7:17,
8:21, 21:9,
78:3, 86:14,
89:1.
requirements
16:19, 18:23,
76:17, 77:4,
77:5.
reread 92:13.
research 54:25.
reserve 97:17,
97:20.
resolved 92:9.
resources 12:20,
14:22, 27:5,

30:6, 33:5,
37:4, 54:6,
54:22, 89:4,
91:6.
respect 5:2,
15:10, 19:11,
19:13, 19:15,
21:14, 44:13,
60:9, 70:1,
72:2, 84:18,
96:14, 96:16,
96:17, 96:19.
respectfully 7:19,
8:20, 9:22,
17:13, 18:19,
24:19, 31:23,
41:9, 84:23,
88:15, 89:3,
89:23, 90:14,
94:24, 94:25.
respects 19:14.
respond 9:13,
66:3, 96:13,
96:18, 99:15.
response 74:1,
88:17, 99:1.
responses 71:3.
responsibility
76:14.
restrain 64:4.
restricted
64:19.
restrictive 33:10,
33:18.
result 10:3, 19:1,
31:1, 38:22,
88:11.
results 91:18.
rethought 98:8.
retreating
18:15.
return 18:7,
19:18, 62:3.
returned 11:19.
review 98:24.
reviewed 20:20,
56:25.
reviewing 98:20.
Revised 86:15.
Richmond 45:23.

Ricks 18:10,
  18:11, 45:1.
ridiculous 32:1,
  42:23.
Rieff 52:9, 58:7,
  84:17.
rig 52:6, 61:4.
rigged 71:7.
riggings 90:11,
  90:12.
rightly 71:16.
risk 34:7, 87:9,
  87:10, 87:13.
Rockefeller 62:15,
  62:18.
Romer 7:23, 45:1,
  47:15.
room 80:5.
route 19:21.
RPR 1:49, 99:18.
Rule 5:17, 5:20,
  15:17, 49:17,
  53:24, 54:3,
  60:6, 63:16,
  63:19, 64:7,
  68:14, 69:3,
  76:14, 77:5,
  77:10, 77:11,
  80:24, 82:20,
  88:2, 97:10,
  99:8.
Rules 59:12,
  68:14.
ruling 3:13, 8:23,
  19:15, 64:5,
  75:10, 75:12,
  76:19, 97:21,
  98:1, 98:5.
rulings 97:25.
run 58:17, 58:25,
  90:2.
runaway 11:15.
RUPA 86:14,
  86:15.
Russell 43:13.
.
.
< S >.
sale 20:11, 32:23,
  93:16.

sales 32:20.
sample 13:25,
  21:5.
SANDERS 40:25.
Sandler 1:39, 2:9,
  3:23, 8:13,
  39:14, 39:18,
  45:14, 45:21,
  53:8, 53:10,
  54:11, 59:16,
  60:8, 64:6,
  66:3, 79:5,
  85:15, 91:11,
  96:3, 99:7.
sat 48:24.
satisfy 16:19,
  18:23, 26:25.
saw 16:21, 44:6,
  83:20.
saying 13:10,
  18:21, 36:16,
  36:18, 43:5,
  64:24, 90:7,
  91:9, 92:8,
  92:9, 92:15,
  95:24, 99:13.
Says 6:24, 17:16,
  18:11, 45:13,
  88:15.
scan 13:9.
scenes 49:24.
schedule 4:14,
  8:6.
school 16:15.
Schopenhauer
  84:3.
scold 42:24.
scope 96:21.
score 51:24.
screen 29:8,
  29:12, 29:16,
  29:18, 39:3.
se 5:17, 15:16,
  15:17, 15:22,
  19:4, 49:17,
  53:24, 54:3,
  61:7, 62:25,
  63:6, 63:16,
  63:19, 63:23,
  71:10, 88:2,

88:7, 91:19,
  91:20.
sealed 11:1,
  27:23, 28:1,
  33:3.
Seated 2:5, 2:7.
Second 37:16,
  39:7, 50:22,
  69:3, 72:5.
Secondly 53:22.
secrets 89:6.
seek 73:4,
  84:22.
seeking 8:25,
  77:13, 77:16,
  78:9, 80:11.
seem 3:1, 36:9,
  36:12, 55:19,
  75:8, 75:9,
  76:18, 77:1,
  77:17.
seems 2:22, 3:5,
  3:14, 15:13,
  15:14, 15:19,
  36:14, 53:23,
  86:25.
seen 78:2.
seized 50:1, 50:2,
  56:17.
send 83:24.
sending 86:5.
senior 44:15.
sense 35:3, 74:22,
  82:3.
separate 20:3,
  33:11, 36:21,
  40:9, 48:3,
  49:4, 80:10.
separately 36:6,
  41:22, 56:19.
September 71:24.
services 33:1,
  33:3.
set 4:13, 6:3,
  59:17.
setting 25:11.
several 35:24,
  69:25, 70:2.
shake 20:21.
sham 45:11, 50:24,

64:5, 94:17,
94:22.
Shane 1:35, 2:6.
share 14:21, 25:7,
27:5, 27:10,
27:16, 28:2,
39:1, 41:15,
87:3, 89:3,
89:4, 89:5,
89:6.
shared 23:7, 27:1,
29:20, 30:5,
30:13, 31:14,
31:15, 31:16,
32:18, 32:25,
33:2, 38:19,
54:21, 54:22,
54:23, 55:1,
55:2, 55:3,
87:9, 87:10,
87:13.
sharing 9:4,
12:20, 14:5,
14:6, 27:24,
29:19, 30:11,
30:12, 91:5,
91:6.
Shell 95:3.
Sherman 6:10,
16:5.
shored 21:10.
short 69:21.
shouldn't 3:20,
15:11.
show 9:20, 9:25,
17:25, 18:17,
19:9, 19:17,
19:20, 24:1,
24:15, 24:16,
25:9, 25:18,
27:14, 28:18,
28:20, 29:8,
31:8, 31:9,
31:10, 31:12,
31:13, 31:15,
41:2, 41:3,
41:11, 85:21,
88:16, 88:18,
94:20.
showed 13:25,

91:8.
showing 47:9,
48:5, 66:15,
79:2.
shows 22:8,
28:23.
side 16:23.
sides 10:7.
significant
37:3.
silly 3:3, 25:3,
45:11, 53:20.
similar 12:5,
28:8, 44:14,
73:25.
simple 34:22,
57:16, 86:20,
86:22.
simplistic
86:19.
simply 18:21,
50:23, 53:5,
56:1, 68:15,
78:13, 94:4.
single-entity-type
67:8.
sit 58:20.
situation 7:19,
11:15, 18:3,
39:23.
six 29:1.
skeptical 31:23.
skilled 43:21.
sky 59:19.
slightly 80:10.
smaller 98:1.
smiling 44:6.
society 19:4.
software 30:6,
30:7, 32:22,
55:3, 89:5.
sole 21:8.
solely 95:5,
95:6.
somebody 11:13,
53:25, 67:1,
97:19.
somehow 54:5.
someone 15:7,
34:8.

sometime 27:4.
sometimes 34:14,
41:22.
sorry 5:19, 26:10,
43:1, 93:5.
sort 70:7, 71:9,
71:22.
sought 78:14.
source 21:16.
South 83:22.
speaking 7:24.
Special 90:22.
specialist
95:25.
Specialties 50:25,
63:25.
specific 7:7,
18:1, 19:17,
57:9, 77:7,
77:13, 77:14,
85:1.
Specifically 60:4,
67:7, 68:13,
71:5.
specifics 74:14.
specify 77:18,
77:19.
speculative
84:20.
spoke 2:20,
83:19.
spot 30:19,
34:10.
spread 22:21.
springs 17:11.
stage 4:13, 6:3,
42:13, 42:19,
43:5, 46:15,
97:6.
stand 45:10, 52:5,
52:19, 53:14,
57:2, 58:10,
67:20, 79:15.
standard 14:7.
standing 75:22,
75:23, 75:24,
76:5, 76:8,
76:10, 76:12.
stands 63:5,
69:10.

start 10:6,
  10:8.
started 4:23,
  6:19, 16:11,
  62:3.
starting 74:4.
state 2:16, 23:14,
  42:21, 43:19,
  59:21, 69:9,
  74:1, 83:9,
  90:21.
stated 2:20,
  50:25.
statement 16:20,
  22:16, 22:20,
  23:19, 25:12,
  80:4.
statements 20:5,
  57:4, 59:2,
  59:10, 61:2,
  61:3, 79:2.
States 1:1, 1:21,
  2:4, 18:11,
  46:10, 47:2,
  51:10, 52:20,
  53:2, 55:11,
  63:24, 64:1,
  64:15, 65:19,
  65:20, 66:18,
  69:8, 69:12,
  71:16, 72:6,
  75:4, 75:22,
  76:5, 76:6,
  76:7, 76:8,
  76:9, 76:12,
  93:23, 98:23.
stating 41:23,
  65:23, 66:24.
status 44:15.
statute 82:13.
stay 2:13.
stenographic
  99:20.
step 5:6.
Stephanie 1:46,
  2:9.
steps 61:18.
stern 90:1.
Steve 20:18, 21:6,
  21:18, 23:11,

58:3.
Steven 58:11.
straight 58:18.
strategy 30:8.
street 17:22.
studied 20:20,
  20:23.
studying 90:16.
subject 59:13,
  74:1, 74:16,
  79:22, 88:22.
subjectively
  5:20.
subjects 77:6.
submit 20:15,
  33:6, 33:9,
  33:18, 38:1,
  49:2, 77:7,
  96:7, 99:1.
submitted 40:20,
  49:4.
submitting 49:3,
  61:15.
subpoena 77:2,
  78:4.
subpoenas 22:24,
  75:4, 75:5,
  75:6, 75:10,
  75:14, 75:15,
  76:6, 76:16,
  76:17, 76:21,
  76:23, 77:5,
  77:6, 77:8,
  77:11, 78:1,
  78:16, 78:23,
  98:6, 98:8.
subsidiaries
  89:15.
subsidiary
  47:17.
sufficient 19:17,
  28:18, 31:24,
  64:20, 74:1,
  74:11.
sufficiently
  74:7.
suggest 3:17,
  12:9, 16:1,
  17:16, 18:20,
  22:11, 26:22,

41:10, 43:14,
  48:17, 49:10,
  51:24, 51:25,
  52:19, 83:23,
  84:23, 89:23.
suggested 43:9,
  56:9, 68:8,
  85:2, 85:21,
  85:23.
suggesting 37:13,
  42:20, 97:12.
suggestion 5:23,
  49:7, 56:6,
  63:9.
suggestions
  51:1.
summarize 40:13,
  54:16.
summarizing
  14:2.
summary 21:16,
  26:23, 40:21,
  40:25, 41:17,
  56:16, 91:11.
summer 78:20.
Summon 22:2.
sums 12:13.
superstitious
  4:18.
supplemental
  38:1.
supplied 14:20.
supply 21:15.
support 18:12,
  55:3, 63:4.
supports 84:19.
supposed 16:25,
  56:18, 56:20,
  64:21, 98:24.
Supreme 3:9, 3:14,
  17:6, 19:15,
  36:10, 51:3,
  89:16, 92:15,
  92:21, 92:23,
  94:2.
surprising 24:4.
survive 18:21.
susceptible 5:13,
  6:13, 29:21.
suspect 25:14,

52:4.
switch 18:4.
synopsis 90:15.
.
.
< T >.
T. 1:49, 99:24.
tab 27:3, 28:23,
    86:17.
table 2:6, 2:8,
    87:12.
tailored 77:12,
    77:21.
taken. 39:12.
talented 10:4.
talked 41:1,
    70:16, 85:20.
tapes 77:13.
target 84:6,
    84:7.
task 27:9.
tax 10:12, 10:20,
    11:7, 11:8,
    11:24, 21:6,
    23:8, 30:18,
    32:20, 32:23,
    36:24, 38:20,
    40:19, 59:17,
    59:20.
taxes 10:14.
teacher 16:15.
team 20:18, 21:5,
    25:22.
teamed 57:11.
teaming 12:19,
    14:5, 14:14,
    16:7, 24:17,
    24:18, 24:22,
    26:4, 54:7,
    55:19.
tee 5:3.
teed 67:6.
telephone 2:17,
    4:4, 75:21.
tells 24:25.
tend 80:1, 80:3.
tentative 2:16,
    2:20, 2:24,
    4:4.
term 11:11, 40:3,

68:3.
terms 3:13, 6:20,
    10:10, 10:16,
    10:22, 19:19,
    24:10, 25:8,
    27:6, 28:21,
    31:6, 32:14,
    34:3, 36:5,
    39:1, 42:6,
    42:8, 44:16,
    55:22, 73:1,
    74:25, 84:20,
    86:8, 91:5,
    95:13, 99:14.
Terrier 43:13.
TERZAKEN 1:32,
    2:7, 46:9,
    46:25, 60:20,
    61:22, 62:2,
    65:4, 66:7,
    70:17, 73:8,
    74:24, 89:11,
    94:7.
test 16:10.
testify 14:3,
    14:10, 15:6,
    29:23, 41:25,
    43:23, 49:9,
    58:13, 67:18,
    68:10, 68:18,
    95:21.
testifying 42:4,
    68:7, 69:4.
testimony 5:5,
    8:8, 19:24,
    23:16, 25:17,
    32:2, 32:17,
    33:23, 34:17,
    35:10, 41:3,
    50:14, 53:2,
    66:19, 67:13,
    68:9, 68:21,
    70:7, 71:24,
    90:25, 99:4.
Texaco 89:21,
    95:2.
themselves 22:7,
    28:8, 49:3,
    49:22, 56:2,
    56:18, 58:22,

60:23, 80:2.
theoretically
    92:2.
theory 7:3, 47:3,
    65:20, 91:20,
    91:25, 92:7,
    93:23.
they'll 59:19.
They've 20:16,
    23:4, 45:4,
    48:18, 51:6,
    62:25, 63:15,
    78:1, 98:25.
thinking 22:3,
    39:21, 45:9,
    87:24.
thinks 42:23,
    42:24, 53:25,
    97:9.
third 26:6, 26:18,
    57:19, 57:22,
    93:6, 98:6.
Thirdly 54:4.
though 27:21,
    57:9, 76:11,
    85:10, 88:9,
    95:19, 95:20.
thousands 33:8.
three 40:12.
threshold 9:18,
    50:22, 65:10,
    84:23, 97:1,
    97:2.
throughout 19:6.
till 5:2.
Timely 39:13.
today 4:14, 20:22,
    46:6, 48:14,
    51:6, 67:11,
    78:11, 82:10,
    85:19, 98:12.
together 6:22,
    11:24, 11:25,
    12:19, 14:5,
    14:21, 14:22,
    15:2, 18:25,
    20:25, 22:8,
    24:11, 24:17,
    27:5, 28:2,
    30:6, 33:5,

34:2, 37:3,
49:19, 54:24,
62:9, 89:6,
91:6.
took 5:6.
tool 77:13.
total 16:4,
36:6.
totaling 21:7.
totally 36:4,
40:9, 43:4,
70:14.
touch 7:23, 8:14,
70:20.
touched 72:25.
touches 70:14.
tough 97:20.
track 38:12.
trade 89:6.
traditional 23:10,
26:25.
traditionally
28:6, 36:1.
transcript 25:15,
99:19.
Treem 2:8, 83:1,
97:18.
trees 54:17.
Trial 1:32, 1:33,
1:34, 1:35,
4:16, 4:17,
4:24, 5:2, 5:9,
7:25, 8:6, 8:7,
12:18, 17:20,
25:11, 41:24,
44:10, 58:14,
74:14, 75:5,
75:6, 75:10,
79:22, 80:9,
80:24, 82:1,
84:9, 95:20,
97:7.
Trial Attorney
1:31.
tried 44:15.
trier 18:17.
troublesome 19:6,
35:11, 35:12,
35:13, 39:19.
true 15:20, 27:18,

34:16, 55:12,
61:1.
truth 5:11, 32:8,
44:9.
try 6:1, 17:19,
22:5, 32:4,
42:17, 51:25,
81:2, 84:21.
trying 24:11,
24:12, 29:14,
38:2, 43:14,
44:13, 45:3,
48:25, 49:21,
64:20, 88:25,
90:16, 90:19,
95:14, 98:15.
turn 7:24, 15:15,
47:6, 47:7,
94:1.
turned 15:25,
49:14.
turning 62:6,
87:25, 88:1.
turns 15:21.
two 39:25, 41:4,
48:3, 48:24,
66:1, 91:22,
93:11, 98:16.
two-page 40:21.
two-prong 16:10.
two-way 17:21.
type 10:25, 11:6,
14:12, 30:3,
42:13, 42:15.
types 10:25.
typical 10:23,
42:12.
.
.
< U >.
ultimate 43:22,
43:23, 64:5.
Ultimately 57:8,
61:3, 68:21,
76:13.
unchallenged
48:11.
uncomfortable
9:7.
uncover 43:15.

underline 53:24.
undermined
60:25.
underscore 42:3.
understanding
7:17, 38:4,
38:9.
understands 22:14,
61:6.
understood 12:3,
12:5, 12:18,
14:4, 20:24,
55:9, 55:11,
61:6, 68:5,
81:20, 85:5,
92:7.
undertaking 18:2,
19:17, 88:23,
88:24, 95:6.
undisputedly
10:15.
unequivocally
6:2.
unexpected
85:11.
Uniform 86:15.
unique 90:13.
unit 6:9, 6:12,
6:21, 6:25, 7:2,
7:5, 16:22,
17:4, 24:21,
85:22.
United 1:1, 1:21,
2:4, 18:11,
46:10, 47:2,
51:10, 52:20,
53:1, 55:10,
63:23, 63:25,
64:15, 65:19,
65:20, 66:18,
69:8, 69:12,
72:6, 75:4,
75:22, 76:5,
76:6, 76:7,
76:9, 76:12,
93:23, 98:23.
UNITED STATES OF
AMERICA 1:5.
University
16:15.

unless 50:13,
    99:6.
unnecessary
    68:24.
unopposed 69:11.
unprecedented
    25:11.
unqualified
    49:9.
unsealed 28:1.
until 50:10.
uphill 4:6.
upwards 12:14.
urge 78:22.
urges 19:14.
using 8:17, 50:23,
    56:8.
.
.
< V >.
vague 76:24.
valid 5:7, 6:7,
    6:9, 6:12, 10:1,
    14:24, 31:6,
    45:13, 45:25,
    46:1, 64:2,
    88:12, 93:19.
validity 85:5.
value 11:17,
    68:24, 69:1,
    94:4.
variable 10:21.
various 3:12,
    27:7, 66:5,
    72:9, 72:21.
veering 44:9.
vendor 6:23.
ventures 45:17,
    78:10, 95:16.
versa 27:19.
version 11:1.
versus 2:5, 68:25,
    74:12, 76:6,
    76:7.
vetting 56:9.
viable 98:8.
vice 20:23,
    27:19.
view 2:20, 2:24,
    4:5, 14:18,

16:13, 22:12,
    29:3.
viewing 9:23.
views 2:16.
Villanova 16:16.
violation 6:24,
    15:22, 91:19,
    91:20.
violation--
    5:17.
violations
    15:16.
virtue 15:1, 15:2,
    80:6.
Vitek 1:45, 2:9.
volume 77:23.
vs 1:9.
.
.
< W >.
W. 1:13, 1:42.
wait 5:2, 6:25,
    32:4, 45:19.
waited 5:14.
waive 17:20.
walk 15:1.
wanted 12:8,
    21:22, 22:24,
    24:9, 33:24,
    34:25, 35:9,
    36:2, 38:10,
    38:17, 38:20,
    39:16, 40:13,
    54:25, 76:2,
    85:19, 93:6.
wanting 89:24.
wants 32:6, 62:23,
    82:10, 82:13,
    95:23.
watches 16:2.
water 10:15,
    13:1.
ways 34:5.
Wednesday 2:20,
    83:20.
weight 84:22.
welcome 4:6,
    30:10, 83:20.
well-oiled 48:15,
    49:12, 61:23.

well-proven
    58:4.
Whatever 19:9,
    27:23, 36:10,
    48:8, 51:18.
whatsoever
    19:21.
Whereas 40:5.
whereby 18:24.
whoever 75:16.
whole 15:17,
    15:21, 27:22,
    27:25, 92:2.
wholly 78:6.
whom 58:11.
wife 22:2.
win 59:20,
    91:13.
winner 58:21,
    59:22, 60:1.
wins 33:7,
    91:18.
wise 25:21.
wishes 71:21,
    83:2.
Without 8:21,
    8:22, 9:12,
    30:22, 32:5,
    44:12, 52:25,
    74:9, 79:22,
    80:23, 81:25,
    82:2, 88:20,
    97:1, 97:6.
witness 13:17,
    13:19, 14:3,
    14:8, 14:25,
    26:12, 56:24,
    70:7, 71:22.
witnesses 5:1,
    23:10, 26:12,
    32:17, 82:4,
    83:22.
Wittig 76:6,
    76:11.
won 92:2.
word 21:14, 33:21,
    57:11.
words 27:3, 33:22,
    91:10.
work 2:19, 24:11,

      27:6, 53:18,
      54:24, 55:3.
working 15:2,
   22:8, 62:9.
world 90:12.
worried 34:6.
wow 6:23.
wrap 95:14.
wrapped 61:8.
wrestle 86:9.
write 98:10.
writing 21:1,
   21:3, 27:15,
   39:2, 43:9,
   47:12, 47:13,
   84:14, 86:14.
writings 21:2.
written 48:11,
   88:19, 88:20,
   95:8.
wrote 43:1.
.
.
< Y >.
Yale 15:6.
year 11:12, 20:9,
   20:16, 22:18,
   23:3.
years 11:23, 12:2,
   16:2, 22:7,
   22:21, 22:22,
   28:7, 44:13.
yields 71:14.
yourself 90:20,
   91:3.
.
.
< Z >.
zero 91:8.